| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| LEO D. PLOTKIN (SBN 101893)<br>LEVY, SMALL & LALLAS<br>A Partnership Including Professional Corporations<br>815 Moraga Drive<br>Los Angeles, California 90049-1633<br>Telephone: (310)471-3000<br>Facsimile: (310)471-7990<br>lplotkin@lsl-la.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* PNC Bank, National Association | |

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| In re:<br>PCA Aerostructures Company | CASE NO.: 8:16-bk-10738-SC<br>CHAPTER: 7 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY)** |
| Debtor(s). | DATE:<br>TIME:<br>COURTROOM: 5C |
| **Movant:** PNC Bank, National Association | |

1. **Hearing Location:**

   ☐ 255 East Temple Street, Los Angeles, CA 90012        ☒ 411 West Fourth Street, Santa Ana, CA 92701
   ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☐ 1415 State Street, Santa Barbara, CA 93101
   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (if any)(Responding Parties), their attorneys (if any), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay, as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4.  When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5.  If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6.  ☐  This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d).  If you wish to oppose this motion, you must file a written response to this motion with the court and serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the hearing and appear at the hearing of this motion.

7.  ☒  This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b).  If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

    a.  ☐  An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

    b.  ☐  An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

    c.  ☒  An application for order setting hearing on shortened notice and remains pending.  After the court has ruled on that application, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date:  03/04/2016

Levy, Small & Lallas
Printed name of law firm (if applicable)

Leo D. Plotkin
Printed name of individual Movant or attorney for Movant

*Leo D Plotkin*
Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 2                          F 4001-1.RFS.PP.MOTION

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO PERSONAL PROPERTY

1. Movant has a perfected security interest in the Property.

2. **The Property at Issue (Property):**

   a. ☐ Vehicle (*year, manufacturer, type, and model*):

      *Vehicle Identification Number:*
      *Location of vehicle (if known):*

   b. ☐ Equipment (*manufacturer, type, and characteristics*):

      *Serial number(s):*

      *Location (if known):*

   c. ☒ Other Personal Property (*type, identifying information, and location*):
      All work in process (WIP) located at Debtor's former Gardena facility and with outside processors relating to
      purchase orders for Fuji Heavy Industries Ltd. which purchase orders total $107,428

3. **Bankruptcy Case History:**

   a. ☒ A voluntary bankruptcy petition  ☐ An involuntary bankruptcy petition
      under chapter  ☒ 7  ☐ 11  ☐ 12  ☐ 13  was filed on (*date*) _02/25/2016_ .

   b. ☐ An order to convert this case to chapter  ☐ 7  ☐ 11  ☐ 12  ☐ 13  was entered on (*date*) _____ .

   c. ☐ Plan was confirmed on (*date*) _____ .

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:

      (1) ☒ Movant's interest in the Property is not adequately protected.

         (A) ☒ Movant's interest in the Property is not protected by an adequate equity cushion.

         (B) ☒ The fair market value of the Property is declining and payments are not being made to Movant
            sufficient to protect Movant's interest against that decline.

         (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's
            obligation to insure the collateral under the terms of Movant's contract with Debtor.

         (D) ☐ Other (*see attached continuation page*).

      (2) ☐ The bankruptcy case was filed in bad faith.

         (A) ☐ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case
            commencement documents.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

(B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

(C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

(D) ☐ Other bankruptcy cases were filed in which an interest in the Property was asserted.

(E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition.  Schedules and statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

(3) ☐ *(Chapter 12 or 13 cases only)* All payments on account of the Property are being made through the plan and plan payments have not been made to the chapter 12 or chapter 13 trustee for payments due ☐ postpetition preconfirmation  ☐ postpetition postconfirmation.

(4) ☐ The lease has matured, been rejected or deemed rejected by operation of law.

(5) ☐ The Debtor filed a statement of intention that indicates the Debtor intends to surrender the Property.

(6) ☐ Movant regained possession of the Property on *(date)* _____, which is ☐ prepetition ☐ postpetition.

(7) ☐ For other cause for relief from stay, see attached continuation page.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

5. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew that the bankruptcy petition had been filed and Movant would have been entitled to relief from stay to proceed with those actions,

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions,

c. ☐ Other *(specify)*:

6. ☒ **Evidence in Support of Motion: *(Declaration(s) must be signed under penalty of perjury and attached to this motion)***

a. The PERSONAL PROPERTY DECLARATION on page 6 of this motion.

b. ☒ Supplemental declaration(s).

c. ☐ The statements made by the Debtor under penalty of perjury concerning Movant's claims and the Property as set forth in the Debtor's case commencement documents.  Authenticated copies of the relevant portions of the case commencement documents are attached as Exhibit(s) _____.

d. ☐ Other:

7. **An optional Memorandum of Points and Authorities is attached to this motion.**

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                          Page 4                          F 4001-1.RFS.PP.MOTION

**Movant requests the following relief:**

1. Relief from the stay is granted under: ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to repossess and sell the Property.

3. ☐ Confirmation that there is no stay in effect.

4. ☐ The stay is annulled retroactive to the petition date. Any postpetition actions taken by Movant to enforce its remedies regarding the Property do not constitute a violation of the stay.

5. ☐ The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7. ☐ The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

8. ☐ The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

9. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days, so that no further stay shall arise in that case as to the Property.

10. ☐ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be
    ☐ without further notice, or  ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☐ If relief from stay is not granted, the court orders adequate protection.

12. ☒ See continuation page for other relief requested

Date: _03/04/2016_

Levy, Small & Lallas
Print name of law firm

Leo D. Plotkin
Print name of individual Movant or attorney for Movant

_Leo D. Plotkin_
Signature of individual Movant or attorney for Movant

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                    Page 5                    F 4001-1.RFS.PP.MOTION

**Continuation Page (as referenced on Page 5 of the Motion for Relief From Automatic Stay, Item No. 12)**

Movant is prepared to have the proceeds of the sale of the Property paid to the Trustee, subject to liens of Movant and other lien claimants, if any.

## PERSONAL PROPERTY DECLARATION

I, (name of declarant) Frederick Kiehne_____, declare:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the Property (specify):

    a.  ☐  I am the Movant.

    b.  ☒  I am employed by Movant as (title and capacity): Senior Vice President of PNC Bank (PNC Business Credit)

    c.  ☐  Other (specify):


2.  a.  ☒  I am one of the custodians of the books, records and files of Movant that pertain to loans, leases, or extensions of credit given to Debtor concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☐  Other (see attached):


3.  The Property is:

    a.  ☐  Vehicle (year, manufacturer, type, model and year):

        Vehicle Identification Number:
        Location of vehicle (if known):

    b.  ☐  Equipment (manufacturer, type, and characteristics):

        Serial number(s):
        Location (if known):

    c.  ☒  Other personal property (type, identifying information, and location):

        All work in process (WIP) located at Debtor's former Gardena facility and with outside processors relating to purchase orders for Fuji Heavy Industries Ltd. which purchase orders total $107,428

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4. The nature of Debtor's interest in the Property is:

    a. ☒ Sole owner

    b. ☐ Co-owner (specify):

    c. ☐ Lessee

    d. ☐ Other (specify):

    e. ☐ Debtor ☐ did ☐ did not   list the Property in the schedules filed in this case.

5. ☐ The lease matured or was rejected on (date) _____:

    a. ☐ rejected

        (1) ☐ by operation of law.

        (2) ☐ by order of the court.

    b. ☐ matured.

6. Movant has a perfected security interest in the Property.

    a. ☒ A true and correct copy of the promissory note or other document that evidences the debt owed by the Debtor to Movant is attached as Exhibit _1_____.

    b. ☐ The Property is a motor vehicle, boat, or other personal property for which a certificate of title is provided for by state law.  True and correct copies of the following items are attached to this motion:

        (1) ☐ Certificate of title ("pink slip") (Exhibit _____).

        (2) ☐ Vehicle or other lease agreement (Exhibit _____).

        (3) ☐ Security agreement (Exhibit _____).

        (4) ☐ Other evidence of a security interest (Exhibit _____).

    c. ☒ The Property is equipment, intangibles, or other personal property for which a certificate of title is not provided for by state law.  True and correct copies of the following items are attached to this motion:

        (1) ☒ Security agreement (Exhibit _2_____).

        (2) ☒ UCC-1 financing statement (Exhibit _3_____).

        (3) ☒ UCC financing statement search results (Exhibit _4_____).

        (4) ☐ Recorded or filed leases (Exhibit _____).

        (5) ☐ Other evidence of perfection of a security interest (Exhibit _____).

    d. ☐ The Property is consumer goods.  True and correct copies of the following items are attached to this motion:

        (1) ☐ Credit application (Exhibit _____).

        (2) ☐ Purchase agreement (Exhibit _____).

        (3) ☐ Account statement showing payments made and balance due (Exhibit _____).

        (4) ☐ Other evidence of perfection of a security interest (if necessary under state law) (Exhibit _____).

    e. ☒ Other liens against the Property are attached as Exhibit _4_____.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                              Page 7                              F 4001-1.RFS.PP.MOTION

7.  Status of Movant's debt:

   a.  The amount of the monthly payment: $ _____.

   b.  Number of payments that became due and were not tendered: ☐ prepetition  ☐ postpetition.

   c.  Total amount in arrears: $ _____.

   d.  Last payment received on (*date*): _____.

   e.  Future payments due by the anticipated hearing date (*if applicable*): _____
       An additional payment of $ _____ will come due on (*date*) _____, and on
       the _____ day of each month thereafter.  If the payment is not received by the _____
       day of the month, a late charge of $ _____ will be charged under the terms of the loan.

8.  ☐  Attached as Exhibit _____ is a true and correct copy of a POSTPETITION payment history that accurately
       reflects the dates and amounts of all payments made by the Debtor since the petition date.

9.  Amount of Movant's debt:

   a.  Principal:.................................................................................. $ 5,944,975.93 _____
   b.  Accrued interest:........................................................................ $ 45,862.06 _____
   c.  Costs (attorney's fees, late charges, other costs):................................. $ 200,000.00 _____
   d.  Advances (property taxes, insurance): .............................................. $ _____
   e.  TOTAL CLAIM as of  02/24/2016  :................................................... $ 6,190,837.99 _____

10. ☒  (*Chapter 7 and 11 cases only*) Valuation: The fair market value of the Property is: $ 43,000.00 _____.
       This valuation is based upon the following supporting evidence:

   a.  ☐  This is the value stated for property of this year, make, model, and general features in the reference guide
          most commonly used source for valuation data used by Movant in the ordinary course of its business for
          determining the value of this type of property.  True and correct copies of the relevant excerpts of the most
          recent edition of the reference guide are attached as Exhibit _____.

   b.  ☐  This is the value determined by an appraisal or other expert evaluation.  True and correct copies of the
          expert's report and/or declaration are attached as Exhibit _____.

   c.  ☐  The Debtor's admissions in the Debtor's schedules filed in the case.  True and correct copies of the relevant
          portions of the Debtor's schedules are attached as Exhibit _____.

   d.  ☒  Other basis for valuation (*specify*):

          The gross amount of the purchase orders is $107,428, as established in the Declaration of Satoshi
          Kawazoe, and WIP is approximately 40% completed, as represented by FHI and agreed by Movant
          based upon available information.

   ┌────────────────────────────────────────────────────────────────────────────────────────┐
   │ **NOTE:**  If valuation is contested, supplemental declarations providing additional foundation for the │
   │ opinions of value should be submitted.                                                   │
   └────────────────────────────────────────────────────────────────────────────────────────┘

11. Calculation of equity in Property:

   a.  ☒  **11 U.S.C. § 362(d)(1) - Equity Cushion:**

          I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s)
          senior to Movant's debt is $ 0.00 _____ and is _____% of the fair market value of the
          Property.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                   Page 8                          F 4001-1.RFS.PP.MOTION

b.  ☒  **11 U.S.C. § 362(d)(2)(A) - Equity**:

By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 10 above, I calculate that the Debtor's equity in the Property is $ 0.00                              .

12. ☒  The fair market value of the Property is declining because:
If the property is not sold to Fuji Heavy Industries Ltd. with the transaction completed on or before March 8, 2016, PNC is advised that the purchaser will no longer purchase the WIP.  As scrap metal, the alternative, the WIP is worth no more than 5 cents on the $$ or, at most, $7,000

13. ☐  The Debtor's intent is to surrender the Property.  A true and correct copy of the Debtor's statement of intentions is attached as Exhibit _____.

14. ☐  Movant regained possession of the Property on (date) _____, which is:  ☐ prepetition  ☐ postpetition.

15. ☐  (Chapter 12 or 13 cases only) Status of Movant's debt and other bankruptcy case information:

a.  The 341(a) meeting of creditors is currently scheduled for (or concluded on) (date) _____
A plan confirmation hearing is currently scheduled for (or concluded on) (date) _____
The plan was confirmed on (if applicable) (date) _____

b.  Postpetition preconfirmation payments due BUT REMAINING UNPAID after the filing of the case:

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

(See attachment for additional breakdown of information attached as Exhibit _____.)

c.  Postconfirmation payments due BUT REMAINING UNPAID after the plan confirmation date (if applicable):

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

d.  Postpetition advances or other charges due but unpaid:                              $
(For details of type and amount, see Exhibit _____)

e.  Attorneys' fees and costs:                              $
(For details of type and amount, see Exhibit _____)

f.  Less suspense account or partial paid balance:                              $ [                    ]

TOTAL POSTPETITION DELINQUENCY:                              $

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

g. ☐ The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent. The plan payment history is attached as Exhibit _____. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan (*attach LBR form F 4001-1.DEC.AGENT.TRUSTEE*).

16. ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with Debtor.

17. ☐ The bankruptcy case was filed in bad faith:

a. ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

b. ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

c. ☐ The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

d. ☐ Other (*specify*):


18. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

a. ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

b. ☐ Multiple bankruptcy cases affecting the Property:

(1) Case name: _____
   Chapter: _____    Case number: _____
   Date filed: _____    Date discharged: _____    Date dismissed: _____
   Relief from stay regarding the Property ☐ was  ☐ was not  granted.

(2) Case name: _____
   Chapter: _____    Case number: _____
   Date filed: _____    Date discharged: _____    Date dismissed: _____
   Relief from stay regarding the Property ☐ was  ☐ was not  granted.

(3) Case name: _____
   Chapter: _____    Case number: _____
   Date filed: _____    Date discharged: _____    Date dismissed: _____
   Relief from stay regarding the Property ☐ was  ☐ was not  granted.

☐ See attached continuation page for more information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, and defraud creditors.

19. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

a. ☐ These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

b. ☐ Although Movant knew the bankruptcy case was filed, Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 03/04/2016 | Frederick Kiehne | _Frederick Kiehne_ |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                            Page 11                            F 4001-1.RFS.PP.MOTION

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

815 Moraga Drive, Los Angeles, CA  90049-1633

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) __03/04/2016__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Mark S Horoupian (Counsel for Debtor)   mhoroupian@sulmeyerlaw.com
Jeffrey I Golden (Chapter 7 Trustee)   jgolden@lwgfllp.com
U.S. Trustee   ustpregion16.sa.ecf@usdoj.gov
Denice Gaucin   denice@evict123.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) __03/04/2016__, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

PCA Aerostructures Company,  Debtor
17800 Gothard Street
Huntington Beach, CA 92647

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) __03/04/2016__, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA FEDERAL EXPRESS
Hon. Scott C. Clarkson
411 West Fourth Street, Suite 5130/Courtroom 5C
Santa Ana, CA  92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| __03/04/2016__ | Heidi Petrilli | *(signature)* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 12                                    F 4001-1.RFS.PP.MOTION

**Continued from Item No. 2 of Proof of Service**
**(Service by U.S. Mail)**


**GemCap**
Attn:  David Ellis
24955 Pacific Coast Highway l Suite A202 l Malibu, California 90265
Direct: 310.593.9074
Mobile: 310.494.1437
Direct Fax: 310.919.3143
dellis@gemcapsolutions.com

**Vintage Capital Group, LLC**
Attn:  Tom Webster
11611 San Vicente Blvd.
10th Floor
Los Angeles, CA 90049
Office:        310-806-6595
Cell:        760-908-7441
email:    twebster@vintagecapitalgroup.com

**Metal Improvement Co., Inc.,**
Attn: Ken Smolko,
2588-A Industry Way
Lynwood, CA  90262.
Phone 323-563-1527
Fax 323-563-2105.
Ken.smolko@cwst.com

## SECOND AMENDED AND RESTATED REVOLVING CREDIT NOTE

$15,000,000.00                                        Date: November 26, 2012

Reference is made to that certain Amended and Restated Revolving Credit Note, dated April 20, 2011, executed by the undersigned maker in favor of the payee hereunder, in the original principal amount of Ten Million Dollars ($10,000,000.00) (the "First Restated Revolving Note"). The First Restated Revolving Note is hereby amended and restated in its entirety as set forth herein.

This Second Amended and Restated Revolving Credit Note is executed and delivered under and pursuant to the terms of that certain Revolving Credit, Term Loan and Security Agreement dated as of November 2, 2005 between PNC BANK, NATIONAL ASSOCIATION ("PNC"), the various financial institutions named therein or which hereafter become a party thereto (together with PNC, collectively, "Lenders") and PNC as agent for Lenders (in such capacity, "Agent"), on the one side, and PCA Aerospace, Inc. and PCA Aerostructures Company, on the other side (and with such Revolving Credit, Term Loan and Security Agreement as amended, restated, supplemented or otherwise modified from time to time, including without limitation, as amended by that certain Amendment to Loan and Security Agreement dated as of the date hereof being referred to herein as the "Loan Agreement"). Unless otherwise defined herein, capitalized terms defind in the Loan Agreement are used herein as therein defined.

FOR VALUE RECEIVED, Borrower hereby promises to pay to the order of PNC, at the office of Agent located at PNC Bank Center, Two Tower Center, 8th Floor, East Brunswick, New Jersey 08816 or at such other place as Agent may from time to time designate to Borrower in writing:

(i)     the principal sum of Fifteen Million Dollars ($15,000,000.00) or, if different from such amount, the unpaid principal balance of PNC's Commitment Percentage of the Revolving Advances as may be due and owing under the Loan Agreement, payable in accordance with the provisions of the Loan Agreement, subject to acceleration upon the occurrence of an Event of Default under the Loan Agreement or earlier termination of the Loan Agreement pursuant to the terms thereof; and

(ii)     interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the applicable Revolving Interest Rate in accordance with the provisions of the Loan Agreement. In no event, however, shall interest exceed the maximum interest rate permitted by law. Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is the Revolving Credit Note referred to in the Loan Agreement and is secured, inter alia, by the liens granted pursuant to the Loan Agreement and the Other Documents, is entitled to the benefits of the Loan Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note is subject to mandatory prepayment and may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the Loan Agreement.

Exhibit "1"

If an Event of Default under Section 10.7 or 10.8 of the Loan Agreement shall occur, then this Note shall immediately become due and payable, without notice, together with reasonable attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof. If any other Event of Default shall occur under the Loan Agreement or any of the Loan Documents, which is not cured within any applicable grace period, then this Note may, as provided in the Loan Agreement, be declared to be immediately due and payable, without notice, together with reasonable attorneys' fees, if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the State of New York.

Borrower expressly waives any presentment, demand, protest, notice of protest, or notice of any kind except as expressly provided in the Loan Agreement.

**PCA Aerospace, Inc.,**
a California corporation

By: _____
Name: GREGORY RUFFALO
Title: CEO

**PCA Aerostructures Company,**
a Delaware corporation

By: _____
Name: GREGORY RUFFALO
Title: CEO

> VIVI GOENAWAN
> Commission # 1894893
> Notary Public - California
> Orange County
> My Comm. Expires Jul 9, 2014

*Please see attachment for Notary Acknowledgment.*

STATE OF CALIFORNIA          )
                            ) ss.
COUNTY OF ~~LOS ANGELES~~    )
         ORANGE

On  Nov. 27        ,   2012,   before   me,   the   undersigned,
_____Vivi   Goenawan_____, a Notary Public in and for said
State, personally appeared ___Gregory Thomas Ruppalo___, personally known to
me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in
his/~~her/their~~ authorized capacity(~~ies~~), and that by his/~~her/their~~ signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

VIVI GOENAWAN
Commission # 1894893
Notary Public - California
Orange County
My Comm. Expires Jul 9, 2014

Signature_____

(Seal)


STATE OF CALIFORNIA          )
                            ) ss.
COUNTY OF LOS ANGELES        )

On  _____,   2012,   before   me,   the   undersigned,
_____, a Notary Public in and for said State,
personally appeared _____, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature_____

(Seal)

**Exhibit "1"**

# REVOLVING CREDIT, TERM LOAN

## AND

## SECURITY AGREEMENT

## PNC BANK, NATIONAL ASSOCIATION

## (AS LENDER AND AS AGENT)

## WITH

## PCA AEROSPACE, INC.

## AND

## PCA AEROSTRUCTURES COMPANY

## (BORROWERS)

### November 2, 2005

Exhibit "2"

## TABLE OF CONTENTS

I    DEFINITIONS....................................................................................................... 1
    1.1.    Accounting Terms. ................................................................................... 1
    1.2.    General Terms. ........................................................................................ 1
    1.3.    Uniform Commercial Code Terms. ........................................................ 20
    1.4.    Certain Matters of Construction. ........................................................... 20

II    ADVANCES, PAYMENTS. ................................................................................ 21
    2.1.    Revolving Advances. .............................................................................. 21
    2.2.    Procedure for Revolving Advances Borrowing. ................................... 23
    2.3.    Disbursement of Advance Proceeds. ..................................................... 25
    2.4.    Term Loan. ............................................................................................. 25
    2.5.    Maximum Advances. ............................................................................. 25
    2.6.    Repayment of Advances. ....................................................................... 25
    2.7.    Repayment of Excess Advances. ........................................................... 26
    2.8.    Statement of Account. ........................................................................... 26
    2.9.    Letters of Credit. ................................................................................... 26
    2.10.   Issuance of Letters of Credit. ................................................................ 27
    2.11.   Requirements For Issuance of Letters of Credit. ................................... 27
    2.12.   Disbursements, Reimbursement. ........................................................... 27
    2.13.   Repayment of Participation Advances. .................................................. 29
    2.14.   Documentation. ...................................................................................... 29
    2.15.   Determination to Honor Drawing Request. ........................................... 29
    2.16.   Nature of Participation and Reimbursement Obligations. .................... 29
    2.17.   Indemnity. .............................................................................................. 31
    2.18.   Liability for Acts and Omissions. .......................................................... 31
    2.19.   Additional Payments. ............................................................................ 32
    2.20.   Manner of Borrowing and Payment. ..................................................... 33
    2.21.   Mandatory Prepayments. ....................................................................... 34
    2.22.   Use of Proceeds. .................................................................................... 34
    2.23.   Defaulting Lender. ................................................................................. 35

III    INTEREST AND FEES. ..................................................................................... 36
    3.1.    Interest. ................................................................................................... 36
    3.2.    Letter of Credit Fees. ............................................................................. 37
    3.3.    Closing Fee and Facility Fee. ................................................................ 38
    3.4.    Collateral Evaluation Fee, Collateral Monitoring Fee. ......................... 38
    3.5.    Computation of Interest and Fees. ......................................................... 38
    3.6.    Maximum Charges. ............................................................................... 38
    3.7.    Increased Costs. ..................................................................................... 39
    3.8.    Basis For Determining Interest Rate Inadequate or Unfair. ................. 39
    3.9.    Capital Adequacy. ................................................................................. 40
    3.10.   Gross Up for Taxes. ............................................................................... 41
    3.11.   Withholding Tax Exemption. ................................................................. 41

IV    COLLATERAL: GENERAL TERMS.................................................................. 42
    4.1.    Security Interest in the Collateral. ......................................................... 42

|       |                                                                 |     |
|-------|-----------------------------------------------------------------|-----|
| 4.2.  | Perfection of Security Interest.                                | 42  |
| 4.3.  | Disposition of Collateral.                                      | 43  |
| 4.4.  | Preservation of Collateral.                                     | 43  |
| 4.5.  | Ownership of Collateral.                                        | 43  |
| 4.6.  | Defense of Agent's and Lenders' Interests.                      | 44  |
| 4.7.  | Books and Records.                                             | 44  |
| 4.8.  | Financial Disclosure.                                          | 45  |
| 4.9.  | Compliance with Laws.                                          | 45  |
| 4.10. | Inspection of Premises.                                        | 45  |
| 4.11. | Insurance.                                                     | 45  |
| 4.12. | Failure to Pay Insurance.                                      | 46  |
| 4.13. | Payment of Taxes.                                              | 47  |
| 4.14. | Payment of Leasehold Obligations.                             | 47  |
| 4.15. | Receivables.                                                  | 47  |
| 4.16. | Inventory.                                                    | 49  |
| 4.17. | Maintenance of Equipment.                                     | 49  |
| 4.18. | Exculpation of Liability.                                     | 49  |
| 4.19. | Environmental Matters.                                        | 50  |
| 4.20. | Financing Statements.                                         | 52  |

| V     | REPRESENTATIONS AND WARRANTIES.                               | 52  |
|-------|--------------------------------------------------------------|-----|
| 5.1.  | Authority.                                                   | 52  |
| 5.2.  | Formation and Qualification.                                | 52  |
| 5.3.  | Survival of Representations and Warranties.                 | 53  |
| 5.4.  | Tax Returns.                                                 | 53  |
| 5.5.  | Financial Statements.                                        | 53  |
| 5.6.  | Entity Names.                                                | 54  |
| 5.7.  | O.S.H.A. and Environmental Compliance.                      | 54  |
| 5.8.  | Solvency; No Litigation, Violation, Indebtedness or Default. | 54  |
| 5.9.  | Patents, Trademarks, Copyrights and Licenses.               | 55  |
| 5.10. | Licenses and Permits.                                        | 56  |
| 5.11. | Default of Indebtedness.                                     | 56  |
| 5.12. | No Default.                                                  | 56  |
| 5.13. | No Burdensome Restrictions.                                  | 56  |
| 5.14. | No Labor Disputes.                                           | 56  |
| 5.15. | Margin Regulations.                                          | 56  |
| 5.16. | Investment Company Act.                                      | 57  |
| 5.17. | Disclosure.                                                  | 57  |
| 5.18. | Delivery of Subordinated Loan Documentation.                | 57  |
| 5.19. | Swaps.                                                       | 57  |
| 5.20. | Conflicting Agreements.                                      | 57  |
| 5.21. | Application of Certain Laws and Regulations.                | 57  |
| 5.22. | Business and Property of Borrowers.                         | 57  |
| 5.23. | Section 20 Subsidiaries.                                     | 58  |
| 5.24. | Anti-Terrorism Laws.                                         | 58  |
| 5.25. | Trading with the Enemy.                                      | 59  |
| 5.26. | Federal Securities Laws.                                     | 59  |

ii

VI      AFFIRMATIVE COVENANTS. ...................................................................... 59
        6.1.    Payment of Fees. ........................................................................ 59
        6.2.    Conduct of Business and Maintenance of Existence and Assets. ........... 59
        6.3.    Violations. ................................................................................. 59
        6.4.    Government Receivables. .............................................................. 59
        6.5.    Financial Covenants. ................................................................... 59
        6.6.    Execution of Supplemental Instruments. .......................................... 60
        6.7.    Payment of Indebtedness. ............................................................. 60
        6.8.    Standards of Financial Statements. ................................................. 60
        6.9.    Federal Securities Laws. .............................................................. 60

VII     NEGATIVE COVENANTS. ....................................................................... 60
        7.1.    Merger, Consolidation, Acquisition and Sale of Assets. ..................... 60
        7.2.    Creation of Liens. ....................................................................... 61
        7.3.    Guarantees. ............................................................................... 61
        7.4.    Investments. .............................................................................. 61
        7.5.    Loans. ...................................................................................... 61
        7.6.    Capital Expenditures. .................................................................. 61
        7.7.    Dividends. ................................................................................ 61
        7.8.    Indebtedness. ............................................................................ 61
        7.9.    Nature of Business. ..................................................................... 62
        7.10.   Transactions with Affiliates. ......................................................... 62
        7.11.   Leases. ..................................................................................... 62
        7.12.   Subsidiaries. ............................................................................. 62
        7.13.   Fiscal Year and Accounting Changes. ............................................. 62
        7.14.   Pledge of Credit. ........................................................................ 62
        7.15.   Amendment of Articles of Incorporation, By-Laws. ........................... 62
        7.16.   Compliance with ERISA. .............................................................. 62
        7.17.   Prepayment of Indebtedness. ......................................................... 63
        7.18.   Anti-Terrorism Laws. .................................................................. 63
        7.19.   [intentionally omitted] ................................................................. 63
        7.20.   Trading with the Enemy Act. ......................................................... 63
        7.21.   Subordinated Debt. ..................................................................... 63
        7.22.   Other Agreements. ...................................................................... 64

VIII    CONDITIONS PRECEDENT. ..................................................................... 64
        8.1.    Conditions to Initial Advances. ...................................................... 64
        8.2.    Conditions to Each Advance. ......................................................... 67

IX      INFORMATION AS TO BORROWERS. ........................................................ 67
        9.1.    Disclosure of Material Matters. ...................................................... 67
        9.2.    Schedules. ................................................................................ 68
        9.3.    Environmental Reports. ................................................................ 68
        9.4.    Litigation. ................................................................................. 68
        9.5.    Material Occurrences. .................................................................. 68
        9.6.    Government Receivables. .............................................................. 69
        9.7.    Annual Financial Statements. ........................................................ 69
        9.8.    [intentionally omitted] ................................................................. 69

iii

**Exhibit "2"**

|  |  | 9.9. | Monthly Financial Statements. | 69 |
|  |  | 9.10. | Other Reports. | 69 |
|  |  | 9.11. | Additional Information. | 70 |
|  |  | 9.12. | Projected Operating Budget. | 70 |
|  |  | 9.13. | Variances From Operating Budget. | 70 |
|  |  | 9.14. | Notice of Suits, Adverse Events. | 70 |
|  |  | 9.15. | ERISA Notices and Requests. | 70 |
|  |  | 9.16. | Additional Documents. | 71 |
| X | EVENTS OF DEFAULT. | | | 71 |
|  |  | 10.1. | Nonpayment. | 71 |
|  |  | 10.2. | Breach of Representation. | 71 |
|  |  | 10.3. | Financial Information. | 71 |
|  |  | 10.4. | Judicial Actions. | 72 |
|  |  | 10.5. | Noncompliance. | 72 |
|  |  | 10.6. | Judgments. | 72 |
|  |  | 10.7. | Bankruptcy. | 72 |
|  |  | 10.8. | Inability to Pay. | 72 |
|  |  | 10.9. | Affiliate Bankruptcy. | 72 |
|  |  | 10.10. | Material Adverse Effect. | 73 |
|  |  | 10.11. | Lien Priority. | 73 |
|  |  | 10.12. | Subordinated Loan Default. | 73 |
|  |  | 10.13. | Cross Default. | 73 |
|  |  | 10.14. | [intentionally omitted] | 73 |
|  |  | 10.15. | Change of Ownership. | 73 |
|  |  | 10.16. | Invalidity. | 73 |
|  |  | 10.17. | Licenses. | 73 |
|  |  | 10.18. | Seizures. | 73 |
|  |  | 10.19. | Operations. | 73 |
|  |  | 10.20. | Pension Plans. | 74 |
| XI | LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. | | | 74 |
|  |  | 11.1. | Rights and Remedies. | 74 |
|  |  | 11.2. | Agent's Discretion. | 76 |
|  |  | 11.3. | Setoff. | 76 |
|  |  | 11.4. | Rights and Remedies not Exclusive. | 76 |
|  |  | 11.5. | Allocation of Payments After Event of Default. | 76 |
| XII | WAIVERS AND JUDICIAL PROCEEDINGS. | | | 77 |
|  |  | 12.1. | Waiver of Notice. | 77 |
|  |  | 12.2. | Delay. | 77 |
|  |  | 12.3. | Jury Waiver. | 77 |
| XIII | EFFECTIVE DATE AND TERMINATION. | | | 77 |
|  |  | 13.1. | Term. | 78 |
|  |  | 13.2. | Termination. | 78 |
| XIV | REGARDING AGENT. | | | 78 |
|  |  | 14.1. | Appointment. | 78 |

iv

**Exhibit "2"**

|        | 14.2.  | Nature of Duties. | 79 |
|        | 14.3.  | Lack of Reliance on Agent and Resignation. | 79 |
|        | 14.4.  | Certain Rights of Agent. | 80 |
|        | 14.5.  | Reliance. | 80 |
|        | 14.6.  | Notice of Default. | 80 |
|        | 14.7.  | Indemnification. | 80 |
|        | 14.8.  | Agent in its Individual Capacity. | 81 |
|        | 14.9.  | Delivery of Documents. | 81 |
|        | 14.10. | Borrowers' Undertaking to Agent. | 81 |
|        | 14.11. | No Reliance on Agent's Customer Identification Program. | 81 |
|        | 14.12. | Other Agreements. | 81 |
| XV     | BORROWING AGENCY. | | 82 |
|        | 15.1.  | Borrowing Agency Provisions. | 82 |
|        | 15.2.  | Waiver of Subrogation. | 82 |
| XVI    | MISCELLANEOUS. | | 82 |
|        | 16.1.  | Governing Law. | 82 |
|        | 16.2.  | Entire Understanding. | 83 |
|        | 16.3.  | Successors and Assigns; Participations; New Lenders. | 85 |
|        | 16.4.  | Application of Payments. | 87 |
|        | 16.5.  | Indemnity. | 87 |
|        | 16.6.  | Notice. | 87 |
|        | 16.7.  | Survival. | 90 |
|        | 16.8.  | Severability. | 90 |
|        | 16.9.  | Expenses. | 90 |
|        | 16.10. | Injunctive Relief. | 90 |
|        | 16.11. | Consequential Damages. | 90 |
|        | 16.12. | Captions. | 90 |
|        | 16.13. | Counterparts; Facsimile Signatures. | 90 |
|        | 16.14. | Construction. | 91 |
|        | 16.15. | Confidentiality; Sharing Information. | 91 |
|        | 16.16. | Publicity. | 91 |
|        | 16.17. | Certifications From Banks and Participants; US PATRIOT Act. | 91 |

**Exhibit "2"**

REVOLVING CREDIT, TERM LOAN
AND
SECURITY AGREEMENT

Revolving Credit, Term Loan and Security Agreement dated as of November 2, 2005 among PCA Aerospace, Inc., a corporation organized under the laws of the State of California ("Parent"), PCA Aerostructures Company, a corporation organized under the laws of the State of Delaware ("Sub") (Parent and Sub, each a "Borrower", and collectively "Borrowers"), the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and individually a "Lender") and PNC BANK, NATIONAL ASSOCIATION ("PNC"), as agent for Lenders (PNC, in such capacity, the "Agent").

IN CONSIDERATION of the mutual covenants and undertakings herein contained, Borrowers, Lenders and Agent hereby agree as follows:

I    DEFINITIONS.

1.1.    Accounting Terms.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP.

1.2.    General Terms.  For purposes of this Agreement the following terms shall have the following meanings:

"Accountants" shall have the meaning set forth in Section 9.7 hereof.

"Advance Rates " shall mean, collectively, the Receivables Advance Rate and the Inventory Advance Rate.

"Advances" shall mean and include the Revolving Advances, Letters of Credit, as well as the Term Loan.

"Affiliate" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

Exhibit "2"

"Agreement" shall mean this Revolving Credit, Term Loan and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the higher of (i) the Base Rate in effect on such day and (ii) the Federal Funds Open Rate in effect on such day plus 1/2 of 1%.

"Anti-Terrorism Laws" shall mean any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Applicable Period" is defined in Section 6.5(b).

"Authority" shall have the meaning set forth in Section 4.19(d).

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate.  This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Blocked Accounts" shall have the meaning set forth in Section 4.15(h).

"Blocked Account Bank" shall have the meaning set forth in Section 4.15(h).

"Blocked Person" shall have the meaning set forth in Section 5.24(b) hereof.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a Consolidated Basis" shall mean the consolidation in accordance with GAAP of the accounts or other items of the Borrowers and their respective Subsidiaries.

"Borrowers' Account" shall have the meaning set forth in Section 2.8.

"Borrowing Agent" shall mean Parent.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2A duly executed by the President, Chief Financial Officer or Controller of the Borrowing

**Exhibit "2"**

and delivered to the Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey and, if the applicable Business Day relates to any Eurodollar Rate Loans, such day must also be a day on which dealings are carried on in the London interbank market.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Material Officer" shall mean any of the following persons ceasing to hold the offices of Borrower presently held by them, and such person is not replaced with a person acceptable to Agent in its good faith business judgment within twenty days thereafter: Peter B. Webber, President; George Robinson, Senior Vice President; David L. Patterson, Executive Vice President and Chief Financial Officer.

"Change of Ownership" shall mean (a) the Webber Family Trust shall own less than 51% of the total Equity Interests of Parent (including for the purposes of the calculation of percentage ownership, any Equity Interests into which any Equity Interests of Parent held by any Person are convertible or for which any such Equity Interests of Parent or of any other Person may be exchanged and any Equity Interests issuable to any Person upon exercise of any warrants, options or similar rights which may at the time of calculation be held by such Person) or (b) any merger, consolidation or sale of substantially all of the property or assets of any Borrower (except for the merger or consolidation of one Borrower into another Borrower or the sale of substantially all of the property or assets of one Borrower to another Borrower), or (c) Parent shall cease to own 100% of the Equity Interests of Sub, or (d) Vintage shall cease to hold Equity Interests and/or warrants to purchase Equity Interests of Parent in an amount not less than 13% of the total Equity Interests of Parent or shall cease to hold any or all of the Vintage Subordinated Debt.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other

authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean November 2, 2005 or such other date as may be agreed to by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include:

(a)      all Receivables;

(b)      all Equipment;

(c)      all General Intangibles;

(d)      all Inventory;

(e)      all Investment Property;

(f)      all of each Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located, (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of each Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(g)      all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), and (f) of this Paragraph; and

4

(h)    all proceeds and products of (a), (b), (c), (d), (e), and (f) in whatever form, including, but not limited to:  cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Commitment Percentage" of any Lender shall mean the percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by a Lender pursuant to Section 16.3(b) hereof.

"Commitment Transfer Supplement" shall mean a document in the form of Exhibit 16.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

"Compliance Certificate" shall mean a compliance certificate to be signed by the Chief Financial Officer or Controller of Borrowing Agent, in the form of Exhibit 1.2B, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such default and, such certificate shall have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 6.5, 7.4, 7.5, 7.6, 7.7, 7.8 and 7.11.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, the Other Documents, the Subordinated Loan Documentation including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Borrower that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Contract Rate" shall mean, as applicable, the Revolving Interest Rate or the Term Loan Rate.

"Controlled Group" shall mean, at any time, each Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other

5

arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall have the meaning set forth in Section 2.23(a) hereof.

"Depository Accounts" shall have the meaning set forth in Section 4.15(h) hereof.

"Documents" shall have the meaning set forth in Section 8.1(c) hereof.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Domestic Rate Loan" shall mean any Advance that bears interest based upon the Alternate Base Rate.

"Drawing Date" shall have the meaning set forth in Section 2.12(b) hereof.

"Early Termination Date" shall have the meaning set forth in Section 13.1 hereof.

"Earnings Before Interest and Taxes" shall mean for any period the sum of (i) net income (or loss) of Borrowers on a Consolidated Basis for such period (excluding extraordinary gains), plus (ii) all interest expense of Borrowers on a Consolidated Basis for such period, plus (iii) all charges against income of Borrowers on a Consolidated Basis for such period for federal, state and local taxes actually paid.

"EBITDA" shall mean for any period the sum of (i) Earnings Before Interest and Taxes for such period plus (ii) depreciation expenses for such period, plus (iii) amortization expenses for such period.

"Eligible Inventory" shall mean and include Inventory consisting of finished goods and raw materials, excluding work in process, with respect to each Borrower, which is not, in Agent's opinion, obsolete, slow moving or unmerchantable and which Agent, in its sole discretion (exercised in good faith), shall not deem ineligible Inventory, based on such considerations as Agent may from time to time deem appropriate including whether the Inventory is subject to a perfected, first priority security interest in favor of Agent and no other Lien (other than Permitted Encumbrances which do not have priority over the security interest of Agent).  In addition, Inventory shall not be Eligible Inventory if it (i) does not conform to all standards imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof, (ii) is in transit, (iii) is located outside the continental United States or at a location that is not otherwise in compliance with this Agreement, (iv) constitutes Consigned Inventory, (v) is the subject of an Intellectual Property Claim; (vi) is subject to a License Agreement or other agreement that limits, conditions or restricts any Borrower's or Agent's right to sell or otherwise dispose of such Inventory, unless Agent is a party to a Licensor/Agent Agreement with the Licensor under such License Agreement; (vii) is situated at a location not

6

owned by a Borrower unless the owner or occupier of such location has executed in favor of Agent a Lien Waiver Agreement; or (viii) does not have all necessary or required governmental and other certifications.

"Eligible Receivables" shall mean and include with respect to each Borrower, each Receivable of such Borrower arising in the Ordinary Course of Business and which Agent, in its sole credit judgment, shall deem to be an Eligible Receivable, based on such considerations as Agent may from time to time deem appropriate. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

(a)    it arises out of a sale made by any Borrower to an Affiliate of any Borrower or to a Person controlled by an Affiliate of any Borrower;

(b)    it is due or unpaid more than ninety (90) days after the original invoice date;

(c)    fifty percent (50%) or more of the Receivables from such Customer are not deemed Eligible Receivables hereunder;

(d)    any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)    the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)    the sale is to a Customer outside the continental United States of America, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its sole discretion;

(g)    the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)    Agent believes, in its sole judgment (exercised in good faith), that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

Exhibit "2"

(i)    the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances;

(j)    the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by the applicable Borrower and accepted by the Customer or the Receivable otherwise does not represent a final sale;

(k)    the Receivables of the Customer exceed a credit limit determined by Agent, in its sole discretion (exercised in good faith), to the extent such Receivable exceeds such limit;

(l)    the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim, the Customer is also a creditor or supplier of a Borrower or the Receivable is contingent in any respect or for any reason;

(m)    the applicable Borrower has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)    any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed;

(o)    such Receivable is not payable to a Borrower; or

(p)    such Receivable is not otherwise satisfactory to Agent as determined in good faith by Agent in the exercise of its discretion in a reasonable manner; or

Receivables owing from one Customer will not be deemed Eligible Receivables to the extent they exceed 20% of the total Receivables outstanding; provided that said percentage shall be 50% in the case of Lockheed Martin and 35% in the case of Boeing Company.

"Environmental Complaint" shall have the meaning set forth in Section 4.19(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including

8

all equipment, machinery, apparatus, motor vehicles, fittings, furniture, furnishings, fixtures, parts, accessories and all replacements and substitutions therefor or accessions thereto.

"Equity Interests " of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"Eurodollar Rate" shall mean for any Eurodollar Rate Loan for the then current Interest Period relating thereto the interest rate per annum determined by Agent by dividing (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) (i) the rate of interest determined by Agent in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the average of the London interbank offered rates for U.S. Dollars quoted by the British Bankers' Association as set forth on Moneyline Telerate (or appropriate successor or, if British Banker's Association or its successor ceases to provide such quotes, a comparable replacement determined by Agent) display page 3750 (or such other display page on the Moneyline Telerate system as may replace display page 3750) two (2) Business Days prior to the first day of such Interest Period for an amount comparable to such Eurodollar Rate Loan and having a borrowing date and a maturity comparable to such Interest Period by (ii) a number equal to 1.00 minus the Reserve Percentage. The Eurodollar Rate may also be expressed by the following formula:

$$\text{Eurodollar Rate} = \frac{\text{Average of London interbank offered rates quoted by BBA as shown on Moneyline Telerate Service display page 3750 or appropriate successor}}{1.00 - \text{Reserve Percentage}}$$

The Eurodollar Rate shall be adjusted with respect to any Eurodollar Rate Loan that is outstanding on the effective date of any change in the Reserve Percentage as of such effective date. The Agent shall give prompt notice to the Borrowing Agent of the Eurodollar Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

"Eurodollar Rate Loan" shall mean an Advance at any time that bears interest based on the Eurodollar Rate.

"Event of Default" shall have the meaning set forth in Article X hereof.

"Exchange Act" shall have the mean the Securities Exchange Act of 1934, as amended.

9

**Exhibit "2"**

"Executive Order No. 13224" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" shall mean the rate per annum determined by the Agent in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the "open" rate for federal funds transactions as of the opening of business for federal funds transactions among members of the Federal Reserve System arranged by federal funds brokers on such day, as quoted by Garvin Guybutler Corporation, any successor entity thereto, or any other broker selected by the Agent, as set forth on the applicable Telerate display page; provided, however; that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day, or if no such rate shall be quoted by a Federal funds broker at such time, such other rate as determined by the Agent in accordance with its usual procedures.

"Fixed Charge Coverage Ratio   " shall mean and include, with respect to any fiscal period, the ratio of (a) EBITDA plus one-time moving costs incurred by Borrower related to the consolidation of the Borrower's facilities prior to June 30, 2006, but only to the extent of up to a maximum of $2,000,000, minus non-financed capitalized expenditures made during the period, minus cash taxes paid during such period, TO (b) all Senior Debt Payments plus all Subordinated Debt Payments made during such period (other than principal payments made on the Banner Subordinated Debt (which shall only be made to the extent permitted herein and in the Subordination Agreement)).

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"Formula Amount" shall have the meaning set forth in Section 2.1(a).

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired, including all payment intangibles, all choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control

procedures, trademarks, trademark applications, service marks, trade secrets, goodwill, copyrights, design rights, software, computer information, source codes, codes, records and updates, registrations, licenses, franchises, customer lists, tax refunds, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables), all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Acts" shall have the meaning set forth in Section 2.17.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean any Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guarantor Security Agreement" shall mean any Security Agreement executed by any Guarantor in favor of Agent securing the Guaranty of such Guarantor.

"Guaranty" shall mean any guaranty of the obligations of Borrowers executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders.

"Hazardous Discharge" shall have the meaning set forth in Section 4.19(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedge Liabilities" shall have the meaning provided in the definition of "Lender-Provided Interest Rate Hedge".

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred

Exhibit "2"

by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"Intellectual Property Claim" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that any Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Interest Period" shall mean the period provided for any Eurodollar Rate Loan pursuant to Section 2.2(b).

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, adjustable strike cap, adjustable strike corridor or similar agreements entered into by any Borrower or its Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

"Inventory" shall mean and include as to each Borrower all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Investment Property" shall mean and include as to each Borrower, all of such Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"Issuer" shall mean any Person who issues a Letter of Credit and/or accepts a draft pursuant to the terms hereof.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which the Agent confirms meets the following requirements: such Interest Rate Hedge (i) is documented in a standard International Swap Dealer Association Agreement, (ii) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner, and (iii) is entered into for hedging (rather than speculative) purposes.  The liabilities of any Borrower to the provider of any Lender-Provided Interest Rate Hedge (the "Hedge Liabilities") shall be "Obligations" hereunder and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d).

"Letter of Credit Sublimit" shall mean $2,000,000.

"Letters of Credit" shall have the meaning set forth in Section 2.9.

"License Agreement" shall mean any agreement between any Borrower and a Licensor pursuant to which such Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Borrower or otherwise in connection with such Borrower's business operations.

"Licensor" shall mean any Person from whom any Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Borrower's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Borrower's business operations.

"Licensor/Agent Agreement" shall mean an agreement between Agent and a Licensor, in form and content satisfactory to Agent, by which Agent is given the unqualified right, vis-a-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Borrower's default under any License Agreement with such Licensor.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Agent from time to time to enter upon the

13

premises to inspect or remove the Collateral from such premises or to use such premises to store or dispose of such Inventory.

"Loan Documents" shall mean collectively this Loan Agreement and the Other Documents.

"Material Adverse Effect" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business, properties or prospects of any Borrower, (b) any Borrower's ability to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (c) the value of the Collateral, or Agent's Liens on the Collateral or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents.

"Maximum Face Amount" shall mean, with respect to any outstanding Letter of Credit, the face amount of such Letter of Credit including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Revolving Advance Amount" shall mean $5,000,000.

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Minimum Tangible Net Worth" is defined in Section 6.5(a).

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"Multiple Employer Plan" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"New Gantry" is defined in Section 2.22(b)(1).

"Note" shall mean collectively, the Term Note, and the Revolving Credit Note.

"Obligations" shall mean and include any and all loans, advances, debts, liabilities, obligations, covenants and duties owing by any Borrower to Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent or any Lender of any kind or nature, present or future (including any interest or other amounts accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to any Borrower, whether or not a claim for post-filing or post-petition interest or other amounts is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, (including this Agreement and the Other Documents) whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar

14

agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of any Borrower's Indebtedness and/or liabilities under this Agreement, the Other Documents or under any other agreement between Agent or Lenders and any Borrower and any amendments, extensions, renewals or increases and all costs and expenses of Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of any Borrower to Agent or Lenders to perform acts or refrain from taking any action.

"Ordinary Course of Business" shall mean with respect to any Borrower, the ordinary course of such Borrower's business as conducted on the Closing Date.

"Other Documents" shall mean the Note, the Questionnaire, any Guaranty, any Guarantor Security Agreement, any Lender-Provided Interest Rate Hedge and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Out-of-Formula Loans" shall have the meaning set forth in Section 15.2(b).

"Parent Entity" of any Person shall mean a corporation or other entity owning, directly or indirectly at least 50% of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors of the Person, or other Persons performing similar functions for any such Person.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"Participation Advance" shall have the meaning set forth in Section 2.12(d).

"Participation Commitment" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"Payment Office" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

15

**Exhibit "2"**

"Pension Benefit Plan" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"Permitted Encumbrances" shall mean (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrowers; provided, that, the Lien shall have no effect on the priority of the Liens in favor of Agent or the value of the assets in which Agent has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) Liens disclosed in the financial statements referred to in Section 5.5, the existence of which Agent has consented to in writing; (d) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (e) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (f) Liens arising by virtue of the rendition, entry or issuance against any Borrower or any Subsidiary, or any property of any Borrower or any Subsidiary, of any judgment, writ, order, or decree for so long as each such Lien (a) is in existence for less than 30 consecutive days after it first arises or is being Properly Contested and (b) is at all times junior in priority to any Liens in favor of Agent; (g) mechanics', workers', materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not due or which are being contested in good faith by the applicable Borrower; (h) Liens placed upon fixed assets hereafter acquired to secure a portion of the purchase price thereof, provided that (x) any such lien shall not encumber any other property of any Borrower and (y) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 7.6; and (i) Liens disclosed on Schedule 1.2.

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan), maintained for employees of any Borrower or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Pro Forma Financial Statements" shall have the meaning set forth in Section 5.5 hereof.

"Properly Contested" shall mean, in the case of any Indebtedness of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Projections" shall have the meaning set forth in Section 5.5(b) hereof.

"Purchasing Lender" shall have the meaning set forth in Section 16.3 hereof.

"Questionnaire" shall mean the Representations and Warranties dated October 17, 2005 executed and delivered by Parent to Agent.

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" is defined in Section 4.19(a).

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to such Borrower by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, credit card receivables and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(i) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b) hereof.

"Release" shall have the meaning set forth in Section 5.7(c)(i) hereof.

"Reportable Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

17

"Required Lenders" shall mean Lenders holding at least 66-2/3% of the Advances and, if no Advances are outstanding, shall mean Lenders holding 66-2/3% of the Commitment Percentages; provided, however, if there are fewer than three (3) Lenders, Required Lenders shall mean all Lenders.

"Reserve Percentage" shall mean as of any day the maximum percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including supplemental, marginal and emergency reserve requirements) with respect to eurocurrency funding (currently referred to as "Eurocurrency Liabilities").

"Revolving Advances" shall mean Advances made other than Letters of Credit, and the Term Loan.

"Revolving Credit Note" shall mean the promissory note referred to in Section 2.1(a) hereof.

"Revolving Interest Rate" shall mean an interest rate per annum equal to (a) the Alternate Base Rate with respect to Domestic Rate Loans, and (b) the sum of the Eurodollar Rate plus two and one-half percent (2.50%)with respect to Eurodollar Rate Loans.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Section 20 Subsidiary" shall mean the Subsidiary of the bank holding company controlling PNC, which Subsidiary has been granted authority by the Federal Reserve Board to underwrite and deal in certain Ineligible Securities.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Senior Debt Payments" shall mean and include all cash actually expended by any Borrower to make (a) interest payments on any Advances hereunder, plus (b) scheduled principal payments on the Term Loan, plus (c) payments for all fees, commissions and charges set forth herein and with respect to any Advances, plus (d) capitalized lease payments, plus (e) payments with respect to any other Indebtedness for borrowed money (other than Subordinated Debt).

"Settlement Date" shall mean the Closing Date and thereafter Wednesday or Thursday of each week or more frequently if Agent deems appropriate unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"Subordinated Debt" shall mean (i) "Subordinated Indebtedness" (the "Banner Subordinated Debt") as defined in the Subordination Agreement of substantially even date (the "Banner Subordination Agreement") between Agent and Banner, and (ii) "Junior Debt Obligations" (the "Vintage Subordinated Debt") as defined in the Subordination Agreement of substantially even date (the "Vintage Subordination Agreement") between Agent and Vintage.

"Subordinated Debt Payments" shall mean and include all cash actually expended to make payments of principal and interest on the Subordinated Debt.

18

**Exhibit "2"**

"Subordinated Lender" shall mean (i) Banner Aerospace Holding Company I, Inc. ("Banner"), and (ii) Vintage Capital Partners, LP, a Delaware limited liability company ("Vintage").

"Subordinated Loan Documentation" shall mean the documents and agreements between Borrowers and Subordinated Lender referred to in the Subordination Agreements or relating to Subordinated Debt.

"Subordination Agreement " shall mean, collectively, (i) the Banner Subordination Agreement, and (ii) the Vintage Subordination Agreement.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Subsidiary Stock" shall mean all of the issued and outstanding Equity Interests of any Subsidiary owned by any Borrower.

"Tangible Net Worth" shall mean, at a particular date, (a) the aggregate amount of all assets of Borrowers on a Consolidated Basis as may be properly classified as such in accordance with GAAP consistently applied excluding such other assets as are properly classified as intangible assets under GAAP, less (b) the aggregate amount of all liabilities of Borrowers on a Consolidated Basis (other than the Subordinated Debt).

"Term" shall have the meaning set forth in Section 13.1 hereof.

"Term Loan" shall mean the Advances made pursuant to Section 2.4 hereof.

"Term Loan Rate" shall mean an interest rate per annum equal to (a) the sum of the Alternate Base Rate plus one percent (1%) with respect to Domestic Rate Loans and (b) the sum of the Eurodollar Rate plus three and one-half percent (3.50%) with respect to Eurodollar Rate Loans.

"Term Note" shall mean the promissory note described in Section 2.4 hereof.

"Termination Event" shall mean (i) a Reportable Event with respect to any Plan or Multiemployer Plan; (ii) the withdrawal of any Borrower or any member of the Controlled Group from a Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vi) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan.

"Toxic Substance" shall mean and include any material present on any Real Property which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Trading with the Enemy Act" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Transactions" shall have the meaning set forth in Section 5.5 hereof.

"Transferee" shall have the meaning set forth in Section 16.3(c) hereof.

"Undrawn Availability" at a particular date shall mean an amount equal to (a) the lesser of (i) the Formula Amount or (ii) the Maximum Revolving Advance Amount, minus (b) the sum of (i) the outstanding amount of Advances (other than the Term Loan) plus (ii) all amounts due and owing to any Borrower's trade creditors which are outstanding beyond normal trade terms, plus (iii) fees and expenses for which Borrowers are liable but which have not been paid or charged to Borrowers' Account.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Week" shall mean the time period commencing with the opening of business on a Wednesday and ending on the end of business the following Tuesday.

1.3.    Uniform Commercial Code Terms.  All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper", "instruments", "general intangibles", "payment intangibles", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code.  To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4.    Certain Matters of Construction.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.  Any pronoun used shall be deemed to cover all genders.  Wherever appropriate

Exhibit "2"

in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. All references herein to the time of day shall mean the time in New York, New York. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Whenever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

## II    ADVANCES, PAYMENTS.

### 2.1.    Revolving Advances.

(a)    Amount of Revolving Advances. Subject to the terms and conditions set forth in this Agreement including Sections 2.1(b) and (c), each Lender, severally and not jointly, will make Revolving Advances to Borrowers in aggregate amounts outstanding at any time equal to such Lender's Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount less the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit or (y) an amount equal to the sum of:

21

(i)    up to 85%, subject to the provisions of Section 2.1(c) hereof ("Receivables Advance Rate"), of Eligible Receivables, plus

(ii)    up to the lesser of (A) 85%, subject to the provisions of Section 2.1(c) hereof, of the value of the Eligible Inventory) ("Inventory Advance Rate" and together with the Receivables Advance Rate, collectively, the "Advance Rates"), (B) 85% of the appraised net orderly liquidation value of Eligible Inventory (as evidenced by an Inventory appraisal satisfactory to Agent in its sole discretion exercised in good faith) or (C) $2,500,000 in the aggregate at any one time, inclusive of amounts under clause (iii) of this clause (y), plus

(iii)    the product of (a) the aggregate Maximum Undrawn Amount of all outstanding trade Letters of Credit times (b) the Inventory Advance Rate, minus

(iv)    the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit, minus

(v)    such reserves as Agent may reasonably deem proper and necessary from time to time.

The amount derived from the sum of (x) Sections 2.1(a)(y)(i) plus (ii) plus (iii) minus (iv) and minus (v) at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a).

Without limiting the right of the Agent to establish such other reserves as it shall reasonably deem proper and necessary from time to time, Agent may establish the following reserves under clause (v) above:

(i)    three months rent on any premises with respect to which Agent has not received a landlord agreement satisfactory to Agent in its good faith business judgment, within sixty days after the date hereof; and

(ii)    $500,000 until such time as the Banner Subordinated Debt is paid in full or it is confirmed to Agent's satisfaction that there is no liability on the Banner Subordinated Debt. In the event the amount owing on the Banner Subordinated Debt is in Agent's judgment (exercised in good faith) likely to be more than $500,000, such reserve shall be increased to such higher amount. Borrower shall promptly provide Agent with all pertinent information relating to the Banner Subordinated Debt and to discussions and negotiations relating to the liability on the Banner Subordinated Debt. Nothing herein limits any of the provisions restricting payments on the Banner Subordinated Debt in this Agreement or in the Banner Subordination Agreement. Borrowers represent and warrant that, to the best of their knowledge, the amount payable on the Banner Subordinated Debt is, and will be confirmed to be, zero.

(b)    Individual Revolving Advances. Lenders may, in their discretion, make Revolving Advances separately to each Borrower based on the Collateral of each Borrower.

(c)    Discretionary Rights. The Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion. Each Borrower consents to any such increases or decreases and acknowledges that decreasing the Advance Rates or increasing or imposing reserves may limit or restrict Advances requested by Borrowing Agent. The rights of Agent under this subsection are subject to the provisions of Section 16.2(b).

2.2.    Procedure for Revolving Advances Borrowing.

(a)    Borrowing Agent on behalf of any Borrower may notify Agent prior to 10:00 a.m. on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation, become due, same shall be deemed a request for a Revolving Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable.

(b)    Notwithstanding the provisions of subsection (a) above, in the event any Borrower desires to obtain a Eurodollar Rate Loan, Borrowing Agent shall give Agent written notice by no later than 10:00 a.m. on the day which is three (3) Business Days prior to the date such Eurodollar Rate Loan is to be borrowed, specifying (i) the date of the proposed borrowing (which shall be a Business Day), (ii) the type of borrowing and the amount on the date of such Advance to be borrowed, which amount shall be a minimum of $1,000,000 with integral multiples of $500,000 in excess thereof, and (iii) the duration of the first Interest Period therefor. Interest Periods for Eurodollar Rate Loans shall be for one, two, or three months; provided, if an Interest Period would end on a day that is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the Interest Period shall end on the next preceding Business Day. No Eurodollar Rate Loan shall be made available to any Borrower during the continuance of a Default or an Event of Default. After giving effect to each requested Eurodollar Rate Loan, including those which are converted from a Domestic Rate Loan under Section 2.2(d), there shall not be outstanding more than four (4) Eurodollar Rate Loans, in the aggregate.

(c)    Each Interest Period of a Eurodollar Rate Loan shall commence on the date such Eurodollar Rate Loan is made and shall end on such date as Borrowing Agent may elect as set forth in subsection (b)(iii) above provided that the exact length of each Interest Period shall be determined in accordance with the practice of the interbank market for offshore Dollar deposits and no Interest Period shall end after the last day of the Term.

Borrowing Agent shall elect the initial Interest Period applicable to a Eurodollar Rate Loan by its notice of borrowing given to Agent pursuant to Section 2.2(b) or by its notice of conversion given to Agent pursuant to Section 2.2(d), as the case may be. Borrowing Agent shall elect the duration of each succeeding Interest Period by giving irrevocable written notice to Agent of such duration not later than 10:00 a.m. on the day which is three (3) Business Days prior to the last day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Agent does not receive timely notice of the Interest Period elected by Borrowing Agent,

Exhibit "2"

Borrowing Agent shall be deemed to have elected to convert to a Domestic Rate Loan subject to Section 2.2(d) hereinbelow.

(d)    Provided that no Event of Default shall have occurred and be continuing, Borrowing Agent may, on the last Business Day of the then current Interest Period applicable to any outstanding Eurodollar Rate Loan, or on any Business Day with respect to Domestic Rate Loans, convert any such loan into a loan of another type in the same aggregate principal amount provided that any conversion of a Eurodollar Rate Loan shall be made only on the last Business Day of the then current Interest Period applicable to such Eurodollar Rate Loan. If Borrowing Agent desires to convert a loan, Borrowing Agent shall give Agent written notice by no later than 10:00 a.m. (i) on the day which is three (3) Business Days' prior to the date on which such conversion is to occur with respect to a conversion from a Domestic Rate Loan to a Eurodollar Rate Loan, or (ii) on the day which is one (1) Business Day prior to the date on which such conversion is to occur with respect to a conversion from a Eurodollar Rate Loan to a Domestic Rate Loan, specifying, in each case, the date of such conversion, the loans to be converted and if the conversion is from a Domestic Rate Loan to any other type of loan, the duration of the first Interest Period therefor.

(e)    At its option and upon written notice given prior to 10:00 a.m. (New York time) at least three (3) Business Days' prior to the date of such prepayment, any Borrower may prepay the Eurodollar Rate Loans in whole at any time or in part from time to time with accrued interest on the principal being prepaid to the date of such repayment. Such Borrower shall specify the date of prepayment of Advances which are Eurodollar Rate Loans and the amount of such prepayment. In the event that any prepayment of a Eurodollar Rate Loan is required or permitted on a date other than the last Business Day of the then current Interest Period with respect thereto, such Borrower shall indemnify Agent and Lenders therefor in accordance with Section 2.2(f) hereof.

(f)    Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any Eurodollar Rate Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a Eurodollar Rate Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its Eurodollar Rate Loans hereunder. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrowing Agent shall be conclusive absent manifest error.

(g)    Notwithstanding any other provision hereof, if any Applicable Law, treaty, regulation or directive, or any change therein or in the interpretation or application thereof, shall make it unlawful for any Lender (for purposes of this subsection (g), the term "Lender" shall include any Lender and the office or branch where any Lender or any corporation or bank controlling such Lender makes or maintains any Eurodollar Rate Loans) to make or maintain its Eurodollar Rate Loans, the obligation of Lenders to make Eurodollar Rate Loans hereunder shall forthwith be cancelled and Borrowers shall, if any affected Eurodollar Rate Loans are then outstanding, promptly upon request from Agent, either pay all such affected Eurodollar Rate

24

Loans or convert such affected Eurodollar Rate Loans into loans of another type. If any such payment or conversion of any Eurodollar Rate Loan is made on a day that is not the last day of the Interest Period applicable to such Eurodollar Rate Loan, Borrowers shall pay Agent, upon Agent's request, such amount or amounts as may be necessary to compensate Lenders for any loss or expense sustained or incurred by Lenders in respect of such Eurodollar Rate Loan as a result of such payment or conversion, including (but not limited to) any interest or other amounts payable by Lenders to lenders of funds obtained by Lenders in order to make or maintain such Eurodollar Rate Loan. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lenders to Borrowing Agent shall be conclusive absent manifest error.

2.3.    Disbursement of Advance Proceeds.  All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books. During the Term, Borrowers may use the Revolving Advances by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Advance requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Section 2.2 hereof shall, with respect to requested Revolving Advances to the extent Lenders make such Revolving Advances, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with respect to Revolving Advances deemed to have been requested by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4.    Term Loan. Subject to the terms and conditions of this Agreement, each Lender, severally and not jointly, will make a Term Loan to Borrowers in the sum equal to such Lender's Commitment Percentage of $5,000,000. The Term Loan shall be advanced on the Closing Date and shall be, with respect to principal, payable as follows, subject to acceleration upon the occurrence of an Event of Default under this Agreement or termination of this Agreement: equal monthly principal payments of $83,333.33 each, commencing December 1, 2005 and continuing on the first day of each month thereafter. The Term Loan shall be evidenced by one or more secured promissory notes (collectively, the "Term Note") in substantially the form attached hereto as Exhibit 2.4.

2.5.    Maximum Advances. The aggregate balance of Revolving Advances outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount or (b) the Formula Amount less, in each case (but without duplication), the aggregate Maximum Undrawn Amount of all issued and outstanding Letters of Credit.

2.6.    Repayment of Advances.

(a)     The Revolving Advances shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided. The Term Loan shall be due and payable as provided in Section 2.4 hereof and in the Term Note, subject to mandatory prepayments as herein provided.

(b)    Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received.   In consideration of Agent's agreement to conditionally credit Borrowers' Account as of the Business Day on which Agent receives those items of payment, each Borrower agrees that, in computing the charges under this Agreement, all items of payment shall be deemed applied by Agent on account of the Obligations one (1) Business Day after (i) the Business Day Agent receives such payments via wire transfer or electronic depository check or (ii) in the case of payments received by Agent in any other form, the Business Day such payment constitutes good funds in Agent's account.   Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned to Agent unpaid.

(c)    All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 P.M. (New York time) on the due date therefor in lawful money of the United States of America in federal funds or other funds immediately available to Agent.   Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)    Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.7.   Repayment of Excess Advances.   The aggregate balance of Advances outstanding at any time in excess of the maximum amount of Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred.

2.8.   Statement of Account.   Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrowers' Account") in the name of Borrowers in which shall be recorded the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender.   Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Agent and Borrowers during such month.   The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within ninety days after such statement is received by Borrowing Agent.   The records of Agent with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.9.   Letters of Credit.   Subject to the terms and conditions hereof, Agent shall issue or cause the issuance of standby and/or trade Letters of Credit ("Letters of Credit") for the account of any Borrower; provided, however, that Agent will not be required to issue or cause to be issued any Letters of Credit to the extent that the issuance thereof would then cause the sum of

(i) the outstanding Revolving Advances plus (ii) the Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the lesser of (x) the Maximum Revolving Advance Amount or (y) the Formula Amount. The Maximum Undrawn Amount of outstanding Letters of Credit shall not exceed in the aggregate at any time the Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the Revolving Interest Rate for Domestic Rate Loans; Letters of Credit that have not been drawn upon shall not bear interest.

2.10.  Issuance of Letters of Credit.

(a)  Borrowing Agent, on behalf of Borrowers, may request Agent to issue or cause the issuance of a Letter of Credit by delivering to Agent at the Payment Office, prior to 10:00 a.m. (New York time), at least five (5) Business Days' prior to the proposed date of issuance, Agent's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent; and, such other certificates, documents and other papers and information as Agent may reasonably request. Borrowing Agent, on behalf of Borrowers, also has the right to give instructions and make agreements with respect to any application, any applicable letter of credit and security agreement, any applicable letter of credit reimbursement agreement and/or any other applicable agreement, any letter of credit and the disposition of documents, disposition of any unutilized funds, and to agree with Agent upon any amendment, extension or renewal of any Letter of Credit.

(b)  Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twenty-four (24) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term. Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, and any amendments or revision thereof adhered to by the Issuer ("UCP 500") or the International Standby Practices (ISP98-International Chamber of Commerce Publication Number 590) (the "ISP98 Rules"), as determined by Agent, and each trade Letter of Credit shall be subject to UCP 500.

(c)  Agent shall use its reasonable efforts to notify Lenders of the request by Borrowing Agent for a Letter of Credit hereunder.

2.11.  Requirements For Issuance of Letters of Credit. Borrowing Agent shall authorize and direct any Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit. If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct the Issuer to deliver to Agent all instruments, documents, and other writings and property received by the Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, and the application therefor.

2.12.  Disbursements, Reimbursement.

27

(a)    Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Agent a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Lender's Commitment Percentage of the Maximum Face Amount of such Letter of Credit and the amount of such drawing, respectively.

(b)    In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, Agent will promptly notify Borrowing Agent. Provided that Borrowing Agent shall have received such notice, the Borrowers shall reimburse (such obligation to reimburse Agent shall sometimes be referred to as a "Reimbursement Obligation") Agent prior to 12:00 Noon, New York time on each date that an amount is paid by Agent under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by Agent. In the event Borrowers fail to reimburse Agent for the full amount of any drawing under any Letter of Credit by 12:00 Noon, New York time, on the Drawing Date, Agent will promptly notify each Lender thereof, and Borrowers shall be deemed to have requested that a Domestic Rate Loan be made by the Lenders to be disbursed on the Drawing Date under such Letter of Credit, subject to the amount of the unutilized portion of the lesser of Maximum Revolving Advance Amount or the Formula Amount and subject to Section 8.2 hereof. Any notice given by Agent pursuant to this Section 2.12(b) may be oral if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)    Each Lender shall upon any notice pursuant to Section 2.12(b) make available to Agent an amount in immediately available funds equal to its Commitment Percentage of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.12(d)) each be deemed to have made a Domestic Rate Loan to Borrowers in that amount. If any Lender so notified fails to make available to Agent the amount of such Lender's Commitment Percentage of such amount by no later than 2:00 p.m., New York time on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Effective Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Domestic Rate Loans on and after the fourth day following the Drawing Date. Agent will promptly give notice of the occurrence of the Drawing Date, but failure of Agent to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this Section 2.12(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.12(c) (i) and (ii) until and commencing from the date of receipt of notice from Agent of a drawing.

(d)    With respect to any unreimbursed drawing that is not converted into a Domestic Rate Loan to Borrowers in whole or in part as contemplated by Section 2.12(b), because of Borrowers' failure to satisfy the conditions set forth in Section 8.2 (other than any notice requirements) or for any other reason, Borrowers shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Domestic Rate Loan. Each Lender's payment to Agent pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its

participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment under this Section 2.12.

(e)      Each Lender's Participation Commitment shall continue until the last to occur of any of the following events:  (x) Agent ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled and (z) all Persons (other than the Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.13.  Repayment of Participation Advances.

(a)      Upon (and only upon) receipt by Agent for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by the Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Agent under such a Letter of Credit, Agent will pay to each Lender, in the same funds as those received by Agent, the amount of such Lender's Commitment Percentage of such funds, except Agent shall retain the amount of the Commitment Percentage of such funds of any Lender that did not make a Participation Advance in respect of such payment by Agent.

(b)      If Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by Borrowers to Agent pursuant to Section 2.13(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each Lender shall, on demand of Agent, forthwith return to Agent the amount of its Commitment Percentage of any amounts so returned by Agent plus interest at the Federal Funds Effective Rate.

2.14.  Documentation.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Agent's interpretations of any Letter of Credit issued on behalf of such Borrower and by Agent's written regulations and customary practices relating to letters of credit, though Agent's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct, Agent shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following the Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.15.  Determination to Honor Drawing Request.  In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, Agent shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.16.  Nature of Participation and Reimbursement Obligations.  Except in the case of gross negligence or intentional misconduct on the part of Agent, each Lender's obligation in

29

accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse Agent upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.16 under all circumstances, including the following circumstances:

(i)     any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Agent, any Borrower or any other Person for any reason whatsoever;

(ii)     the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of the Lenders to make Participation Advances under Section 2.12;

(iii)     any lack of validity or enforceability of any Letter of Credit;

(iv)     any claim of breach of warranty that might be made by Borrower or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, crossclaim, defense or other right which any Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(v)     the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provision of services relating to a Letter of Credit, in each case even if Agent or any of Agent's Affiliates has been notified thereof;

(vi)     payment by Agent under any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit;

(vii)     the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)     any failure by the Agent or any of Agent's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless the Agent has received written notice from Borrowing Agent of such failure within three (3) Business Days after the Agent shall

30

have furnished Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)    any Material Adverse Effect on any Borrower or any Guarantor;

(x)    any breach of this Agreement or any Other Document by any party thereto;

(xi)    the occurrence or continuance of an insolvency proceeding with respect to any Borrower or any Guarantor;

(xii)    the fact that a Default or Event of Default shall have occurred and be continuing;

(xiii)    the fact that the Term shall have expired or this Agreement or the Obligations hereunder shall have been terminated; and

(xiv)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.17.    Indemnity.  In addition to amounts payable as provided in Section 16.5, each Borrower hereby agrees to protect, indemnify, pay and save harmless Agent and any of Agent's Affiliates that have issued a Letter of Credit from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Agent or any of Agent's Affiliates may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (A) the gross negligence or willful misconduct of the Agent or (b) the wrongful dishonor by the Agent or any of Agent's Affiliates of a proper demand for payment made under any Letter of Credit, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body (all such acts or omissions herein called "Governmental Acts").

2.18.    Liability for Acts and Omissions.  As between Borrowers and Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the respective foregoing, Agent shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Agent shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors,

31

omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Agent, including any governmental acts, and none of the above shall affect or impair, or prevent the vesting of, any of Agent's rights or powers hereunder. Nothing in the preceding sentence shall relieve Agent from liability for Agent's gross negligence or willful misconduct in connection with actions or omissions described in such clauses (i) through (viii) of such sentence. In no event shall Agent or Agent's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

Without limiting the generality of the foregoing, Agent and each of its Affiliates (i) may rely on any oral or other communication believed in good faith by Agent or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit, (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Agent or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Agent or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Agent under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence, shall not put Agent under any resulting liability to any Borrower or any Lender.

2.19.  Additional Payments.  Any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 4.2, 4.4, 4.12, 4.13, 4.14 and 6.1 hereof, may be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

32

Exhibit "2"

2.20.  <u>Manner of Borrowing and Payment.</u>

(a)    Each borrowing of Revolving Advances shall be advanced according to the applicable Commitment Percentages of Lenders.  The Term Loan shall be advanced according to the Commitment Percentages of Lenders.

(b)    Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Revolving Advances, shall be applied to the Revolving Advances pro rata according to the applicable Commitment Percentages of Lenders.  Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Term Note, shall be made from or to, or applied to that portion of the Term Loan evidenced by the Term Note pro rata according to the Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 P.M., New York time, in Dollars and in immediately available funds.

(c)

(i)    Notwithstanding anything to the contrary contained in Sections 2.20(a) and (b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Advances shall be advanced by Agent and each payment by any Borrower on account of Revolving Advances shall be applied first to those Revolving Advances advanced by Agent.  On or before 1:00 P.M., New York time, on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (I) if the aggregate amount of new Revolving Advances made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Advances during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (w) such Revolving Advances and (x) such repayments and (II) if the aggregate amount of repayments applied to outstanding Revolving Advances during such Week exceeds the aggregate amount of new Revolving Advances made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (y) such repayments and (z) such Revolving Advances.

(ii)    Each Lender shall be entitled to earn interest at the applicable Contract Rate on outstanding Advances which it has funded.

(iii)    Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date.  Such certificate of Agent shall be conclusive in the absence of manifest error.

(d)    If any Lender or Participant (a "benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other

33

Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(e)    Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowing Agent of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Federal Funds Effective Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Advances hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.21.  Mandatory Prepayments.  Subject to Section 4.3 hereof, when any Borrower sells or otherwise disposes of any Collateral other than Inventory in the Ordinary Course of Business, Borrowers shall repay the Advances in an amount equal to the net proceeds of such sale (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Agent. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such repayments shall be applied first, to the outstanding principal installments of the Term Loan in the inverse order of the maturities thereof and second to the remaining Advances in such order as Agent may determine, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

2.22.  Use of Proceeds.

(a)    Proceeds.  Borrowers shall apply the proceeds of Advances to (i) repay existing indebtedness owed to CapitalSource Finance LLC, (ii) pay fees and expenses relating to

34

this transaction, (iii) provide for its working capital needs and reimburse drawings under Letters of Credit; and make payments to Vintage permitted by Section 2.22(b).

    (b)    <u>New Gantry; Vintage Bridge Note.</u>

    (1)    Borrower represents and warrants that it has borrowed $600,000 from Vintage, evidenced by that certain promissory note dated October 24, 2005 in the original principal amount of $600,000 made by Borrower to Vintage (the "Vintage Bridge Note"). The proceeds of such borrowing were utilized by Borrower to purchase that certain Kolb Varimat, 5-axis, single-spindle, high speed CNC Gantry type vertical mill machine (the "New Gantry").

    (2)    Borrower agrees to sell the New Gantry and lease it back (the "Gantry Sale Leaseback") within 90 days after the date hereof, and in connection therewith Lenders shall release or subordinate their security interest in the New Gantry to permit such sale to be consummated (provided no Default or Event of Default has occurred and is continuing).

    (3)    Borrower may utilize the proceeds of Advances to repay the Vintage Bridge Note (provided no Default or Event of Default has occurred and is continuing). If Borrower has repaid the Vintage Bridge Note at the time of the Gantry Sale Leaseback, the proceeds of the Gantry Sale Leaseback shall be paid to Agent in accordance with Section 2.21 (except that such proceeds shall be applied to the outstanding Revolving Advances, rather than the Term Loan).

    (4)    If Borrower has not repaid the Vintage Bridge Note at the time of the Gantry Sale Leaseback, the proceeds of the Gantry Sale Leaseback shall be used to repay the Vintage Bridge Note (provided no Default or Event of Default has occurred and is continuing), and any excess shall be paid to Agent in accordance with Section 2.21 (except that such proceeds shall be applied to the outstanding Revolving Advances, rather than the Term Loan).

    (c)    <u>Trading with the Enemy Act.</u> Without limiting the generality of Section 2.22(a) above, neither the Borrowers nor any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of the Trading with the Enemy Act.

    2.23.  <u>Defaulting Lender.</u>

    (a)    Notwithstanding anything to the contrary contained herein, in the event any Lender (x) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance or (y) notifies either Agent or Borrowing Agent that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement) (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.23 while such Lender Default remains in effect.

**Exhibit "2"**

(b)      Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be advanced by any Lender shall be increased as a result of such Lender Default.  Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender (other than any Defaulting Lender) pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees).  Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent.  Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(c)      A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents.  All amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d)      Other than as expressly set forth in this Section 2.23, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged.  Nothing in this Section 2.23 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)      In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

III     INTEREST AND FEES.

3.1.    Interest.  Interest on Advances shall be payable in arrears on the first day of each month with respect to Domestic Rate Loans and, with respect to Eurodollar Rate Loans, at the end of each Interest Period or, for Eurodollar Rate Loans with an Interest Period in excess of three months, at the earlier of (a) each three months from the commencement of such Eurodollar Rate Loan or (b) the end of the Interest Period.  Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to (i) with respect to Revolving Advances, the applicable Revolving Interest Rate and (ii) with respect to the Term Loan, the Term Loan Rate.  Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the applicable Contract Rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.  The Eurodollar Rate shall be adjusted with respect to Eurodollar Rate Loans

36

without notice or demand of any kind on the effective date of any change in the Reserve Percentage as of such effective date. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders, the Obligations shall bear interest at the applicable Contract Rate plus two (2%) percent per annum (as applicable, the "Default Rate").

3.2.    Letter of Credit Fees.

(a)    Borrowers shall pay (x) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by 2.50% per annum, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable quarterly in arrears on the first day of each quarter and on the last day of the Term, and (y) to the Issuer, a fronting fee of one quarter of one percent (0.25%) per annum, together with any and all administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and all fees and expenses as agreed upon by the Issuer and the Borrowing Agent in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "Letter of Credit Fees"). All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction. All Letter of Credit Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.

(b)    On demand made at any time (i) during the existence of an Event of Default, with respect to all outstanding Letters of Credit or (ii) on or before the end of the Term, with respect to any outstanding Letters of Credit with an expiry date, or that can be renewed, beyond the day before the last day of the Term (without limitation upon any provision hereof which may prohibit such an expiry date or renewal), Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time. Agent will invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and such Borrower mutually agree and the net return on such investments shall be credited to such account and constitute additional cash collateral. No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) payment and performance in full of all Obligations, (y) expiration of all Letters of Credit and (z) termination of this Agreement.

37

3.3.    Closing Fee and Facility Fee.

(a)    Closing Fee.  Upon the execution of this Agreement, Borrowers shall pay to Agent for the ratable benefit of Lenders a closing fee of $75,000, less any portion of the deposit heretofore paid by Borrowers to Agent remaining after application of such deposit to out of pocket expenses, and less the commitment fee previously paid by Borrower to Agent.

(b)    Facility Fee.  If, for any calendar quarter during the Term, the average daily unpaid balance of the Revolving Advances, plus the average daily Maximum Undrawn Amount, for each day of such calendar quarter does not equal the Maximum Revolving Advance Amount, then Borrowers shall pay to Agent for the ratable benefit of Lenders a fee at a rate equal to 0.375% per annum on the amount by which the Maximum Revolving Advance Amount exceeds the average daily unpaid balance of the Revolving Advances, plus the average daily Maximum Undrawn Amount, for each day of such calendar quarter.  Such fee shall be payable to Agent in arrears on the first day of each calendar quarter with respect to the previous calendar quarter.

3.4.    Collateral Evaluation Fee, Collateral Monitoring Fee.

(a)    Collateral Evaluation Fee.  Borrowers shall pay Agent a collateral evaluation fee equal to $1,500 per month commencing on the first day of the month following the Closing Date and on the first day of each month thereafter during the Term.  The collateral evaluation fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

(b)    Collateral Monitoring Fee.  Borrowers shall pay to Agent on the first day of each month following any month in which Agent performs any collateral monitoring - namely any field examination, collateral analysis or other business analysis, the need for which is to be determined by Agent and which monitoring is undertaken by Agent or for Agent's benefit - a collateral monitoring fee in an amount equal to $750 per day for each person employed to perform such monitoring, plus all costs and disbursements incurred by Agent in the performance of such examination or analysis.  Field examinations shall be limited to four in any consecutive 12-month period, except that (i) such limitation shall not apply if any Default or Event of Default has occurred and is continuing or, in Agent's judgment (exercised in good faith) there is reason for concern that a Default or Event of Default may have occurred and may be continuing, and (ii) such limit shall not apply to field examinations by Agent at its own expense.

3.5.    Computation of Interest and Fees.  Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed.  If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate for Domestic Rate Loans during such extension.

3.6.    Maximum Charges.  In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under law,

38

such excess amount shall be first applied to any unpaid principal balance owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.7.   Increased Costs.  In the event that any Applicable Law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)   subject Agent or any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to Agent or any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Document (except for changes in the rate of tax on the overall net income of Agent or any Lender by the jurisdiction in which it maintains its principal office);

(b)   impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)   impose on Agent or any Lender or the London interbank Eurodollar market any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, renewing or maintaining its Advances hereunder by an amount that Agent or such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent or such Lender deems to be material, then, in any case Borrowers shall promptly pay Agent or such Lender, upon its demand, such additional amount as will compensate Agent or such Lender for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the Eurodollar Rate, as the case may be. Agent or such Lender shall certify the amount of such additional cost or reduced amount to Borrowing Agent, and such certification shall be conclusive absent manifest error.

3.8.   Basis For Determining Interest Rate Inadequate or Unfair.  In the event that Agent or any Lender shall have determined that:

(a)   reasonable means do not exist for ascertaining the Eurodollar Rate for any Interest Period; or

(b)   Dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank Eurodollar market, with respect to an outstanding Eurodollar Rate Loan, a proposed Eurodollar Rate Loan, or a proposed conversion of a Domestic Rate Loan into a Eurodollar Rate Loan,

Exhibit "2"

then Agent shall give Borrowing Agent prompt written, telephonic or telegraphic notice of such determination.  If such notice is given, (i) any such requested Eurodollar Rate Loan shall be made as a Domestic Rate Loan, unless Borrowing Agent shall notify Agent no later than 10:00 a.m. (New York City time) two (2) Business Days prior to the date of such proposed borrowing, that its request for such borrowing shall be cancelled or made as an unaffected type of Eurodollar Rate Loan, (ii) any Domestic Rate Loan or Eurodollar Rate Loan which was to have been converted to an affected type of Eurodollar Rate Loan shall be continued as or converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 10:00 a.m. (New York City time) two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of Eurodollar Rate Loan, and (iii) any outstanding affected Eurodollar Rate Loans shall be converted into a Domestic Rate Loan, or, if Borrowing Agent shall notify Agent, no later than 10:00 a.m. (New York City time) two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected Eurodollar Rate Loan, shall be converted into an unaffected type of Eurodollar Rate Loan, on the last Business Day of the then current Interest Period for such affected Eurodollar Rate Loans.  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of Eurodollar Rate Loan or maintain outstanding affected Eurodollar Rate Loans and no Borrower shall have the right to convert a Domestic Rate Loan or an unaffected type of Eurodollar Rate Loan into an affected type of Eurodollar Rate Loan.

3.9.   Capital Adequacy.

(a)     In the event that Agent or any Lender shall have determined that any Applicable Law, rule, regulation or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender (for purposes of this Section 3.9, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) and the office or branch where Agent or any Lender (as so defined) makes or maintains any Eurodollar Rate Loans with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent or any Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent or such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction.  In determining such amount or amounts, Agent or such Lender may use any reasonable averaging or attribution methods.  The protection of this Section 3.9 shall be available to Agent and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, regulation or condition.

(b)     A certificate of Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to Section 3.9(a) hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.10.  <u>Gross Up for Taxes</u>.  If any Borrower shall be required by Applicable Law to withhold or deduct any taxes from or in respect of any sum payable under this Agreement or any of the Other Documents to Agent, or any Lender, assignee of any Lender, or Participant (each, individually, a "Payee" and collectively, the "Payees"), (a) the sum payable to such Payee or Payees, as the case may be, shall be increased as may be necessary so that, after making all required withholding or deductions, the applicable Payee or Payees receives an amount equal to the sum it would have received had no such withholding or deductions been made (the "Gross-Up Payment"), (b) such Borrower shall make such withholding or deductions, and (c) such Borrower shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with Applicable Law.  Notwithstanding the foregoing, no Borrower shall be obligated to make any portion of the Gross-Up Payment that is attributable to any withholding or deductions that would not have been paid or claimed had the applicable Payee or Payees properly claimed a complete exemption with respect thereto pursuant to Section 3.11 hereof.

3.11.  <u>Withholding Tax Exemption</u>.

(a)  Each Payee that is not incorporated under the Laws of the United States of America or a state thereof (and, upon the written request of Agent, each other Payee) agrees that it will deliver to Borrowing Agent and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under §1.1441-1(c)(16) of the Income Tax Regulations ("Regulations")) certifying its status (i.e., U.S. or foreign person) and, if appropriate, making a claim of reduced, or exemption from, U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Code.  The term "Withholding Certificate" means a Form W-9; a Form W-8BEN; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under §1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in §1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person.

(b)  Each Payee required to deliver to Borrowing Agent and Agent a valid Withholding Certificate pursuant to Section 3.11(a) hereof shall deliver such valid Withholding Certificate as follows: (A) each Payee which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by any Borrower hereunder for the account of such Payee; (B) each Payee shall deliver such valid Withholding Certificate at least five (5) Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such Payee to deliver such Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent).  Each Payee which so delivers a valid Withholding Certificate further undertakes to deliver to Borrowing Agent and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrowing Agent or Agent.

Exhibit "2"

(c)    Notwithstanding the submission of a Withholding Certificate claiming a reduced rate of or exemption from U.S. withholding tax required under Section 3.11(b) hereof, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under §1.1441-7(b) of the Regulations. Further, Agent is indemnified under §1.1461-1(e) of the Regulations against any claims and demands of any Payee for the amount of any tax it deducts and withholds in accordance with regulations under §1441 of the Code.

IV    COLLATERAL: GENERAL TERMS.

4.1.    Security Interest in the Collateral.    To secure the prompt payment and performance to Agent and each Lender of the Obligations, each Borrower hereby assigns, pledges and grants to Agent for its benefit and for the ratable benefit of each Lender a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located. Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest. Each Borrower shall promptly provide Agent with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s). Upon delivery of each such notice, such Borrower shall be deemed to hereby grant to Agent a security interest and lien in and to such commercial tort claims and all proceeds thereof.

4.2.    Perfection of Security Interest. Each Borrower shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens other than Permitted Encumbrances, (ii) obtaining Lien Waiver Agreements, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law. By its signature hereto, each Borrower hereby authorizes Agent to file against such Borrower, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

Exhibit "2"

4.3.    Disposition of Collateral. Each Borrower will safeguard and protect all Collateral for Agent's general account and make no disposition thereof whether by sale, lease or otherwise except (a) the sale of Inventory in the Ordinary Course of Business and (b) the disposition or transfer of obsolete and worn-out Equipment in the Ordinary Course of Business during any fiscal year having an aggregate fair market value of not more than $100,000 and only to the extent that (i) the proceeds of any such disposition are used to acquire replacement Equipment which is subject to Agent's first priority security interest or (ii) the proceeds of which are remitted to Agent to be applied pursuant to Section 2.21, and (c) the sale of the Kolb Gantry machine, as permitted in the Subordination Agreement and subject to the terms thereof, with the portion of the proceeds thereof which are payable to Borrower to be remitted to Agent to be applied pursuant to Section 2.21, and (d) sale of Receivables, which are outstanding for more than 180 days, to Banner in accordance with Section 4B of the Banner Subordination Agreement, for a cash purchase price equal to their face value, with the proceeds thereof to be remitted to Agent to be applied pursuant to Section 2.21.

4.4.    Preservation of Collateral. Following the occurrence of a Default or Event of Default, in addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may direct. All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

4.5.    Ownership of Collateral.

(a)    With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (i) each Borrower shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of the its respective Collateral to Agent; and, except for Permitted Encumbrances the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by each Borrower or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all respects; (iii) all signatures and endorsements of each Borrower that appear on such documents and agreements shall be genuine and each Borrower shall have full capacity to execute same; and (iv) each Borrower's Equipment and Inventory shall be located as set forth on Schedule 4.5 and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business and Equipment to the extent permitted in Section 4.3 hereof.

43

(b) (i) There is no location at which any Borrower has any Inventory (except for Inventory in transit) other than those locations listed on Schedule 4.5; (ii) Schedule 4.5 hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at which Inventory of any Borrower is stored; none of the receipts received by any Borrower from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of (A) each place of business of each Borrower and (B) the chief executive office of each Borrower; and (iv) Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all real property owned or leased by each Borrower, together with the names and addresses of any landlords.

(c) Borrower shall have the right to exercise all voting rights with respect to all Investment Property included in the Collateral, provided no Default or Event of Default has occurred and is continuing. Upon the occurrence of any Default or Event of Default, Agent shall have the right (but not any obligation) to exercise all voting rights with respect to such Investment Property.

4.6.   Defense of Agent's and Lenders' Interests.   Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force and effect. During such period no Borrower shall, without Agent's prior written consent, pledge, sell (except Inventory in the Ordinary Course of Business and Equipment to the extent permitted in Section 4.3 hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral. Each Borrower shall defend Agent's interests in the Collateral against any and all Persons whatsoever. At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent. In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law. Each Borrower shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7.   Books and Records.   Each Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including by reason of enumeration, accruals for premiums, if any, due on

44

required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrowers.

4.8.  Financial Disclosure.  Each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations. Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

4.9.  Compliance with Laws.  Each Borrower shall comply in all material respects with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect. The Collateral at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the Collateral, so that such insurance shall remain in full force and effect.

4.10.  Inspection of Premises.  At all reasonable times Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business. Agent, any Lender and their agents may enter upon any premises of any Borrower at any time during business hours and at any other reasonable time, and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business.

4.11.  Insurance.  The assets and properties of each Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of such Borrower so that such insurance shall remain in full force and effect. Each Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At each Borrower's own cost and expense in amounts and with carriers acceptable to Agent, each Borrower shall (a) keep all its insurable properties and properties in which such Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to such Borrower's including business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance

45

against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which such Borrower is engaged in business; (e) [intentionally omitted]; (f) furnish Agent with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured and loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (a) and (c) above, and providing (A) that all proceeds thereunder shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. In the event of any loss thereunder, the carriers named therein hereby are directed by Agent and the applicable Borrower to make payment for such loss to Agent and not to such Borrower and Agent jointly. If any insurance losses are paid by check, draft or other instrument payable to any Borrower and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (a) and (b) above. All loss recoveries received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus shall be paid by Agent to Borrowers or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Borrowers to Agent, on demand. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, Agent shall remit to Borrowing Agent insurance proceeds received by Agent during any calendar year under insurance policies procured and maintained by Borrowers which insure Borrowers' insurable properties to the extent such insurance proceeds do not exceed $100,000 in the aggregate during such calendar year or $50,000 per occurrence. In the event the amount of insurance proceeds received by Agent for any occurrence exceeds $50,000, then Agent shall not be obligated to remit the insurance proceeds to Borrowing Agent unless Borrowing Agent shall provide Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss. In the event Borrowing Agent have previously received (or, after giving effect to any proposed remittance by Agent to Borrowing Agent would receive) insurance proceeds which equal or exceed $100,000 in the aggregate during any calendar year, then Agent may, in its sole discretion, either remit the insurance proceeds to Borrowing Agent upon Borrowing Agent providing Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Borrowers to repair, replace or restore the insured property which was the subject of the insurable loss, or apply the proceeds to the Obligations, as aforesaid. The agreement of Agent to remit insurance proceeds in the manner above provided shall be subject in each instance to satisfaction of each of the following conditions: (x) No Event of Default or Default shall then have occurred, and (y) Borrowers shall use such insurance proceeds to repair, replace or restore the insurable property which was the subject of the insurable loss and for no other purpose.

   4.12.  Failure to Pay Insurance. If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Borrower, and charge Borrowers' Account therefor as a Revolving Advance of a Domestic Rate Loan and such expenses so paid shall be part of the Obligations.

46

4.13. <u>Payment of Taxes</u>. Each Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral including real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes. Except for taxes payable on the net income of Agent or any Lender, if any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may without notice to Borrowers pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof. The amount of any payment by Agent under this Section 4.13 shall be charged to Borrowers' Account as a Revolving Advance and added to the Obligations and, until Borrowers shall furnish Agent with an indemnity therefor (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold without interest any balance standing to Borrowers' credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

4.14. <u>Payment of Leasehold Obligations</u>. Each Borrower shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's request will provide evidence of having done so.

4.15. <u>Receivables</u>.

(a)    <u>Nature of Receivables</u>. Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower as of the date each Receivable is created. Same shall be due and owing in accordance with the applicable Borrower's standard terms of sale without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by Borrowers to Agent.

(b)    <u>Solvency of Customers</u>. Each Customer, to the best of each Borrower's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due or with respect to such Customers of any Borrower who are not solvent such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c)    <u>Location of Borrowers</u>. Parent's chief executive office is located at 225 Oregon Street, El Segundo, California 90245, and Sub's chief executive office is located at 17800 Gothard Street, Huntington Beach, California 92647. Until written notice is given to Agent by Borrowing Agent of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

47

(d)    Collection of Receivables.  Borrower shall instruct all of its Customers to make all payments with respect to Receivables to the Blocked Account, and in the event, for any reason, any such payment is made to Borrower, Borrower shall hold the same in trust for Agent and shall not commingle such collections with any of Borrower's funds and Borrower shall deposit the same in the Blocked Account in original form and on the date of receipt thereof.

(e)    Notification of Assignment of Receivables.  At any time following the occurrence of an Event of Default or a Default, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral. Thereafter, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrowers' Account and added to the Obligations.

(f)    Power of Agent to Act on Borrowers' Behalf.  Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power (i) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (iii) to send verifications of Receivables to any Customer; (iv) to sign such Borrower's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; (v) to demand payment of the Receivables; (vi) to enforce payment of the Receivables by legal proceedings or otherwise; (vii) to exercise all of such Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral; (viii) to settle, adjust, compromise, extend or renew the Receivables; (ix) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (x) to prepare, file and sign such Borrower's name on a proof of claim in bankruptcy or similar document against any Customer; (xi) to prepare, file and sign such Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; and (xii) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  Agent shall have the right at any time following the occurrence of an Event of Default or Default, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower.

(g)    No Liability.  Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of

Exhibit "2"

any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom. Following the occurrence of an Event of Default or Default, Agent may, without notice or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept following the occurrence of an Event of Default or Default the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

(h)      Establishment of a Lockbox Account, Dominion Account. Except as otherwise provided herein, all proceeds of Collateral shall be deposited by Borrowers into either (i) a lockbox account, dominion account or such other "blocked account" ("Blocked Accounts") established at a bank or banks (each such bank, a "Blocked Account Bank") pursuant to an arrangement with such Blocked Account Bank as may be selected by Borrowing Agent and be acceptable to Agent or (ii) depository accounts ("Depository Accounts") established at the Agent for the deposit of such proceeds. Each applicable Borrower, Agent and each Blocked Account Bank shall enter into a deposit account control agreement in form and substance satisfactory to Agent directing such Blocked Account Bank to transfer such funds so deposited to Agent, either to any account maintained by Agent at said Blocked Account Bank or by wire transfer to appropriate account(s) of Agent. All funds deposited in such Blocked Accounts shall immediately become the property of Agent and Borrowing Agent shall obtain the agreement by such Blocked Account Bank to waive any offset rights against the funds so deposited. Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder. All deposit accounts and investment accounts of each Borrower and its Subsidiaries are set forth on Schedule 4.15(h).

(i)      Adjustments. No Borrower will, without Agent's consent, compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the business of such Borrower.

4.16.  Inventory. To the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.17.  Maintenance of Equipment. The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved. No Borrower shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation. Each Borrower shall have the right to sell Equipment to the extent set forth in Section 4.3 hereof.

4.18.  Exculpation of Liability. Nothing herein contained shall be construed to constitute Agent or any Lender as any Borrower's agent for any purpose whatsoever, nor shall

Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any Borrower's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.19. Environmental Matters.

(a)     Borrowers shall ensure that all present and future real property now or hereafter owned or leased by Borrower (the "Real Property") and all operations and businesses conducted thereon remains in compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by Applicable Law or appropriate governmental authorities.

(b)     Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws which system shall include periodic reviews of such compliance.

(c)     Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws. Borrowers shall use their best efforts to obtain certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)     In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any such person or entity hereinafter the "Authority"), then Borrowing Agent shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in and Lien on the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential

responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward copies of correspondence between any Borrower and the Authority regarding such claims to Agent until the claim is settled.  Borrowing Agent shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws.  Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Real Property and the Collateral.

(f)    Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien.  If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Borrower shall fail to comply with any of the requirements of any Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral:  (A) give such notices or (B) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint.  All reasonable costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans constituting Revolving Advances shall be paid upon demand by Borrowers, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, any Lender and any Borrower.

(g)    Promptly upon the written request of Agent from time to time, Borrowers shall provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm acceptable in the reasonable opinion of Agent, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property.  Any report or investigation of such Hazardous Discharge proposed and acceptable to an appropriate Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent.  If such estimates, individually or in the aggregate, exceed $100,000, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)    Borrowers shall defend and indemnify Agent and Lenders and hold Agent, Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, damage and expense, claims, costs, fines and penalties, including attorney's fees, suffered or incurred by Agent or Lenders under or on account of any Environmental Laws, including the assertion of any Lien thereunder, with respect to any Hazardous Discharge, the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability,

51

damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of Agent or any Lender. Borrowers' obligations under this Section 4.19 shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property, whether or not any federal, state, or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Substances. Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement.

(i)    For purposes of Section 4.19 and 5.7, all references to Real Property shall be deemed to include all of each Borrower's right, title and interest in and to its owned and leased premises.

4.20.  <u>Financing Statements</u>. Except as respects the financing statements filed by Agent and the financing statements described on Schedule 1.2, no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

## V    REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants as follows:

5.1.  <u>Authority</u>. Each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents and to perform all its respective Obligations hereunder and thereunder. This Agreement, the Subordination Agreement and the Other Documents have been duly executed and delivered by each Borrower, and this Agreement, the Subordination Agreement and the Other Documents constitute the legal, valid and binding obligation of such Borrower enforceable in accordance with their terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally. The execution, delivery and performance of this Agreement and of the Other Documents (a) are within such Borrower's corporate powers, have been duly authorized by all necessary corporate action, are not in contravention of law or the terms of such Borrower's by-laws, certificate of incorporation or other applicable documents relating to such Borrower's formation or to the conduct of such Borrower's business or of any material agreement or undertaking to which such Borrower is a party or by which such Borrower is bound, including the Subordinated Loan Documentation, (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body or any other Person, except those Consents set forth on Schedule 5.1 hereto, all of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of such Borrower under the provisions of any agreement, charter document, instrument, by-law, or other instrument to which such Borrower is a party or by which it or its property is a party or by which it may be bound, including under the provisions of the Subordinated Loan Documentation.

5.2.  <u>Formation and Qualification</u>.

(a)    Each Borrower is duly incorporated and in good standing under the laws of the state listed on Schedule 5.2(a) and is qualified to do business and is in good standing in the

Exhibit "2"

states listed on Schedule 5.2(a) which constitute all states in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Borrower. Each Borrower has delivered to Agent true and complete copies of its certificate of incorporation and by-laws and will promptly notify Agent of any amendment or changes thereto.

      (b)     The only Subsidiaries of each Borrower are listed on Schedule 5.2(b).

     5.3.   Survival of Representations and Warranties.  All representations and warranties of such Borrower contained in this Agreement and the Other Documents shall be true at the time of such Borrower's execution of this Agreement and the Other Documents, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

     5.4.   Tax Returns.  Each Borrower's federal tax identification number is set forth on Schedule 5.4.  Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable.  Federal, state and local income tax returns of each Borrower have been examined and reported upon by the appropriate taxing authority or closed by applicable statute and satisfied for all fiscal years prior to and including the fiscal year ending December 31, 2004.  The provision for taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

     5.5.   Financial Statements.

      (a)     The twelve-month cash flow projections of Borrowers on a Consolidated Basis and their projected balance sheets as of the Closing Date, copies of which are annexed hereto as Exhibit 5.5(b) (the "Projections") were prepared by the Chief Financial Officer of Borrower, are based on underlying assumptions which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.  The cash flow Projections are referred to as the "Pro Forma Financial Statements".

      (b)     The consolidated and consolidating balance sheets of Borrowers, their Subsidiaries and such other Persons described therein (including the accounts of all Subsidiaries for the respective periods during which a subsidiary relationship existed) as of July 31, 2005, and the related statements of income, changes in stockholder's equity, and changes in cash flow for the period ended on such date, copies of which have been delivered to Agent, have been prepared in accordance with GAAP, consistently applied and present fairly the financial position of Borrowers and their Subsidiaries at such date and the results of their operations for such period. Since July 31, 2005, there has been no change in the condition, financial or otherwise, of Borrowers or their Subsidiaries as shown on the consolidated balance sheet as of such date and no change in the aggregate value of machinery, equipment and Real Property owned by Borrowers and their respective Subsidiaries, except changes in the Ordinary Course of Business, none of which individually or in the aggregate has been materially adverse.

Exhibit "2"

    5.6.  <u>Entity Names</u>.  No Borrower has been known by any other corporate name in the past five years and does not sell Inventory under any other name except as set forth on Schedule 5.6, nor has any Borrower been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years (provided that this representation, with respect to Sub is being made on the basis of Parent's best knowledge).

    5.7.  <u>O.S.H.A. and Environmental Compliance</u>.

    (a)  Each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds, Real Property and Equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; there are no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations.

    (b)  Each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

    (c)  (i) There are no visible signs of releases, spills, discharges, leaks or disposal (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property or any premises leased by any Borrower; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property or any premises leased by any Borrower; (iii) neither the Real Property nor any premises leased by any Borrower has ever been used as a treatment, storage or disposal facility of Hazardous Waste; and (iv) no Hazardous Substances are present on the Real Property or any premises leased by any Borrower, excepting such quantities as are handled in accordance with all applicable manufacturer's instructions and governmental regulations and in proper storage containers and as are necessary for the operation of the commercial business of any Borrower or of its tenants.

    5.8.  <u>Solvency; No Litigation, Violation, Indebtedness or Default</u>.

    (a)  After giving effect to the Transactions, each Borrower will be solvent, able to pay its debts as they mature, will have capital sufficient to carry on its business and all businesses in which it is about to engage, and (i) as of the Closing Date, the fair present saleable value of its assets, calculated on a going concern basis, is in excess of the amount of its liabilities and (ii) subsequent to the Closing Date, the fair saleable value of its assets (calculated on a going concern basis) will be in excess of the amount of its liabilities.

    (b)  Except as disclosed in Schedule 5.8(b), no Borrower has (i) any pending or threatened litigation, arbitration, actions or proceedings which involve the possibility of having a Material Adverse Effect, and (ii) any liabilities or indebtedness for borrowed money other than the Obligations.

    (c)  No Borrower is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Borrower in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d)    No Borrower nor any member of the Controlled Group maintains or contributes to any Plan other than those listed on Schedule 5.8(d) hereto. (i) No Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code; (iii) neither any Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan; (v) at this time, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and neither any Borrower nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither any Borrower nor any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither any Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists which could give rise to any such liability; (viii) neither any Borrower nor any member of the Controlled Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan; (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period has not been waived; (xi) neither any Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group; (xii) neither any Borrower nor any member of the Controlled Group maintains or contributes to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xiii) neither any Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

5.9.    <u>Patents, Trademarks, Copyrights and Licenses</u>. All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by any Borrower are set forth on Schedule 5.9, are valid and have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the intellectual property rights which are necessary for the operation of its business; there is no objection to or

55

pending challenge to the validity of any such patent, trademark, copyright, design rights, tradename, trade secret or license and no Borrower is aware of any grounds for any challenge, except as set forth in Schedule 5.9 hereto. Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design rights, copyright, copyright application and copyright license owned or held by any Borrower and all trade secrets used by any Borrower consist of original material or property developed by such Borrower or was lawfully acquired by such Borrower from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof. With respect to all software used by any Borrower, such Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a source code escrow agreement, each such source code escrow agreement being listed on Schedule 5.9 hereto.

5.10. <u>Licenses and Permits</u>. Except as set forth in Schedule 5.10, each Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to procure such licenses or permits could have a Material Adverse Effect.

5.11. <u>Default of Indebtedness</u>. No Borrower is in default in the payment of the principal of or interest on any Indebtedness or under any instrument or agreement under or subject to which any Indebtedness has been issued and no event has occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

5.12. <u>No Default</u>. No Borrower is in default in the payment or performance of any of its contractual obligations and no Default has occurred.

5.13. <u>No Burdensome Restrictions</u>. No Borrower is party to any contract or agreement the performance of which could have a Material Adverse Effect. Each Borrower has heretofore delivered to Agent true and complete copies of all material contracts to which it is a party or to which it or any of its properties is subject. No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance.

5.14. <u>No Labor Disputes</u>. No Borrower is involved in any labor dispute; there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto.

5.15. <u>Margin Regulations</u>. No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance will be

Exhibit "2"

used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.16. <u>Investment Company Act</u>. No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.17. <u>Disclosure</u>. No representation or warranty made by any Borrower in this Agreement, the Subordinated Loan Documentation, or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to any Borrower or which reasonably should be known to such Borrower which such Borrower has not disclosed to Agent in writing with respect to the transactions contemplated by the Subordinated Loan Documentation or this Agreement which could reasonably be expected to have a Material Adverse Effect.

5.18. <u>Delivery of Subordinated Loan Documentation</u>. Agent has received complete copies of the Subordinated Loan Documentation (including all exhibits, schedules and disclosure letters referred to therein or delivered pursuant thereto, if any) and all amendments thereto, waivers relating thereto and other side letters or agreements affecting the terms thereof. None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to Agent.

5.19. <u>Swaps</u>. No Borrower is a party to, nor will it be a party to, any swap agreement whereby such Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.20. <u>Conflicting Agreements</u>. No provision of any mortgage, indenture, contract, agreement, judgment, decree or order binding on any Borrower or affecting the Collateral conflicts with, or requires any Consent which has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

5.21. <u>Application of Certain Laws and Regulations</u>. Neither any Borrower nor any Affiliate of any Borrower is subject to any law, statute, rule or regulation which regulates the incurrence of any Indebtedness, including laws, statutes, rules or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

5.22. <u>Business and Property of Borrowers</u>. Upon and after the Closing Date, Borrowers do not propose to engage in any business other than manufacturing components and subassemblies for commercial and military aerospace programs, and activities necessary to conduct the foregoing. On the Closing Date, each Borrower will own all the property and

possess all of the rights and Consents necessary for the conduct of the business of such Borrower.

5.23.   Section 20 Subsidiaries.   Borrowers do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a Section 20 Subsidiary.

5.24.   Anti-Terrorism Laws.

(a)   General.   Neither any Borrower nor any Affiliate of any Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)   Executive Order No. 13224.   Neither any Borrower nor any Affiliate of any Borrower or their respective agents acting or benefiting in any capacity in connection with the Advances or other transactions hereunder, is any of the following (each a "Blocked Person"):

(i)   a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(ii)   a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(iii)   a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)   a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

(v)   a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(vi)   a Person or entity who is affiliated or associated with a Person or entity listed above.

Neither any Borrower nor to the knowledge of any Borrower, any of its agents acting in any capacity in connection with the Advances or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

58

5.25. <u>Trading with the Enemy</u>. No Borrower has engaged, nor does it intend to engage, in any business or activity prohibited by the Trading with the Enemy Act.

5.26. <u>Federal Securities Laws</u>. Neither any Borrower nor any of its Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) has any securities registered under the Exchange Act or (iii) has filed a registration statement that has not yet become effective under the Securities Act.

## VI    AFFIRMATIVE COVENANTS.

Each Borrower shall, until payment in full of the Obligations and termination of this Agreement:

6.1. <u>Payment of Fees</u>. Pay to Agent on demand all usual and customary fees and expenses which Agent incurs in connection with (a) the forwarding of Advance proceeds and (b) the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.15(h). Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

6.2. <u>Conduct of Business and Maintenance of Existence and Assets</u>. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof.

6.3. <u>Violations</u>. Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Borrower which could reasonably be expected to have a Material Adverse Effect.

6.4. <u>Government Receivables</u>. Take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code and all other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them.

6.5. <u>Financial Covenants</u>.

(a) <u>Tangible Net Worth</u>. Maintain as of the end of each calendar quarter, beginning with the calendar quarter ending December 31, 2005, a Tangible Net Worth in an

59

**Exhibit "2"**

amount not less than $5,800,000 (the **"Minimum Tangible Net Worth"**), provided that, at the end of each subsequent calendar quarter, the Minimum Tangible Net Worth requirement shall be increased by 50% of the consolidated net income of the Borrower realized for such quarter. Said increased Minimum Tangible Net Worth requirement shall be effective as of the end of such fiscal quarter, and thereafter.  In no event shall the Minimum Tangible Net Worth requirement be decreased.

(b)    Fixed Charge Coverage Ratio.  Maintain during each Applicable Period a Fixed Charge Coverage Ratio of not less than 1.25 to 1.0.  **"Applicable Period"** as used in this Agreement means (i) the period from October 1, 2005 through December 31, 2005, (ii) the period from October 1, 2005 through March 31, 2006, (iii) the period from October 1, 2005 through June 30, 2006, and (iv) the twelve-month period ending September 30, 2006, and each consecutive cumulative rolling twelve-month period ending on the end of each subsequent calendar quarter throughout the term of this Agreement.

6.6.    Execution of Supplemental Instruments.  Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may request, in order that the full intent of this Agreement may be carried into effect.

6.7.    Payment of Indebtedness.  Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, except when the failure to do so could not reasonably be expected to have a Material Adverse Effect or when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and each Borrower shall have provided for such reserves as Agent may reasonably deem proper and necessary, subject at all times to any applicable subordination arrangement in favor of Lenders.

6.8.    Standards of Financial Statements.  Cause all financial statements referred to in Sections 9.7, 9.8, 9.9, 9.10, 9.11, 9.12, 9.13 and 9.14 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein).

6.9.    Federal Securities Laws.  Promptly notify Agent in writing if any Borrower or any of its Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) registers any securities under the Exchange Act or (iii) files a registration statement under the Securities Act.

VII    NEGATIVE COVENANTS.

No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement:

7.1.    Merger, Consolidation, Acquisition and Sale of Assets.

(a)    Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Equity Interests of any Person or permit any other Person to consolidate with or merge with it.

(b)    Sell, lease, transfer or otherwise dispose of any of its properties or assets, except (i) dispositions of Inventory and Equipment to the extent expressly permitted by Section 4.3 and (ii) any other sales or dispositions expressly permitted by this Agreement.

7.2.    <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

7.3.    <u>Guarantees</u>.  Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders).

7.4.    <u>Investments</u>.  Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except (a) obligations issued or guaranteed by the United States of America or any agency thereof, (b) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating), (c) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, and (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof.

7.5.    <u>Loans</u>.  Make advances, loans or extensions of credit to any Person, including any Parent Entity, Subsidiary or Affiliate, except with respect to the extension of commercial trade credit in connection with the sale of Inventory in the Ordinary Course of Business.

7.6.    <u>Capital Expenditures</u>.  Contract for, purchase or make any expenditure or commitments for any unfinanced Capital Expenditures in any fiscal year in an aggregate amount for all Borrowers in excess of $200,000, except for (i) the purchase of the New Gantry in October of 2005 for a purchase price not to exceed $595,000, plus moving costs (to the extent the same are capital expenditures) for the same in an amount not to exceed $200,000, and (ii) one-time moving costs (to the extent the same are capital expenditures) incurred by Borrower related to the consolidation of the Borrower's facilities prior to June 30, 2006, but only to the extent of up to a maximum of $2,000,000

7.7.    <u>Dividends</u>.  Declare, pay or make any dividend or distribution on any shares of the common stock or preferred stock of any Borrower (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock) or apply any of its funds, property or assets to the purchase, redemption or other retirement of any common or preferred stock, or of any options to purchase or acquire any such shares of common or preferred stock of any Borrower.

7.8.    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except in respect of (i) Indebtedness to Lenders; (ii) Indebtedness incurred for

Capital Expenditures permitted under Section 7.6 hereof; and (iii) Indebtedness due under the Subordinated Loan Documentation.

7.9.  Nature of Business.  Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted.

7.10.  Transactions with Affiliates.  Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except transactions disclosed to the Agent, which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate.

7.11.  Leases.  Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 7.6 hereof) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $1,980,000 in any one fiscal year in the aggregate for all Borrowers plus $20,000 per month with respect to the New Gantry.

7.12.  Subsidiaries.

(a)    Form any Subsidiary, unless (i) prior to the acquisition of any assets by such Subsidiary, such Subsidiary expressly joins in this Agreement as a borrower and becomes jointly and severally liable for the obligations of Borrowers hereunder, under the Notes, and under any other agreement between any Borrower and Lenders and (ii) Agent shall have received all documents, including legal opinions, it may reasonably require to establish compliance with each of the foregoing conditions.

(b)    Enter into any partnership, joint venture or similar arrangement.

7.13.  Fiscal Year and Accounting Changes.  Change its fiscal year end from the last Sunday of December, or make any change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.

7.14.  Pledge of Credit.  Now or hereafter pledge Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of any Advance in or for any business other than such Borrower's business as conducted on the date of this Agreement.

7.15.  Amendment of Articles of Incorporation, By-Laws.  Amend, modify or waive any term or material provision of its Articles of Incorporation or By-Laws, unless required by law.

7.16.  Compliance with ERISA.  (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on Schedule 5.8(d), (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in section 406 of

62

ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan not disclosed on Schedule 5.8(d), (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any Termination Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

7.17. <u>Prepayment of Indebtedness</u>. Except as permitted pursuant to Section 7.21 hereof, at any time, directly or indirectly, prepay any Indebtedness (other than to Lenders), or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Borrower.

7.18. <u>Anti-Terrorism Laws</u>. No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement, nor shall it permit any Affiliate or agent to:

(a)    Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person.

(b)    Deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

(c)    Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA PATRIOT Act or any other Anti-Terrorism Law. Borrower shall deliver to Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming Borrower's compliance with this Section.

7.19. [intentionally omitted]

7.20. <u>Trading with the Enemy Act</u>. Engage in any business or activity in violation of the Trading with the Enemy Act.

7.21. <u>Subordinated Debt</u>. At any time, directly or indirectly, pay, prepay, repurchase, redeem, retire or otherwise acquire, or make any payment on account of any principal of, interest on or premium payable in connection with the repayment or redemption of any of the Subordinated Debt, except (A) as otherwise permitted under the Banner Subordination Agreement as to any principal payments of the Banner Subordinated Debt and as long as after giving effect to any such otherwise permitted payment, Borrower shall have Undrawn Availability of at least $500,000; and (B) that payments of accrued interest on the Subordinated

Debt shall be permitted provided no Default or Event of Default has occurred and is continuing, and, after giving effect to the payment, Borrower shall have Undrawn Availability of at least $500,000.

     7.22.  <u>Other Agreements</u>. Enter into any material amendment, waiver or modification of the Subordinated Loan Documentation or any related agreements.

VIII   CONDITIONS PRECEDENT.

     8.1.  <u>Conditions to Initial Advances</u>.  The agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

     (a)   <u>Note</u>.  Agent shall have received the Notes duly executed and delivered by an authorized officer of each Borrower;

     (b)   <u>Filings, Registrations and Recordings</u>.  Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received an acknowledgment copy, or other evidence satisfactory to it, of each such filing, registration or recordation and satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto;

     (c)   <u>Corporate Proceedings of Borrowers</u>.  Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Board of Directors of each Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Notes, any related agreements, the Subordinated Loan Documentation, (collectively the "Documents") and (ii) the granting by each Borrower of the security interests in and liens upon the Collateral in each case certified by the Secretary or an Assistant Secretary of each Borrower as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

     (d)   <u>Incumbency Certificates of Borrowers</u>.  Agent shall have received a certificate of the Secretary or an Assistant Secretary of each Borrower, dated the Closing Date, as to the incumbency and signature of the officers of each Borrower executing this Agreement, the Other Documents, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary or Assistant Secretary;

     (e)   [intentionally omitted]

     (f)   [intentionally omitted]

     (g)   <u>Certificates</u>.  Agent shall have received a copy of the Articles or Certificate of Incorporation of each Borrower, and all amendments thereto, certified by the

**Exhibit "2"**

Secretary of State or other appropriate official of its jurisdiction of incorporation together with copies of the By-Laws of each Borrower and all agreements of each Borrower's shareholders certified as accurate and complete by the Secretary of each Borrower;

(h)  Good Standing Certificates. Agent shall have received good standing certificates for each Borrower dated not more than 30 days prior to the Closing Date, issued by the Secretary of State or other appropriate official of each Borrower's jurisdiction of incorporation and each jurisdiction where the conduct of each Borrower's business activities or the ownership of its properties necessitates qualification;

(i)  Legal Opinion. Agent shall have received the executed legal opinion of Holland & Knight in form and substance satisfactory to Agent which shall cover such matters incident to the transactions contemplated by this Agreement, the Notes, the Other Documents, the Subordination Agreement and related agreements as Agent may reasonably require and each Borrower hereby authorizes and directs such counsel to deliver such opinions to Agent and Lenders;

(j)  No Litigation. (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement, the Other Documents, the Subordinated Loan Documents or any of the transactions contemplated thereby and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the reasonable opinion of Agent, have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the Transactions shall have been issued by any Governmental Body;

(k)  [Intentionally Omitted.] (l)  Collateral Examination. Agent shall have completed Collateral examinations and received appraisals, the results of which shall be satisfactory in form and substance to Lenders, of the Receivables, Inventory, General Intangibles, and Equipment of each Borrower and all books and records in connection therewith;

(m)  Fees. Agent shall have received all fees payable to Agent and Lenders on or prior to the Closing Date hereunder, including pursuant to Article III hereof;

(n)  Pro Forma Financial Statements. Agent shall have received a copy of the Pro Forma Financial Statements which shall be satisfactory in all respects to Lenders;

(o)  Subordinated Loan Documents. Agent shall have received final executed copies of the Subordinated Loan Documentation, and all related agreements, documents and instruments as in effect on the Closing Date all of which shall be satisfactory in form and substance to Agent and the transactions contemplated by such documentation shall be consummated prior to or simultaneously with the making of the initial Advance;

(p)  Subordination Agreements. Agent shall have entered into the Subordination Agreements, which shall be satisfactory in form and substance to Agent in its sole discretion;

(q)    Insurance.  Agent shall have received in form and substance satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements on Agent's standard form of loss payee endorsement naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(r)    [intentionally omitted]

(s)    Payment Instructions.  Agent shall have received written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(t)    Blocked Accounts.  Agent shall have received duly executed agreements establishing the Blocked Accounts or Depository Accounts with financial institutions acceptable to Agent for the collection or servicing of the Receivables and proceeds of the Collateral;

(u)    Consents.  Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(v)    No Adverse Material Change.  (i) since July 31, 2005, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and (ii) no representations made or information supplied to Agent or Lenders shall have been proven to be inaccurate or misleading in any material respect;

(w)    [intentionally omitted] Borrower represents and warrants that none of its Inventory, Equipment or books or records are located with a warehouseman or other third-party;

(x)    Subordinated Loan Documentation.  Agent shall have received final executed copies of the Subordinated Loan Documentation which shall contain such terms and provisions including subordination terms, satisfactory to Agent;

(y)    Contract Review.  Agent shall have reviewed all material contracts of Borrowers including leases, union contracts, labor contracts, vendor supply contracts, license agreements and distributorship agreements and such contracts and agreements shall be satisfactory in all respects to Agent;

(z)    Closing Certificate.  Agent shall have received a closing certificate signed by the Chief Financial Officer of each Borrower dated as of the date hereof, stating that (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct on and as of such date, (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents, (iii) on such date no Default or Event of Default has occurred or is continuing;

(aa)    Borrowing Base.  Agent shall have received evidence from Borrowers that the aggregate amount of Eligible Receivables and Eligible Inventory is sufficient in value and amount to support Advances in the amount requested by Borrowers on the Closing Date;

66

**Exhibit "2"**

(bb)    <u>Undrawn Availability</u>.    After giving effect to the initial Advances hereunder, Borrowers shall have Undrawn Availability of at least $1,000,000;

(cc)    <u>Compliance with Laws</u>.    Agent shall be reasonably satisfied that each Borrower is in compliance with all pertinent federal, state, local or territorial regulations, including those with respect to the Federal Occupational Safety and Health Act, the Environmental Protection Act, ERISA and the Trading with the Enemy Act; and

(dd)    <u>Other</u>.    Agent shall receive such other certificates as it shall specify, and all corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Agent and its counsel.

8.2.    <u>Conditions to Each Advance</u>.    The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)    <u>Representations and Warranties</u>.    Each of the representations and warranties made by any Borrower in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(b)    <u>No Default</u>.    No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default; and

(c)    <u>Maximum Advances</u>.    In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

IX    INFORMATION AS TO BORROWERS.

Each Borrower shall, or (except with respect to Section 9.11) shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1.    <u>Disclosure of Material Matters</u>.    Immediately upon learning thereof, report to Agent all matters materially affecting the value, enforceability or collectibility of any portion of the Collateral, including any Borrower's reclamation or repossession of, or the return to any

Borrower of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

9.2.   Schedules.  Deliver to Agent on or before the fifteenth (15th) day of each month as and for the prior month (a) accounts receivable agings inclusive of reconciliations to the general ledger, (b) accounts payable schedules inclusive of reconciliations to the general ledger, (c) Inventory reports, and (d) a Borrowing Base Certificate in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement). In addition, each Borrower will deliver to Agent at such intervals as Agent may require:  (i) confirmatory assignment schedules, (ii) copies of Customer's invoices, (iii) evidence of shipment or delivery, and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications, including without limitation weekly reports of sales, collections and credits.  Agent shall have the right to confirm and verify all Receivables by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder.  The items to be provided under this Section are to be in form satisfactory to Agent and executed by each Borrower and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Borrower's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

9.3.   Environmental Reports.  Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8, with a certificate signed by the President of Borrowing Agent stating, to the best of his knowledge, that each Borrower is in compliance in all material respects with all federal, state and local Environmental Laws.  To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action such Borrower will implement in order to achieve full compliance.

9.4.   Litigation.  Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Borrower, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

9.5.   Material Occurrences.  Promptly notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any event of default under the Subordinated Loan Documentation; (c) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under the Subordinated Loan Documentation; (d) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Borrower as of the date of such statements; (e) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (f) each and every default by any Borrower which might result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or

could be accelerated, and the amount of such Indebtedness; and (g) any other development in the business or affairs of any Borrower which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Borrowers propose to take with respect thereto.

9.6.   Government Receivables.  Notify Agent immediately if any of its Receivables arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them.

9.7.   Annual Financial Statements.  Furnish Agent within 120 days after the end of each fiscal year of Borrowers, financial statements of Borrowers on a consolidating and consolidated basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by an independent certified public accounting firm selected by Borrowers and satisfactory to Agent (the "Accountants").  The report of the Accountants shall be accompanied by a statement of the Accountants certifying that (i) they have caused this Agreement to be reviewed, (ii) in making the examination upon which such report was based either no information came to their attention which to their knowledge constituted an Event of Default or a Default under this Agreement or any related agreement or, if such information came to their attention, specifying any such Default or Event of Default, its nature, when it occurred and whether it is continuing, and such report shall contain or have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 6.5, 7.4, 7.5, 7.6, 7.7, 7.8 and 7.11 hereof.  In addition, the reports shall be accompanied by a Compliance Certificate.

9.8.   [intentionally omitted]

9.9.   Monthly Financial Statements.  Furnish Agent within thirty (30) days after the end of each month, an unaudited balance sheet of Borrowers on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year end adjustments that individually and in the aggregate are not material to Borrowers' business.  The reports shall be accompanied by a Compliance Certificate.

9.10.   Other Reports.  Furnish Agent as soon as available, but in any event within ten (10) days after the issuance thereof, (i) with copies of such financial statements, reports and returns as each Borrower shall send to its stockholders, and (ii) copies of all notices, reports, financial statements and other materials sent pursuant to the Subordinated Loan Documentation. In addition, Borrower shall furnish to Agent the following:  (i) within 60 days after the date hereof, monthly projections for Borrower's 2006 fiscal year, showing projected revenue and net profit, in such form as Agent shall specify, which shall be satisfactory to Agent in its discretion, and (ii) within 30 days after the date hereof, balance sheet of Sub as of the closing of the acquisition of Sub by Parent, prepared in accordance with GAAP applied on a basis consistent

69

with prior practices, and in reasonable detail and audited by the Accountants, which balance sheet shall be satisfactory to Agent in its discretion (exercised in good faith).

9.11.  Additional Information.  Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without the necessity of any request by Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening of any new office or place of business or any Borrower's closing of any existing office or place of business, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Borrower is a party or by which any Borrower is bound.

9.12.  Projected Operating Budget.  Furnish Agent, no later than thirty (30) days prior to the beginning of each Borrower's fiscal years commencing with fiscal year 2006, a month by month projected operating budget and cash flow of Borrowers on a consolidated and consolidating basis for such fiscal year (including an income statement for each month and a balance sheet as at the end of the last month in each fiscal quarter), such projections to be accompanied by a certificate signed by the President or Chief Financial Officer of each Borrower to the effect that such projections have been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared.

9.13.  Variances From Operating Budget.  Furnish Agent, concurrently with the delivery of the financial statements referred to in Section 9.7 and each monthly report, a written report summarizing all material variances from budgets submitted by Borrowers pursuant to Section 9.12 and a discussion and analysis by management with respect to such variances.

9.14.  Notice of Suits, Adverse Events.  Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Body or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by any Borrower with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Borrower.

9.15.  ERISA Notices and Requests.  Furnish Agent with immediate written notice in the event that (i) any Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any  Borrower or any member of the Controlled Group knows or has reason to know

70

that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter; (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice; (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

9.16. <u>Additional Documents</u>.    Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

X    EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1. <u>Nonpayment</u>.    Failure by any Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or by notice of intention to prepay, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document;

10.2. <u>Breach of Representation</u>.    Any representation or warranty made or deemed made by any Borrower in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

10.3. <u>Financial Information</u>.    Failure by any Borrower to (i) furnish financial information when due or when requested, or (ii) permit the inspection of its books or records;

**Exhibit "2"**

10.4. <u>Judicial Actions</u>. Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's Inventory or Receivables or against a material portion of any Borrower's other property which is not stayed or lifted within thirty (30) days;

10.5. <u>Noncompliance</u>. Except as otherwise provided for in Sections 10.1, 10.3 and 10.5(ii), (i) failure or neglect of any Borrower to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document or any other agreement or arrangement, now or hereafter entered into between any Borrower and Agent or any Lender, or (ii) failure or neglect of any Borrower to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.6, 4.7, 4.9, 4.13, 4.14, 4,19, 6.1, 6.3, 6.4, 9.4 or 9.6 hereof which is not cured within ten (10) days from the occurrence of such failure or neglect;

10.6. <u>Judgments</u>. Any judgment or judgments are rendered against any Borrower for an aggregate amount in excess of $250,000 or against all Borrowers for an aggregate amount in excess of $250,000 and (i) enforcement proceedings shall have been commenced by a creditor upon such judgment, (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) any such judgment results in the creation of a Lien upon any of the Collateral (other than a Permitted Encumbrance);

10.7. <u>Bankruptcy</u>. Any Borrower shall (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vi) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (vii) take any action for the purpose of effecting any of the foregoing;

10.8. <u>Inability to Pay</u>. Any Borrower shall admit in writing its inability, or be generally unable, to pay its debts generally as they become due or cease operations of its present business;

10.9. <u>Affiliate Bankruptcy</u>. Any Subsidiary of any Borrower shall (i) apply for, consent to or suffer the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or similar fiduciary of itself or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

72

10.10. <u>Material Adverse Effect</u>. Any change in any Borrower's results of operations or condition (financial or otherwise) which in Agent's opinion (exercised in good faith) has a Material Adverse Effect;

10.11. <u>Lien Priority</u>. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest;

10.12. <u>Subordinated Loan Default</u>. An event of default has occurred under any of the Subordinated Loan Documentation or the Subordination Agreement, which default shall not have been cured or waived in writing within any applicable grace period;

10.13. <u>Cross Default</u>. A default of the obligations of any Borrower under any other agreement to which it is a party shall occur which materially and adversely affects its condition, affairs or prospects (financial or otherwise) which default is not cured within any applicable grace period;

10.14. [intentionally omitted]

10.15. <u>Change of Ownership</u>. Any Change of Ownership or Change of Material Officer shall occur;

10.16. <u>Invalidity</u>. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on Borrower, or any Borrower shall so claim in writing to Agent or any Lender;

10.17. <u>Licenses</u>. (i) Any Governmental Body shall (A) revoke, terminate, suspend or adversely modify any license, permit, patent trademark or tradename of any Borrower, the continuation of which is material to any Borrower's business, or (B) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (c) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Borrower's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; (ii) any agreement which is necessary or material to the operation of any Borrower's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination, and such revocation or termination and non-replacement would reasonably be expected to have a Material Adverse Effect;

10.18. <u>Seizures</u>. Any portion of the Collateral shall be seized or taken by a Governmental Body, or any Borrower or the title and rights of any Borrower of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit or other proceeding which might, in the opinion of Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents;

10.19. <u>Operations</u>. The operations of any Borrower's manufacturing facility are interrupted at any time for more than seven consecutive days (except for interruption for up to

ten days in connection with the presently contemplated consolidation of Borrower's operations), unless such Borrower shall (i) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to assure that its per diem cash needs during such period is at least equal to its average per diem cash needs for the consecutive three month period immediately preceding the initial date of interruption and (ii) receive such proceeds in the amount described in clause (i) preceding not later than thirty (30) days following the initial date of any such interruption; provided, however, that notwithstanding the provisions of clauses (i) and (ii) of this section, an Event of Default shall be deemed to have occurred if such Borrower shall be receiving the proceeds of business interruption insurance for a period of thirty (30) consecutive days; or

10.20. Pension Plans. An event or condition specified in Sections 7.16 or 9.15 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect.

XI    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1. Rights and Remedies.

(a)    Upon the occurrence of (i) an Event of Default pursuant to Section 10.7 all Obligations shall be immediately due and payable and this Agreement and the obligation of Lenders to make Advances shall be deemed terminated; and (ii) any of the other Events of Default and at any time thereafter (such default not having previously been cured), at the option of Required Lenders all Obligations shall be immediately due and payable and Lenders shall have the right to terminate this Agreement and to terminate the obligation of Lenders to make Advances; and (iii) a filing of a petition against any Borrower in any involuntary case under any state or federal bankruptcy laws, all Obligations shall be immediately due and payable and the obligation of Lenders to make Advances hereunder shall be terminated other than as may be required by an appropriate order of the bankruptcy court having jurisdiction over such Borrower. Upon the occurrence of any Event of Default, Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it

74

being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by each Borrower. In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Borrower's (a) trademarks, trade styles, trade names, patents, patent applications, copyrights, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof. Noncash proceeds will only be applied to the Obligations as they are converted into cash. If any deficiency shall arise, Borrowers shall remain liable to Agent and Lenders therefor.

> (b)    To the extent that Applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for the Agent (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Borrower, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Each Borrower acknowledges that the purpose of this Section 11.1(b) is to provide non-exhaustive indications of what actions or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.1(b). Without limitation upon the foregoing, nothing contained in this Section 11.1(b) shall be

Exhibit "2"

construed to grant any rights to any Borrower or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.1(b).

11.2. Agent's Discretion. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder.

11.3. Setoff. Subject to Section 14.12, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence of an Event of Default hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Borrower's property held by Agent and such Lender to reduce the Obligations.

11.4. Rights and Remedies not Exclusive. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

11.5. Allocation of Payments After Event of Default. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations or any other amounts outstanding under any of the Other Documents or in respect of the Collateral may, at Agent's discretion, be paid over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of the Agent in connection with enforcing its rights and the rights of the Lenders under this Agreement and the Other Documents and any protective advances made by the Agent with respect to the Collateral under or pursuant to the terms of this Document;

SECOND, to payment of any fees owed to the Agent;

THIRD, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of the Lenders in connection with enforcing its rights under this Agreement and the Other Documents or otherwise with respect to the Obligations owing to such Lender;

FOURTH, to the payment of all of the Obligations consisting of accrued fees and interest;

FIFTH, to the payment of the outstanding principal amount of the Obligations (including the payment or cash collateralization of any outstanding Letters of Credit);

SIXTH, to all other Obligations and other obligations which shall have become due and payable under the Other Documents or otherwise and not repaid pursuant to clauses "FIRST" through "FIFTH" above; and

76

SEVENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of the Lenders shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding Advances held by such Lender bears to the aggregate then outstanding Advances) of amounts available to be applied pursuant to clauses "FOURTH", "FIFTH" and "SIXTH" above; and (iii) to the extent that any amounts available for distribution pursuant to clause "FIFTH" above are attributable to the issued but undrawn amount of outstanding Letters of Credit, such amounts shall be held by the Agent in a cash collateral account and applied (A) first, to reimburse the Issuer from time to time for any drawings under such Letters of Credit and (B) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "FIFTH" and "SIXTH" above in the manner provided in this Section 11.5.

XII    WAIVERS AND JUDICIAL PROCEEDINGS.

12.1.  Waiver of Notice.  Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2.  Delay.  No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3.  Jury Waiver.  **EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

XIII    EFFECTIVE DATE AND TERMINATION.

77

13.1. <u>Term</u>. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Borrower, Agent and each Lender, shall become effective on the date hereof and shall continue in full force and effect until November 2, 2008 (the "Term") unless sooner terminated as herein provided. Borrowers may terminate this Agreement at any time upon ninety (90) days' prior written notice upon payment in full of the Obligations. In the event the Obligations are prepaid in full prior to the last day of the Term (the date of such prepayment hereinafter referred to as the "Early Termination Date"), Borrowers shall pay to Agent for the benefit of Lenders an early termination fee in an amount equal to (x) $75,000 if the Early Termination Date occurs on or after the Closing Date to and including the date immediately preceding the first anniversary of the Closing Date, (y) $50,000 if the Early Termination Date occurs on or after the first anniversary of the Closing Date to and including the date immediately preceding the second anniversary of the Closing Date, and (z) $37,500 if the Early Termination Date occurs on or after the second anniversary of the Closing Date to and including the date immediately preceding the third anniversary of the Closing Date. The Term Loan may be prepaid at any time, in whole or in part, without premium or penalty (except as set forth in this Agreement with respect to Eurodollar Rate Loans), any such prepayments to be applied to the installments thereon in the inverse order of their maturity.

13.2. <u>Termination</u>. The termination of the Agreement shall not affect any Borrower's, Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated. The security interests, Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been indefeasibly paid and performed in full after the termination of this Agreement or each Borrower has furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto. Accordingly, each Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations have been indefeasibly paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are indefeasibly paid and performed in full.

XIV   REGARDING AGENT.

14.1. <u>Appointment</u>. Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents. Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in Sections 2.3(a) and 2.4), charges and collections (without giving effect to any collection days) received pursuant to this

Exhibit "2"

Agreement, for the ratable benefit of Lenders. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

14.2. Nature of Duties. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. As between Agent and Lenders, neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct, or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower. The duties of Agent as respects the Advances to Borrowers shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

14.3. Lack of Reliance on Agent and Resignation. Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default.

Exhibit "2"

Agent may resign on sixty (60) days' written notice to each of Lenders and Borrowing Agent and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers.

Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article XIV shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

14.4.  **Certain Rights of Agent**. If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

14.5.  **Reliance**. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

14.6.  **Notice of Default**. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.7.  **Indemnification**. To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent in proportion to its respective portion of the Advances (or, if no Advances are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses,

damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct.

14.8. <u>Agent in its Individual Capacity</u>.  With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender.  Agent may engage in business with any Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.9. <u>Delivery of Documents</u>.  To the extent Agent receives financial statements required under Sections 9.7, 9.9, 9.12 and 9.13 or Borrowing Base Certificates from any Borrower pursuant to the terms of this Agreement which any Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders.

14.10. <u>Borrowers' Undertaking to Agent</u>.  Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.11. <u>No Reliance on Agent's Customer Identification Program</u>.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any Borrower, its Affiliates or its agents, this Agreement, the Other Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any record-keeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or such other laws.

14.12. <u>Other Agreements</u>.  Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or any deposit accounts of any Borrower now or hereafter maintained with such Lender.  Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

XV   . BORROWING AGENCY.

15.1. <u>Borrowing Agency Provisions</u>.

(a)     Each Borrower hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)     The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request. Neither Agent nor any Lender shall incur liability to Borrowers as a result thereof. To induce Agent and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 15.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party.

(c)     All Obligations shall be joint and several, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted to Agent or any Lender to any Borrower, failure of Agent or any Lender to give any Borrower notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Borrower, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof. Each Borrower waives all suretyship defenses.

15.2. <u>Waiver of Subrogation</u>. Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

XVI   MISCELLANEOUS.

16.1. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applied to contracts to be performed wholly within the State of New York. Any judicial proceeding brought by or against any Borrower with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement

82

**Exhibit "2"**

may be brought in any court of competent jurisdiction in the State of New York, United States of America, and, by execution and delivery of this Agreement, each Borrower accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. Each Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 16.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the Agent's option, by service upon Borrowing Agent which each Borrower irrevocably appoints as such Borrower's agent for the purpose of accepting service within the State of New York. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent or any Lender to bring proceedings against any Borrower in the courts of any other jurisdiction. Each Borrower waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Each Borrower waives the right to remove any judicial proceeding brought against such Borrower in any state court to any federal court. Any judicial proceeding by any Borrower against Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of New York, State of New York.

16.2. Entire Understanding.

(a) This Agreement and the documents executed concurrently herewith contain the entire understanding between each Borrower, Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Borrower's, Agent's and each Lender's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b) The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this Section 16.2 (b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Borrowers, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Borrowers thereunder or the conditions, provisions or terms thereof of waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall, without the consent of all Lenders:

(i) increase the Commitment Percentage, the maximum dollar commitment of any Lender or the Maximum Revolving Advance Amount.

Exhibit "2"

(ii)    extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrowers to Lenders pursuant to this Agreement.

(iii)    alter the definition of the term Required Lenders or alter, amend or modify this Section 16.2(b).

(iv)    release any Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $100,000.

(v)    change the rights and duties of Agent.

(vi)    permit any Revolving Advance to be made if after giving effect thereto the total of Revolving Advances outstanding hereunder would exceed the Formula Amount for more than sixty (60) consecutive Business Days or exceed one hundred and five percent (105%) of the Formula Amount.

(vii)    increase the Advance Rates above the Advance Rates in effect on the Closing Date.

(viii)    release any Guarantor.

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrowers, Lenders and Agent and all future holders of the Obligations. In the case of any waiver, Borrowers, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

In the event that Agent requests the consent of a Lender pursuant to this Section 16.2 and such Lender shall not respond or reply to Agent in writing within five (5) days of delivery of such request, such Lender shall be deemed to have consented to the matter that was the subject of the request. In the event that Agent requests the consent of a Lender pursuant to this Section 16.2 and such consent is denied, then PNC may, at its option, require such Lender to assign its interest in the Advances to PNC or to another Lender or to any other Person designated by the Agent (the "Designated Lender"), for a price equal to (i) the then outstanding principal amount thereof plus (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Borrowers. In the event PNC elects to require any Lender to assign its interest to PNC or to the Designated Lender, PNC will so notify such Lender in writing within forty five (45) days following such Lender's denial, and such Lender will assign its interest to PNC or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, PNC or the Designated Lender, as appropriate, and Agent.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied or (c)

Exhibit "2"

any other provision of this Agreement, Agent may at its discretion and without the consent of the Required Lenders, voluntarily permit the outstanding Revolving Advances at any time to exceed an amount equal to the Formula Amount (such sum, the "Overadvance Threshold Amount") by up to ten percent (10%) of the Formula Amount for up to thirty (30) consecutive Business Days (the "Out-of-Formula Loans"). If Agent is willing in its sole and absolute discretion to make such Out-of-Formula Loans, such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances consisting of Domestic Rate Loans; provided that, if Lenders do make Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the limits of Section 2.1(a). For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Receivables" or "Eligible Inventory", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Revolving Advances to exceed the Formula Amount by more than ten percent (10%), Agent shall use its efforts to have Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 16.2, the Agent is hereby authorized by Borrowers and the Lenders, from time to time in the Agent's sole discretion, (A) after the occurrence and during the continuation of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Revolving Advances to Borrowers on behalf of the Lenders which the Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement; provided, that at any time after giving effect to any such Revolving Advances the outstanding Revolving Advances do not exceed 110% of the Formula Amount.

16.3.  Successors and Assigns; Participations; New Lenders.

(a)      This Agreement shall be binding upon and inure to the benefit of Borrowers, Agent, each Lender, all future holders of the Obligations and their respective successors and assigns, except that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

(b)      Each Borrower acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to other financial institutions (each such transferee or purchaser of a participating interest, a "Participant"). Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof

Exhibit "2"

provided that Borrowers shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder and in no event shall Borrowers be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Each Borrower hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

(c)     Any Lender may with the consent of Agent which shall not be unreasonably withheld or delayed sell, assign or transfer all or any part of its rights under this Agreement and the Other Documents to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make Advances hereunder (each a "Purchasing Lender", and together with each Participant, each a "Transferee" and collectively the "Transferees"), in minimum amounts of not less than $1,000,000, pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Each Borrower hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Borrowers shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(d)     Agent shall maintain at its address a copy of each Commitment Transfer Supplement delivered to it and a register (the "Register") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrowers, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender upon the effective date of each transfer or assignment to such Purchasing Lender.

(e)     Each Borrower authorizes each Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning such Borrower which has been delivered to such Lender by or on behalf of such Borrower pursuant to this Agreement or in connection with such Lender's credit evaluation of such Borrower.

16.4.  Application of Payments.  Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations.  To the extent that any Borrower makes a payment or Agent or any Lender receives any payment or proceeds of the Collateral for any Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent or such Lender.

16.5.  Indemnity.  Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified.  Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the indemnitees described above in this Section 16.5 by any Person under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Substances and Hazardous Waste, or other Toxic Substances.  Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of Agent and Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by Agent, Lenders or Borrowers on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrowers will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the indemnitees described above in this Section 16.5 harmless from and against all liability in connection therewith.

16.6.  Notice.  Any notice or request hereunder may be given to Borrowing Agent or any Borrower or to Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section.  Subject to the provisions of Section 16.1, any notice, request,

demand, direction or other communication (for purposes of this Section 16.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Loan Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a site on the World Wide Web (a "Website Posting") if Notice of such Website Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 16.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6. Subject to the provisions of Section 16.1, any Notice shall be effective:

(a)     In the case of hand-delivery, when delivered;

(b)     If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c)     In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)     In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)     In the case of electronic transmission, when actually received;

(f)     In the case of a Website Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g)     If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to Borrowing Agent or any Borrower shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders of its receipt of such Notice.

(A)     If to Agent or PNC at:

PNC Bank, National Association
Two North Lake Avenue, Suite 440
Pasadena, California  91101
Attention:      Relationship Manager
Telephone:      (626) 432-6114
Facsimile:      (626) 432-4589

Exhibit "2"

with a copy to:

PNC Bank, National Association
Two Tower Center Boulevard
East Brunswick, New Jersey 08816
Attention:      _____
Telephone:      _____
Facsimile:      _____

with a copy to:

PNC Bank, National Association
PNC Agency Services
PNC Firstside Center
500 First Avenue, 4th Floor
Pittsburgh, Pennsylvania 15219
Attention:      Lisa Pierce
Telephone:      (412) 762-6442
Facsimile:      (412) 762-8672

with an additional copy to:

Steven G. Small, Esq.
Levy, Small & Lallas
815 Moraga Drive
Los Angeles, CA  90049
Telephone:      (310) 471-3000
Facsimile:      (310) 471-7990

(B)     If to a Lender other than Agent, as specified on the signature pages hereof

(C)     If to any Borrower:

PCA Aerospace, Inc.
225 Oregon Street
El Segundo, California 90245
Attention:      Mr. David Patterson
Telephone:      (310) 322-2762
Facsimile:      (310) 322-3128

with a copy to:

Holland & Knight LLP
633 W. 5th Street, Suite 2100
Los Angeles, California  90071
Attention:      Tasha Nguyen, Esq.

89

**Exhibit "2"**

Telephone:    (213) 896-2400
Facsimile:    (213) 896-2450

16.7.  Survival.  The obligations of Borrowers under Sections 2.2(f), 3.7, 3.8, 3.9, 4.19(h), and 16.5 and the obligations of Lenders under Section 14.7, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

16.8.  Severability.  If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

16.9.  Expenses.  All costs and expenses including reasonable attorneys' fees (including the allocated costs of in house counsel) and disbursements incurred by Agent on its behalf or on behalf of Lenders and Lenders (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement, the Subordination Agreement or any consents or waivers hereunder or thereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, or maintaining, preserving or enforcing any of Agent's or any Lender's rights hereunder, under the Subordination Agreement and under all related agreements, documents and instruments, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's or any Lender's transactions with any Borrower, or any Subordinated Lender or (e) in connection with any advice given to Agent or any Lender with respect to its rights and obligations under this Agreement, the Subordination Agreement and all related agreements, documents and instruments, may be charged to Borrowers' Account and shall be part of the Obligations.

16.10.  Injunctive Relief.  Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.11.  Consequential Damages.  Neither Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Borrower (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

16.12.  Captions.  The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

16.13.  Counterparts; Facsimile Signatures.  This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so

90

executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

16.14. <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

16.15. <u>Confidentiality; Sharing Information</u>.

Agent, each Lender and each Transferee shall hold all non-public information obtained by Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Agent, each Lender and each Transferee may disclose such confidential information (a) to its examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to Agent, any Lender or to any prospective Transferees, and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law or court order, Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Borrower of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall Agent, any Lender or any Transferee be obligated to return any materials furnished by any Borrower other than those documents and instruments in possession of Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated. Each Borrower acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Borrower hereby authorizes each Lender to share any information delivered to such Lender by such Borrower and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 16.15 as if it were a Lender hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement.

16.16. <u>Publicity</u>. Each Borrower and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Borrowers, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

16.17. <u>Certifications From Banks and Participants; US PATRIOT Act</u>. Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States

of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

-5

**Exhibit "2"**

Each of the parties has signed this Agreement as of the day and year first above written.

ATTEST:

PCA AEROSPACE, INC.

By: _____
Name: DAVID L. PATTERSON
Title: EVP + CFO

ATTEST:

PCA AEROSTRUCTURES COMPANY

By: _____
Name: David L. Patterson
Title: EVP & CFO

PNC BANK, NATIONAL ASSOCIATION,
as Lender and as Agent

By: _____
Paul A. Krupela, Vice President

Commitment Percentage: 100%

**Exhibit "2"**

STATE OF CALIFORNIA ) 
) ss.
COUNTY OF LOS ANGELES )

On November 2, 2005, before me, the undersigned, Robin Carol Dunn, a Notary Public in and for said State, personally appeared _David L. Patterson_ , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature _Robin Carol Dunn_

(Seal)

```
ROBIN CAROL DUNN
Commission # 1423340
Notary Public - California
Los Angeles County
My Comm. Expires Jun 9, 2007
```

STATE OF CALIFORNIA ) 
) ss.
COUNTY OF LOS ANGELES )

On November 2, 2005, before me, the undersigned, Robin Carol Dunn, a Notary Public in and for said State, personally appeared _David L. Patterson_ , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature _Robin Carol Dunn_

(Seal)

```
ROBIN CAROL DUNN
Commission # 1423340
Notary Public - California
Los Angeles County
My Comm. Expires Jun 9, 2007
```

**Exhibit "2"**

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )


On November 2, 2005, before me, the undersigned, Robin Carol Dunn, a Notary Public in and for said State, personally appeared _Paul A. Krupela_____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.


Witness my hand and official seal.


Signature _Robin Carol Dunn_____


(Seal)

ROBIN CAROL DUNN
Commission # 1423340
Notary Public - California
Los Angeles County
My Comm. Expires Jun 9, 2007

**Exhibit "2"**

## LIST OF EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit 1.2A | Borrowing Base Certificate |
| Exhibit 1.2B | Compliance Certificate |
| Exhibit 2.1(a) | Revolving Credit Note |
| Exhibit 2.4 | Term Note |
| Exhibit 5.5(b) | Financial Projections |
| Exhibit 8.1(k) | Financial Condition Certificate |
| Exhibit 16.3 | Commitment Transfer Supplement |

Schedules

| | |
|---|---|
| Schedule 1.2 | Permitted Encumbrances |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.15(h) | Deposit and Investment Accounts |
| Schedule 5.1 | Consents |
| Schedule 5.2(a) | States of Qualification and Good Standing |
| Schedule 5.2(b) | Subsidiaries |
| Schedule 5.4 | Federal Tax Identification Number |
| Schedule 5.6 | Prior Names |
| Schedule 5.8(b) | Litigation |
| Schedule 5.8(d) | Plans |
| Schedule 5.9 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 5.10 | Licenses and Permits |
| Schedule 5.14 | Labor Disputes |

## UCC FINANCING STATEMENT
FOLLOW  INSTRUCTIONS (front and back) CAREFULLY

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:42 PM 10/19/2005
INITIAL FILING NUM: 5324596 7
AMENDMENT    NUMBER: 0000000
SRV: 050855408

A. NAME & PHONE OF CONTACT AT FILER [optional]
Robin Dunn                310-471-3000

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Levy, Small & Lallas
815 Moraga Drive
Los Angeles, CA  90049

rdunn@lsl-la.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PCA AEROSTRUCTURES COMPANY | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 17800 GOTHARD STREET | HUNTINGTON BEACH | CA | 92647 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Delaware | 2911992 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2 NORTH LAKE AVENUE, SUITE 440 | PASADENA | CA | 91101 | USA |

4. This FINANCING STATEMENT covers the following collateral:

Debtor grants Secured Party a security interest in all assets of the Debtor, of every kind and nature, now
existing and hereafter acquired and arising and wherever located, including without limitation, accounts
(including health-care-insurance receivables and credit card receivables), deposit accounts, commercial tort
claims, letter of credit rights, chattel paper (including electronic chattel paper) documents, instruments,
investment property, general intangibles (including payment intangibles), software, goods, inventory,
equipment, furniture and fixtures, all supporting obligations of the foregoing, and all cash and non-cash
proceeds and products (including without limitation insurance proceeds) of the foregoing, and all additions and
accessions thereto, substitutions therefore and replacements thereof.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum | | ☐ Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | F#141620 | |
| Ref# 1286.3937-DE - Secretary of State | | | L023049 | | A#228796 | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Exhibit "3"

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Christopher P. O'Connell, Esq.  (213) 683-6500

**B. SEND ACKNOWLEDGEMENT TO: (Name and Address)**

SAC 269879 CE

First Corporate
s o l u t i o n s

32 Loockerman Square,
Ste. 101D
Dover, DE 19904

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:17 PM 09/02/2008
INITIAL FILING # 5324596 7
AMENDMENT      # 2008 3044722
SRV: 080918215

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
5324596 7   (Delaware)

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| | ADDL INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | ☐ NONE |
|---|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**See attached list.**

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PNC Bank, National Association | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) — CALIFORNIA (REV. 01/01/08)

Exhibit "3"

| | |
|---|---|
| 1 | CINCINNATI MILACRON 5-AXIS 2-SPINDLE GANTRY CNC PROFILER, 10,000 RPM, 100 HP, 612" X 120" BED, X=612", Y=104", Z=28", A=+1-30°, B=+1-30°, ACRAMATIC 950 CONTROLLER, 1997,INSTALLED IN 1996, SN: 4320CO97-0008, WI (2) PORTABLE CHIP SCREENS; (1) FIXED CHIP SCREEN, WI MAYFRAN CHIP SYSTEM WI PRIMARY CONVEYOR & SEPARATOR CONVEYOR, SN: 99M3115 |
| 2 | BRIDGE CRANE, 2-TON, BOTTOM-RUNNING, SINGLE GIRDER, 60' +1- SPAN, REMOVABLE CRANEWAYS APPROX. 110' +1- |
| 3 | DEA 5-AXIS COORDINATE MEASURING MACHINE (CMM), MDL. EPSILON 3305, FULLY MOTORIZED & PROGRAMMABLE WITH X=124", Y=55", Z=55", SN 11120 |
| 4 | KOMATSU FORKLIFT, MODEL FG35ST-4, SN: 93508A, 8000#, 2-STAGE MAST, HEADLIGHTS, SOLID TIRES TOOL CRIB L SHOP, MISC. SMALL MACHINES ON |
| 5 | MISC. PLANT FLOOR: DBLE-END PEDESTAL DELTA GRINDER ROCKWELL DBLE-END PEDESTAL GRINDER CABINETS, TABLE, BENCH VISE, SHOP FURNITURE, MILWAUKEE BENCH-MODEL HEAVY DUTY ABRASIVE |
| 6 | DELTA ROCKWELL TOOL & CUTTER GRINDER, MODEL 24-150, SN UNREADABLE |
| 7 | 10" HORIZONTAL BAND SAW, NO ID |
| 8 | BUFFALO PEDESTAL DRILL, MODEL 1A RPMSTER, BELT DRIVE (NOT UNDER POWER), SN: 65-6924 |
| 9 | WILTON BELT I DISC GRINDER, MODEL 4200, SN: 80341 FRANK E JONES VERTICAL BAND SAW, MODEL B2, SN: 113 |
| 10 | CLARK-AIKEN VERTICAL CAVITY MILL, MDL. C, 410" X 125" TABLE, WI VACUUM TABLE, HYDRAULIC POWERPAK, DO MOTOR WI (2) FREQUENCY CONVERTERS (1 ACTIVE, 1 SPARE), SAID TO DATE FROM 1960's, SN NOT LOCATED |
| 11 | BETTS RISE AND FALL HORIZONTAL MILL ("SPAR MILL") VERTICAL SPINDLE, 3600 RPM, 636" X 84" TABLE, VACUUM HOLD-DOWN FOR TABLE, TRACER HEADSNN/A |
| 12 | PACIFIC HYDRAULIC PRESS BRAKE, MDL. 200-12, 200-TON, 120" WIDE X 41" THROAT, CAP: 10' X 1/4", AGE 195457 BASED ON SN, SN: 1618 |
| 13 | BRIDGEPORT SERIES I VERTICAL MILLING MACHINE, SN: 227737, PFT 42", XY DRO |
| 14 | BRIDGEPORT VERTICAL MILLING MACHINE, SN NOT AVAILABLE, ACCURITE XY DRO, PFT, VARIABLE SPEED HEAD WISN 166160 |
| 15 | MORI-SEIKI MOD. MS850, 19" X 54" ENGINE LATHE, 3-JAW CHUCK, TAILSTOCK, CROSS SLIDE, HOLE THRU SPINDLE, SN: 7171. |
| 16 | COMP AIR HYDROVANE 50 HP AIR COMPRESSOR, SN: 216-001202-A, 100 PSIG MAX PRESSURE |
| 17 | GASCOM AIR COMPRESSOR, MODEL GCM200, GAS POWERED AIR COMPRESSOR |
| 18 | LB DRYER W F LONG GRANITE SURFACE PLATE, SN: 17616,24" x 36"x 6" |
| 19 | BENDIX CORDAX DIGITAL MEASURING MACHINE, MDL. 1000, MPP-Z COMPUTER, 3-AXIS READOUT (MANUAL), SN: 2-2286-0277 |
| 20 | (2) GRANITE SURFACE PLATES AS FOLLOWS: MOJAVE GRANITE SURFACE PLATE, 48" x 72" X 8", STEEL STAND, SN: M10142 |
| 21 | 2-SECTION CANTILEVERED STEEL STORAGE RACK, OUTSIDE CHALLENGER POWERMASTER LOAD CENTER (OUTSIDE), MISC. PALLET RACKING |
| 22 | OFFICE FURNITURE & FIXTURES, INCLUDING INSPECTION DEPT., PHONE SYSTEM, ETC. |

**Exhibit "3"**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                    8008585294

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808
```

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:40 PM 05/19/2010
INITIAL FILING # 5324596 7
AMENDMENT    # 2010 1754450
SRV: 100533502

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 5324596 7 | ☐ |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial):  Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

PNC Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Debtor: PCA Aerostructures GET IT 12832 #50232707

**Exhibit "3"**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                    8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:20 PM 04/30/2015
INITIAL FILING # 5324596 7
AMENDMENT    # 2015 1851434
SRV: 150591583

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 5324596 7 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor **or** ☐ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes and provide appropriate information in items 6 and 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

PNC Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Debtor: PCA Aerostructures Company - GET IT 233339

**Exhibit "3"**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Robin Dunn                    310-471-3000

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Levy, Small & Lallas
815 Moraga Drive
Los Angeles, CA  90049

rdunn@lsl-la.com

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 05:39 PM 06/02/2015*
*INITIAL FILING # 5324596 7*
*AMENDMENT     # 2015 2344835*
*SRV: 150868718*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
5324596 7  10/19/2005

**1b.** This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. ☐

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The collateral described on Schedule II hereto that was sold by PCA Aerospace, Inc. and/or PCA Aerostructures, Inc. on or about May 29, 2015 is deleted.

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** PNC BANK, NATIONAL ASSOCIATION | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10.** OPTIONAL FILER REFERENCE DATA
Ref# 1286.3937-DE - Secretary of State; Debtor: PCA AEROSTRUCTURES COMPANY

F#141620
A#665683

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

Exhibit "3"

Garden Grove Equipment Transfer
7100 Belgrave
Attachment A to MJF Aerospace Holdings Purchase Order #1, dated 12/18/14.

Schedule II

| Qty | Description |
|---|---|
| 1 EA | (1979) CINCINNATI MILACRON 4-SPINDLE, 3-AXIS GANTRY MACHINE CENTER, VICKER ACRAMATIC 2100 CONTROL CONVERSION, 60' W. 120' BED. 30 JI.P., 3600 RPTYI.J.8:.WIDE  S/N 431879-Q005 |
| 1 EA | (1981) CINCINNATI MILACRON 3-SPINDLE, 5-JAXIS GANTRY MACHINE CENTER, 60' BED.120" WIDTH, 30 H.P.. 3600 RPM SPINDLE, AC 950 CONTROLS S/N 4318-81-35 |
| 2 Ea | (2) TRADEMARK 2 TON STAND ALONE TRAVELLING BRIDGE CRANES, 90' X I 20' RAILS W/ SUPPORTS  L S/N 260408 |
| 1 EA | KOMATSU MOD. FG35ST-7.14000 I.B.LPG FORKLWt S/N 102310A |
| 1 EA | CROWN MOD. RF3520-45, 4500 LB. F.LEC. FORKLIFTS S/N'S 1A188249. 1A18823 |
| 1 EA | TORIT DUST COLLECTOR. |
| Half Of Total | CANTILEVER & PALLET SHELVING. |
| 1 EA | (2006) sNK MOD PM-6B, 3-SPINDLE, 3-AXIS GANTRY PROFILER. FANUC 15IM CONTROLS, 70' X 12' TABLE. 84" Y-TRAVEL, 865"X TRAVEL. 28" Z TRAVEL, (10000R PM, VACUUM PUJvfP. SNN/A |
| 1 EA | (2005)I.R. MOD. SSREP100, 100 H.P.ROTARY SCREW AIR ..C...O. MPR&-SSOR WIDRYER S/N GK6929U05333 |

MF

JSL



## Telos Legal Corp.

*A company that cares*

Name :              **PCA Aerostructures Company**

Service :           **UCC/FTL - Certified**

Jurisdiction :      **US - DE - Secretary of State**

Thru Date:          **01/08/2016**

Results :

**5 Financing Statement(s)**

**0 Federal Tax Lien(s)**

---

Reasonable care is exercised in the completion of all requests, however, as the responsibility for the accuracy
of the public records rests with the filing officer, we accept no liability for the report contained herein.

**Exhibit "4"**

# Delaware

*Page 1*

### The First State

*CERTIFICATE*

*SEARCHED JANUARY 25, 2016 AT 11:58 A.M.*
*FOR DEBTOR, PCA AEROSTRUCTURES COMPANY*

| | | | |
|---|---|---|---|
| *1 OF 5* | *FINANCING STATEMENT* | | *20052028570* |

*EXPIRATION DATE: 06/30/2020*

*DEBTOR:       PCA AEROSTRUCTURES COMPANY*

*17800 GOTHARD STREET                ADDED    06-30-05*

*HUNTINGTON BEACH, CA 92647*

*SECURED:    VINTAGE CAPITAL PARTNERS, L.P., AS AGENT*

*11611 SAN VICENTE BOULEVARD,        ADDED    06-30-05*

*10TH FLOOR                   REMOVED  09-08-08*

*LOS ANGELES, CA 90049*

*SECURED:    VINTAGE SBIC, L.P.*

*11611 SAN VICENTE BOULEVARD, 10T    ADDED    09-08-08*

*H FLOOR*

*LOS ANGELES, CA 90049*

*SECURED:    VINTAGE CAPITAL PARTNERS SIDE, L.P.*

*11611 SAN VICENTE BOULEVARD, 10T    ADDED    09-08-08*

*H FLOOR*

*LOS ANGELES, CA 90049*



Jeffrey W. Bullock, Secretary of State

Authentication: 201721661
Date: 01-25-16

**Exhibit "4"**

# Delaware

*Page 2*

### The First State

*F I L I N G   H I S T O R Y*

| | | | |
|---|---|---|---|
| 20052028570 | FILED 06-30-05 | AT 7:21 P.M. | FINANCING STATEMENT |
| 20083044698 | FILED 09-02-08 | AT 2:16 P.M. | AMENDMENT |
| 20083033949 | FILED 09-08-08 | AT 6:32 P.M. | FULL ASSIGNMENT |
| 20100017057 | FILED 01-04-10 | AT 6:42 P.M. | CONTINUATION |
| 20150009281 | FILED 01-02-15 | AT 4:09 P.M. | CONTINUATION |

*2 OF 5*          *FINANCING STATEMENT*                    *20053245967*

*EXPIRATION DATE: 10/19/2020*

DEBTOR:      PCA AEROSTRUCTURES COMPANY

17800 GOTHARD STREET          ADDED    10-19-05

HUNTINGTON BEACH, CA 92647

SECURED:    PNC BANK, NATIONAL ASSOCIATION

2 NORTH LAKE AVENUE, SUITE 440      ADDED    10-19-05

PASADENA, CA 91101

*F I L I N G   H I S T O R Y*

*20053245967    FILED 10-19-05    AT 6:42 P.M.    FINANCING STATEMENT*

Jeffrey W. Bullock, Secretary of State

20160461244-UCC11
SR# 20160375043

Authentication: 201721661
Date: 01-25-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

**Exhibit "4"**

# Delaware

*Page 3*

### The First State

| | | | |
|---|---|---|---|
| *20083044722* | *FILED 09-02-08* | *AT 2:17 P.M.* | *AMENDMENT* |
| *20101754450* | *FILED 05-19-10* | *AT 12:40 P.M.* | *CONTINUATION* |
| *20151851434* | *FILED 04-30-15* | *AT 12:20 P.M.* | *CONTINUATION* |
| *20152344835* | *FILED 06-02-15* | *AT 5:39 P.M.* | *AMENDMENT* |


*3 OF 5*          *FINANCING STATEMENT*                *20123759836*

*EXPIRATION DATE: 09/28/2017*

*DEBTOR:*        *PCA AEROSTRUCTURES COMPANY*

*17800 GOTHARD STREET*                *ADDED    09-28-12*

*HUNTINGTON BEACH, CA 92647*

*SECURED:*        *PACIFIC STANDARD EQUIPMENT LEASING, LLC*

*11611 SAN VICENTE BLVD.,*                *ADDED    09-28-12*

*10TH FLR.*

*LOS ANGELES, CA 90049*


*F I L I N G    H I S T O R Y*

*20123759836*    *FILED 09-28-12*    *AT 6:46 P.M.*    *FINANCING STATEMENT*

*20130033051*    *FILED 01-03-13*    *AT 2:55 P.M.*    *TERMINATION*



Jeffrey W. Bullock, Secretary of State

20160461244-UCC11
SR# 20160375043

Authentication: 201721661
Date: 01-25-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

**Exhibit "4"**

# Delaware

*Page 4*

### The First State

4 OF 5          FINANCING STATEMENT          20123759901

          EXPIRATION DATE: 09/28/2017
DEBTOR:     PCA AEROSTRUCTURES COMPANY

          17800 GOTHARD STREET          ADDED    09-28-12

          HUNTINGTON BEACH, CA 92647

SECURED:    PACIFIC STANDARD EQUIPMENT LEASING, LLC

          11611 SAN VICENTE BLVD.,          ADDED    09-28-12

          10TH FLR.

          LOS ANGELES, CA 90049


          F I L I N G   H I S T O R Y

     20123759901    FILED 09-28-12   AT 6:49 P.M.    FINANCING STATEMENT


     5 OF 5          FINANCING STATEMENT          20143624343

          EXPIRATION DATE: 09/10/2019
DEBTOR:     PCA  AEROSTRUCTURES COMPANY

          17800 GOTHARD STREET          ADDED    09-10-14

          HUNTINGTON, CA 92467

SECURED:    GEMCAP LENDING I, LLC



Jeffrey W. Bullock, Secretary of State

20160461244-UCC11
SR# 20160375043

Authentication: 201721661
Date: 01-25-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

**Exhibit "4"**

# Delaware

*Page 5*

### The First State

24955 PACIFIC COAST HIGHWAY, SUI          ADDED    09-10-14

TE A202

MALIBU, CA 90265


*F I L I N G   H I S T O R Y*

20143624343    FILED 09-10-14    AT 5:33 P.M.    FINANCING STATEMENT

20152331667    FILED 06-02-15    AT 12:25 P.M.   AMENDMENT


*E N D   O F   F I L I N G   H I S T O R Y*

THE UNDERSIGNED FILING OFFICER HEREBY CERTIFIES THAT THE ABOVE
LISTING IS A RECORD OF ALL PRESENTLY EFFECTIVE FINANCING STATEMENTS,
LAPSED FINANCING STATEMENTS, FEDERAL TAX LIENS AND UTILITY SECURITY
INSTRUMENTS FILED IN THIS OFFICE WHICH NAME THE ABOVE DEBTOR, PCA
AEROSTRUCTURES COMPANY AS OF JANUARY 8, 2016 AT 11:59 P.M.



Jeffrey W. Bullock, Secretary of State

20160461244-UCC11                                Authentication: 201721661
SR# 20160375043                                  Date: 01-25-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

**Exhibit "4"**

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

> Thomas A. Waldman, Esq.
> Bingham McCutchen LLP
> 355 South Grand Avenue, 44th Floor
> Los Angeles, CA 90071

*DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 07:21 PM 06/30/2005
INITIAL FILING NUM: 5202857 0
AMENDMENT   NUMBER: 0000000
SRV: 050549117*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | PCA Aerostructures Company | | | |
| OR  1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17800 Gothard Street | Huntington Beach | CA | 92647 | |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Delaware | 2911992 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR  2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | Vintage Capital Partners, L.P. | | | |
| OR  3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11611 San Vicente Boulevard, 10th Fl. | Los Angeles | CA | 90049 | |

4. This FINANCING STATEMENT covers the following collateral:

See Annex I (attached)

This Financing Statement shall at all times be subject to and subordinate in all rights to a Financing Statement filed on May 26, 2005, as number 05-7028488911, naming CapitalSource Finance LLC as the Secured Party and PCA Aerospace, Inc. as the Debtor.

| 5. ALTERNATIVE DESIGNATION [if applicable] | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)
608271;1

Template:  506485

**Exhibit "4"**

<u>Annex I</u>

DEBTOR:                    PCA AEROSTRUCTURES COMPANY

SECURED PARTY:             VINTAGE CAPITAL PARTNERS, L.P.

      The Financing Statement covers all of the following property and interests in property of Debtor, whether now owned or existing or hereafter created or acquired or arising and wheresoever located:

    (a)     Accounts;

    (b)     Certificated Securities;

    (c)     Chattel Paper;

    (d)     Commercial Tort Claims;

    (e)     Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

    (f)     Contract Rights;

    (g)     Deposit Accounts;

    (h)     Documents;

    (i)     Electronic Chattel Paper;

    (j)     Equipment;

    (k)     Financial Assets;

    (l)     Fixtures;

    (m)    General Intangibles, including Payment Intangibles and Software;

    (n)    Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

    (o)     Instruments;

    (p)     Patents, patent applications, trademarks, trademark applications, copyrights,

LA/40296572.1

copyright applications, and all other intellectual property;

    (q)    Inventory;

    (r)    Investment Property;

    (s)    Money (of every jurisdiction whatsoever);

    (t)    Letter-of-Credit Rights;

    (u)    Payment Intangibles;

    (v)    Security Entitlements;

    (w)    Software;

    (x)    Supporting Obligations;

    (y)    Uncertificated Securities; and

    (z)    to the extent not included in the foregoing, all other personal property of any kind or description;

together with all books, records, writings, databases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing; and all Proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that the Collateral shall not include, and no security interest is hereby granted with respect to, that certain Kolb Varimat, 5 axis, single-spindle, high speed CNC Gantry type vertical mill machine owned by Aerostructures; and provided further that to the extent that the provisions of any license, permit, lease or contract expressly prohibit (which prohibition is enforceable under applicable law) any assignment thereof, and the grant of security interest therein, the Secured Party will not enforce the security interest in that Obligor's rights under such license, permit, lease or contract (other than in respect of the Proceeds thereof) for so long as such prohibition continues, it being understood that upon request of the Secured Party, such Obligor will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of the Secured Party (and to enforcement by the Secured Party of such security interest) in the Obligor's rights under such license, permit, lease or contract.

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:32 PM 09/08/2008
INITIAL FILING # 5202857 0
AMENDMENT    # 2008 3033949
SRV: 080935358

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Kimberley Lathrop          213-680-6651

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
┌                                            ┐
  BINGHAM MCCUTCHEN LLP

  355 South Grand Avenue

  Los Angeles, CA  90071


  kimberley.lathrop@bingham.com
└                                            ┘
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 52028570  6/30/2005 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☒ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| VINTAGE CAPITAL PARTNERS SIDE, L.P. | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11611 San Vicente Boulevard, 10th Floor | Los Angeles | CA | 90049 | USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| VINTAGE CAPITAL PARTNERS, L.P. | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 10. OPTIONAL FILER REFERENCE DATA | | |
|---|---|---|
| Filed with: DE - Secretary of State; Debtor: PCA AEROSTRUCTURES COMPANY  L043176    1 pg attached | | F#230957 A#345251 |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

Exhibit "4"

**UCC FINANCING STATEMENT AMENDMENT ADDITIONAL PARTY**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**14. INITIAL FINANCING STATEMENT FILE #** (same as item 1a on Amendment form)
52028570   6/30/2005

**15. NAME OF PARTY AUTHORIZING THIS AMENDMENT** (same as item 9 on Amendment form)

| 15a. ORGANIZATION'S NAME |
|---|
| VINTAGE CAPITAL PARTNERS, L.P. |

OR

| 15b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|

**16. MISCELLANEOUS**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**17. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (17a or 17b) - do not abbreviate or combine names

| 17a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 17b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 17c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 17d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 17e. TYPE OF ORGANIZATION | 17f. JURISDICTION OF ORGANIZATION | 17g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

**18. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (18a or 18b) - do not abbreviate or combine names

| 18a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 18b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 18c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 18d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 18e. TYPE OF ORGANIZATION | 18f. JURISDICTION OF ORGANIZATION | 18g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

**19. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (19a or 19b) - do not abbreviate or combine names

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 19b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 19d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 19e. TYPE OF ORGANIZATION | 19f. JURISDICTION OF ORGANIZATION | 19g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

**20. ADDITIONAL SECURED PARTY'S NAME** (or Name of TOTAL ASSIGNEE) - insert only one name (20a or 20b)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| VINTAGE SBIC, L.P. | | | |

OR

| 20b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 11611 San Vicente Boulevard, 10th Floor | Los Angeles | CA | 90049 | USA |

**21. ADDITIONAL SECURED PARTY'S NAME** (or Name of TOTAL ASSIGNEE) - insert only one name (21a or 21b)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 21b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT ADDITIONAL PARTY (FORM UCC3AP) (REV. 05/22/02)

**Exhibit "4"**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**Christopher P. O'Connell, Esq.    (213) 683-6500**

**B. SEND ACKNOWLEDGEMENT TO: (Name and Address)**

SAC 269879 CE

First Corporate solutions

32 Loockerman Square,
Ste. 101D
Dover, DE 19904

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:16 PM 09/02/2008
INITIAL FILING # 5202857 0
AMENDMENT      # 2008 3044698
SRV: 080918205

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**

**5202857 0  (Delaware)**

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.     ☐ DELETE name: Give record name to be deleted in item 6a or 6b.     ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **OR** 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | | | | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See attached list.

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Vintage Capital Partners, L.P.** | | | |
| **OR** 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**10. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) — CALIFORNIA (REV. 01/01/08)

**Exhibit "4"**

| | |
|---|---|
| 1 | **CINCINNATI MILACRON 5-AXIS 3-SPINDLE GANTRY** CNC PROFILER, 10,000 RPM, 100 HP, 612" X 120" BED, X=612", Y=104", Z=28", A=+1-30°, B=+1-30°, ACRAMATIC 950 CONTROLLER, 1997,INSTALLED IN 1998, S/N: 4329COI97-0008, WI (2) PORTABLE CHIP SCREENS; (1) FIXED CHIP SCREEN, WI MAYFRAN CHIP SYSTEM WI PRIMARY CONVEYOR & SEPARATOR CONVEYOR, S/N: 99M3115 |
| 2 | **BRIDGE CRANE, 2-TON, BOTTOM-RUNNING, SINGLE** GIRDER, 50' +1- SPAN, REMOVABLE CRANEWAYS APPROX. 110' +1- |
| 3 | **DEA 5-AXIS COORDINATE MEASURING MACHINE** (CMM), MDL. EPSILON 3305, FULLY MOTORIZED & PROGRAMMABLE WITH X=124", Y=56", Z=55", SN 11120 |
| 4 | **KOMATSU FORKLIFT, MODEL FG35ST-4, S/N: 955054,** 8000#, 2-STAGE MAST, HEADLIGHTS, SOLID TIRES TOOL CRIB L SHOP. MISC. SMALL MACHINES ON |
| 5 | **MISC. PLANT FLOOR:** DBLE-END PEDESTAL DELTA GRINDER ROCKWELL DBLE-END PEDESTAL GRINDER, CABINETS, TABLE, BENCH VISE, SHOP FURNITURE, MILWAUKEE BENCH-MODEL HEAVY DUTY ABRASIVE |
| 6 | **DELTA ROCKWELL TOOL & CUTTER GRINDER, MODEL** 24-150, SN UNREADABLE |
| 7 | **10" HORIZONTAL BAND SAW, NO ID** |
| 8 | **BUFFALO PEDESTAL DRILL, MODEL 1A RPMSTER,** BELT DRIVE (NOT UNDER POWER), SN: 65-6824 |
| 9 | **WILTON BELT I DISC GRINDER, MODEL 4200, S/N: 30341** **FRANK E JONES VERTICAL BAND SAW, MODEL B2,** S/N:113 |
| 10 | **CLARK-AIKEN VERTICAL CAVITY MILL, MDL. C,** 410" X 125" TABLE, WI VACUUM TABLE, HYDRAULIC POWERPAK, DC MOTOR WI (2) FREQUENCY CONVERTERS (1 ACTIVE, 1 SPARE), SAID TO DATE FROM 1950's, SN NOT LOCATED |
| 11 | **BETTS RISE AND FALL HORIZONTAL MILL ("SPAR MILL")** , VERTICAL SPINDLE, 3600 RPM, 636" X 84" TABLE, VACUUM HOLD-DOWN FOR TABLE, TRACER HEADSN/N/A |
| 12 | **PACIFIC HYDRAULIC PRESS BRAKE, MDL. 200-12,** 200-TON, 120" WIDE X 41" THROAT, CAP: 10' x 1/4", AGE 195457 BASED ON SN, SN: 1816 |
| 13 | **BRIDGEPORT SERIES I VERTICAL MILLING MACHINE,** S/N: 227737, PFT 42", XY DRO |
| 14 | **BRIDGEPORT VERTICAL MILLING MACHINE,** SN NOT AVAILABLE, ACCURITE XY DRO, PFT, VARIABLE SPEED HEAD WISN 168160 |
| 15 | **MORI-SEIKI MOD. MS850, 19" X 54" ENGINE LATHE, 3-JAW** CHUCK, TAILSTOCK, CROSS SLIDE, HOLE THRU SPINDLE, S/N: 7171. |
| 16 | **COMP AIR HYDROVANE 50 HP AIR COMPRESSOR,** S/N: 218-001202-A, 100 PSIG MAX PRESSURE |
| 17 | **GASCOM AIR COMPRESSOR, MODEL GCM200,** GAS POWERED AIR COMPRESSOR |
| 18 | **LB DRYER** W F LONG GRANITE SURFACE PLATE, SN: 17516,24" x 35"x 5' |
| 19 | **BENDIX CORDAX DIGITAL MEASURING MACHINE,** MDL. 1000, MFP-Z COMPUTER, 3-AXIS READOUT (MANUAL), S/N: 2-2288-0277 |
| 20 | **(2) GRANITE SURFACE PLATES AS FOLLOWS:** MOJAVE GRANITE SURFACE PLATE, 48" x 72" X 6", STEEL STAND, SN: M10142 |
| 21 | **2-SECTION CANTILEVERED STEEL STORAGE RACK,** OUTSIDE CHALLENGER POWERMASTER LOAD CENTER (OUTSIDE) MISC. PALLET RACKING |
| 22 | **OFFICE FURNITURE & FIXTURES, INCLUDING** INSPECTION DEPT., PHONE SYSTEM, ETC. |

**Exhibit "4"**

███████████

███████████

███████████

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

CIRIL WYATT-DONNELLY
BINGHAM McCUTCHEN LLP
THREE EMBARCADERO CENTER
SAN FRANCISCO, CA  94111

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:42 PM 01/04/2010
INITIAL FILING # 5202857 0
AMENDMENT       # 2010 0017057
SRV: 100005786

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 5202857 0 - filed in DE SOS on 06/30/2005 | ☐ |

| 2. | ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement. |
|---|---|
| 3. | ☑ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law. |
| 4. | ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9. |

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | VINTAGE CAPITAL PARTNERS SIDE, L.P. | | | |
| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

Debtor: PCA Aerostructures Company - DE SOS

Exhibit "4"

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## UCC FINANCING STATEMENT **AMENDMENT ADDENDUM**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

11. INITIAL FINANCING STATEMENT FILE # (same as item 1a on Amendment form)

**5202857 0 - filed in DE SOS on 06/30/2005**

12. NAME OF PARTY AUTHORIZING THIS AMENDMENT (same as item 9 on Amendment form)

| | 12a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| | **VINTAGE CAPITAL PARTNERS SIDE, L.P.** | | |
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
| | | | |

13. Use this space for additional information

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

Name of Additional Party Authorizing this amendment:

VINTAGE SBIC, L.P.

Exhibit "4"

# UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
MORGAN, LEWIS & BOCKIUS LLP      (213) 680-6400

B. E-MAIL CONTACT AT FILER (optional)
kimberley.lathrop@morganlewis.com

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Morgan, Lewis & Bockius LLP

355 South Grand Avenue, Suite 4400
Los Angeles, CA 90071-3106

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 04:09 PM 01/02/2015
INITIAL FILING # 5202857 0
AMENDMENT      # 2015 0009281
SRV: 150003484

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
52028570  6/30/2005

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]
(or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination
Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is
continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                                                AND  Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record      ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c      ☐ ADD name: Complete item 7a or 7b, and item 7c      ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. **CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

7. **CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 7b. INDIVIDUAL'S SURNAME | | | |
|---|---|---|---|
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:  ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral

Indicate collateral:

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| VINTAGE CAPITAL PARTNERS SIDE, L.P. | | | |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

10. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - Secretary of State; Debtor: PCA AEROSTRUCTURES COMPANY

F#456245
A#643706

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Exhibit "C"

## UCC FINANCING STATEMENT AMENDMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

19. INITIAL FINANCING STATEMENT FILE NUMBER:  Same as item 1a on Amendment form
**52028570   6/30/2005**

20. NAME OF PARTY AUTHORIZING THIS AMENDMENT:  Same as item 9 on Amendment form

20a. ORGANIZATION'S NAME
**VINTAGE CAPITAL PARTNERS SIDE, L.P.**

OR

20b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S)          SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

21. ADDITIONAL DEBTOR'S NAME:  Provide only one Debtor name (21a or 21b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

22. ADDITIONAL DEBTOR'S NAME:  Provide only one Debtor name (22a or 22b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

23. ADDITIONAL DEBTOR'S NAME:  Provide only one Debtor name (23a or 23b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

24. [X] ADDITIONAL SECURED PARTY'S NAME  or  [ ] ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (24a or 24b)

| 24a. ORGANIZATION'S NAME  **VINTAGE SBIC, L.P.** | | | |
|---|---|---|---|
| OR 24b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 24c. MAILING ADDRESS  **11611 San Vicente Boulevard, 10th Floor** | CITY  **Los Angeles** | STATE **CA**  POSTAL CODE **90049** | COUNTRY **USA** |

25. [ ] ADDITIONAL SECURED PARTY'S NAME  or  [ ] ASSIGNOR SECURED PARTY'S NAME:  Provide only one name (25a or 25b)

| 25a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 25b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 25c. MAILING ADDRESS | CITY | STATE  POSTAL CODE | COUNTRY |

26. MISCELLANEOUS

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Robin Dunn                                310-471-3000

**B. SEND ACKNOWLEDGMENT TO:**  (Name and Address)

Levy, Small & Lallas
815 Moraga Drive
Los Angeles, CA  90049

rdunn@lsl-la.com

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 06:42 PM 10/19/2005*
*INITIAL FILING NUM: 5324596 7*
*AMENDMENT   NUMBER: 0000000*
*SRV: 050855408*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PCA AEROSTRUCTURES COMPANY | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17800 GOTHARD STREET | HUNTINGTON BEACH | CA | 92647 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Delaware | 2911992 | NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PNC BANK, NATIONAL ASSOCIATION | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2 NORTH LAKE AVENUE, SUITE 440 | PASADENA | CA | 91101 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

Debtor grants Secured Party a security interest in all assets of the Debtor, of every kind and nature, now existing and hereafter acquired and arising and wherever located, including without limitation, accounts (including health-care-insurance receivables and credit card receivables), deposit accounts, commercial tort claims, letter of credit rights, chattel paper (including electronic chattel paper) documents, instruments, investment property, general intangibles (including payment intangibles), software, goods, inventory, equipment, furniture and fixtures, all supporting obligations of the foregoing, and all cash and non-cash proceeds and products (including without limitation insurance proceeds) of the foregoing, and all additions and accessions thereto, substitutions therefore and replacements thereof.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum. [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional] | | All Debtors | Debtor 1 | Debtor 2 |

| 8. OPTIONAL FILER REFERENCE DATA | |
|---|---|
| Ref# 1286.3937-DE - Secretary of State | L023099    F#141620  A#228796 |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Exhibit "4"

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Christopher P. O'Connell, Esq.   (213) 683-6500

**B. SEND ACKNOWLEDGEMENT TO: (Name and Address)**

First Corporate
s o l u t i o n s

SAC 269879 CE

32 Loockerman Square,
Ste. 101D
Dover, DE 19904

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:17 PM 09/02/2008
INITIAL FILING # 5324596 7
AMENDMENT     # 2008 3044722
SRV: 080918215

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**   5324596 7   (Delaware)

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | | | | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**See attached list.**

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME |
|---|
| **PNC Bank, National Association** |

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

**10. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) – CALIFORNIA (REV. 01/01/05)

Exhibit "4"

| | |
|---|---|
| 1 | CINCINNATI MILACRON 5-AXIS 2-SPINDLE GANTRY CNC PROFILER, 10,000 RPM, 100 HP, 512" X 120" BED, X=512", Y=104", Z=28", A=+1-30°, B=+1-30°, ACRAMATIC 950 CONTROLLER, 1997,INSTALLED IN 1998, SN: 4320CC197-0008, W/ (2) PORTABLE CHIP SCREENS; (1) FIXED CHIP SCREEN, W/ MAYFRAN CHIP SYSTEM W/ PRIMARY CONVEYOR & SEPARATOR CONVEYOR, SN: 99M3115 |
| 2 | BRIDGE CRANE, 2-TON, BOTTOM-RUNNING, SINGLE GIRDER, 60' +1- SPAN, REMOVABLE CRANEWAYS APPROX. 110' +1- |
| 3 | DEA 5-AXIS COORDINATE MEASURING MACHINE (CMM), MDL. EPSILON 3305, FULLY MOTORIZED & PROGRAMMABLE WITH X=124", Y=55", Z=55", SN 11120 |
| 4 | KOMATSU FORKLIFT, MODEL FG35ST-5, SN: 958094, 8000#, 2-STAGE MAST, HEADLIGHTS, SOLID TIRES TOOL CRIB L SHOP, MISC. SMALL MACHINES ON |
| 5 | MISC. PLANT FLOOR: DBLE-END PEDESTAL DELTA GRINDER ROCKWELL DBLE-END PEDESTAL GRINDER CABINETS, TABLE, BENCH VISE, SHOP FURNITURE, MILWAUKEE BENCH-MODEL HEAVY DUTY ABRASIVE |
| 6 | DELTA ROCKWELL TOOL & CUTTER GRINDER, MODEL 24-150, SN UNREADABLE |
| 7 | 10" HORIZONTAL BAND SAW, NO ID |
| 8 | BUFFALO PEDESTAL DRILL, MODEL 1A REMSTER, BELT DRIVE (NOT UNDER POWER), SN: 65-6924 |
| 9 | WILTON BELT I DISC GRINDER, MODEL 4200, SN: 50341 FRANK E JONES VERTICAL BAND SAW, MODEL B2, SN:113 |
| 10 | CLARK-AIKEN VERTICAL CAVITY MILL, MDL. C, .410" X 125" TABLE, W/ VACUUM TABLE, HYDRAULIC POWERPAK, DO MOTOR W/ (2) FREQUENCY CONVERTERS (1 ACTIVE, 1 SPARE), SAID TO DATE FROM 1980's, SN NOT LOCATED |
| 11 | BETTS RISE AND FALL HORIZONTAL MILL ("SPAR MILL") VERTICAL SPINDLE, 3600 RPM, 636" X 84" TABLE, VACUUM HOLD-DOWN FOR TABLE, TRACER HEAD5NN/A |
| 12 | PACIFIC HYDRAULIC PRESS BRAKE, MDL. 200-12, 200-TON, 120" WIDE X 41" THROAT, CAP: 10' x 1/4", AGE 195457 BASED ON SN, SN: 1616 |
| 13 | BRIDGEPORT SERIES I VERTICAL MILLING MACHINE, SN: 227737, PFT 42", XY DRO |
| 14 | BRIDGEPORT VERTICAL MILLING MACHINE, SN NOT AVAILABLE, ACCURITE XY DRO, PFT, VARIABLE SPEED HEAD WISN 166150 |
| 15 | MORI-SEIKI MOD. MS850, 19" X 84" ENGINE LATHE, 3-JAW CHUCK, TAILSTOCK, CROSS SLIDE, HOLE THRU SPINDLE, SN: 7171, |
| 16 | COMP AIR HYDROVANE 50 HP AIR COMPRESSOR, SN: 218-001200-A, 100 PSIG MAX PRESSURE |
| 17 | GASCOM AIR COMPRESSOR, MODEL GCM200, GAS POWERED AIR COMPRESSOR |
| 18 | LB DRYER W F LONG GRANITE SURFACE PLATE, SN: 17516,24" x 36"x 6" |
| 19 | BENDIX CORDAX DIGITAL MEASURING MACHINE, MDL. 1000, MPF-Z COMPUTER, 3-AXIS READOUT (MANUAL), SN: 2-2296-0277 |
| 20 | (2) GRANITE SURFACE PLATES AS FOLLOWS: MOJAVE GRANITE SURFACE PLATE, 48" x 72" X 6", STEEL STAND, SN: M10142 |
| 21 | 2-SECTION CANTILEVERED STEEL STORAGE RACK, OUTSIDE CHALLENGER POWERMASTER LOAD CENTER (OUTSIDE). MISC. PALLET RACKING |
| 22 | OFFICE FURNITURE & FIXTURES, INCLUDING INSPECTION DEPT., PHONE SYSTEM, ETC. |

**Exhibit "4"**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                          8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 12:40 PM 05/19/2010*
*INITIAL FILING # 5324596 7*
*AMENDMENT    # 2010 1754450*
*SRV: 100533502*

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 5324596 7 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

PNC Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Debtor: PCA Aerostructures GET IT 12832 #50232707

**Exhibit "4"**

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Corporation Service Company                                    8008585294

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

CORPORATION SERVICE COMPANY

2711 CENTERVILLE ROAD

SUITE 400

WILMINGTON DE 19808

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:20 PM 04/30/2015
INITIAL FILING # 5324596 7
AMENDMENT      # 2015 1851434
SRV: 150591583

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE #<br>5324596 7 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only **one** of these two boxes.
Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. **CURRENT RECORD INFORMATION:**

| | 6a. ORGANIZATION'S NAME | | | |
|OR| | | | |
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. **CHANGED (NEW) OR ADDED INFORMATION:**

| | 7a. ORGANIZATION'S NAME | | | |
|OR| | | | |
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | |

8. **AMENDMENT (COLLATERAL CHANGE):** check only **one** box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. **NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT**
PNC Bank, National Association

10. OPTIONAL FILER REFERENCE DATA

Debtor: PCA Aerostructures Company - GET IT 233339

**Exhibit "4"**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Robin Dunn          310-471-3000

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌐Levy, Small & Lallas

815 Moraga Drive
Los Angeles, CA  90049

⌐rdunn@lsl-la.com⌐

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 05:39 PM 06/02/2015*
*INITIAL FILING # 5324596 7*
*AMENDMENT    # 2015 2344835*
*SRV: 150868718*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
5324596 7  10/19/2005

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The collateral described on Schedule II hereto that was sold by PCA Aerospace, Inc. and/or PCA Aerostructures, Inc. on or about May 29, 2015 is deleted.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | PNC BANK, NATIONAL ASSOCIATION | | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | | |

10. OPTIONAL FILER REFERENCE DATA
Ref# 1286.3937-DE - Secretary of State; Debtor: PCA AEROSTRUCTURES COMPANY     F#141620   A#665683

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

Exhibit 4

Garden Grove Equipment Transfer
7100 Belgrave
Attachment A to MJF Aerospace Holdings Purchase Order #1, dated 12/18/14.

Schedule II

| Qty | Description |
|---|---|
| 1 EA | (1979) CINCINNATI MILACRON 4-SPINDLE, 3-AXIS GANTRY MACHINE CENTER, VICKER ACRAMATIC 2100 CONTROL CONVERSION, 60' W. 120' BED. 30 JI.P., 3600 RPI'YI.J.§:.WIDE SIN 431879-Q005 |
| 1 EA | (1981) CINCINNATI MILACRON 3-SPINDLE, 5-AXIS GANTRY MACHINE CENTER. 60' BED.120" WIDTH, 30 H.P.. 3600 RPM SPINDLE, AC 950 CONTROLS SIN 4318-81-35 |
| 2 Ea | (2) TRADEMARK 2 TON STAND ALONE TRAVELLING BRIDGE CRANES, 90' X 120' RAILS W1 SUPPORTS L SIN 260408 |
| 1 EA | KOMATSU MOD. FG35ST-7.14000 LB.LPG FORKLWI SIN 102310A |
| 1 EA | CROWN MOD. RP3520-45, 4500 LB. F.LEC. FORKLIFTS SIN'S 1A188249. 1A18823 |
| 1 EA | TORIT DUST COLLECTOR. |
| Half Of Total | CANTILEVER & PALLET SHELVING. |
| 1 EA | (2006) aNK MOD PM-6B, 3-SPINDLE, 3-AXIS GANTRY PROFILER. FANUC 15iM CONTROLS, 70' X 12' TABLE. 84" Y-TRAVEL, 865"X TRAVEL. 28" Z TRAVEL, (I0000R PM, VACUUM PUJvfP. SNN/A |
| 1 EA | (2005)I.R. MOD. SSREP100, 100 H.P.ROTARY SCREW AIR ..C...O. MPR&-SSOR WIDRYER SIN GK6929U05333 |

*HF*

*JSW*

**Exhibit "4"**

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
KIMBERLEY A LATHROP    213-680-6400

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

BINGHAM MCCUTCHEN LLP
355 South Grand Avenue
Los Angeles, CA 90071

kimberley.lathrop@bingham.com

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:46 PM 09/28/2012
INITIAL FILING # 2012 3759836

SRV: 121082450

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
PCA AEROSTRUCTURES COMPANY

OR
1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17800 Gothard Street | Huntington Beach | CA | 92647 | US |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE. ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION Delaware | 1g. ORGANIZATIONAL ID #, if any ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

OR
2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
PACIFIC STANDARD EQUIPMENT LEASING, LLC

OR
3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Vintage Fund Management, LLC, 11611 San Vicente Blvd., 10th Flr. | Los Angeles | CA | 90049 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See Exhibit A (attached)

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]    ☐ All Debtors    ☐ Debtor 1    ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
Filed with: DE - Secretary of State    13 pages attached    F#357904 A#518437

EXHIBIT A
TO
UCC-1 FINANCING STATEMENT

Debtor:         PCA AEROSTRUCTURES COMPANY

Secured Party:   PACIFIC STANDARD EQUIPMENT LEASING, LLC

Description of Collateral:

All right, title and interest of Debtor in and to:

1.      all Equipment and Fixtures listed on Schedule 1 attached hereto;

2.      All books and records pertaining to such Equipment and Fixtures;

3.      All additions to and substitutions for such Equipment and Fixtures;

4.      All present and future rights, claims, remedies and privileges of Debtor pertaining to such
        Equipment and Fixtures;

5.      All general intangibles, payment intangibles, and contract rights of Debtor, in each case
        relating to such Equipment and Fixtures; and

6.      All proceeds, products and profits of such Equipment and Fixtures (including proceeds of
        proceeds, proceeds of insurance policies and claims against third parties), in each case
        whether now existing or hereafter arising or acquired.

A/75170329.2

## SCHEDULE 1

See attached.

**Exhibit "4"**



DESCRIPTION

### BUILDING #A

Leica Mod. LTD706, Port. Laser Tracker.
   S/N 2055

36" x 48" Granite Surface Plate.

(2) 16" x 72" x 144" Granite Surface Plates.

(1994) Leica Smart 310, Type 803314 Laser Inferometer
w/ PC Computer.
   S/N 039

(1990) Fadal Mod. VMC-4020, CNC Vert. Machine
Center, 20-Station A.T.C., Fadal CNC 88 Controls, Table
Vise.
   S/N 9006329

(2) (1989) Fadal Mod. VMC6030, CNC Vert. Machine
Centers, 22-Station A.T.C.'s, Fadal CNC88 Controls w/
Receiving Tanks.
   S/N 8905384
   S/N 8902118

(1994) Fadal Mod. VMC 8030, CNC Vert. Machine
Center, 22-Station ATC, Fadal CNC88 Controls.
   S/N 9303069

Brown & Sharpe Mod. 5851-12, Hite-Icator.

(2) Mitutoyo 24" Height Indicators.

Mitutoyo 18" Height Indicator.

Misc. Inspection Devices, Fixtures & Equipment.

Page 6

**Exhibit "4"**



DESCRIPTION

(1996) Cincinnati Milacron Mod. 30V, Single-Spindle, 5-Axis Gantry Type Profiler, 19' x 72' Table, 10,000 RPM, 100 H.P. Spindle, Acramatic 950 Controls, ConSep 2000 Chip Conveyor, 72" x 110" x 60" Travels.
    S/N 3239E0196-0004

Trimos Mod. TPR40H3050, Tool Setter Height Gauge.
    S/N 1421/TDV0/H-2

3 Ton Single-Girder Bridge Crane.

Aeronca Mod. 1-5, 120 Ton Stretchformer, 18' x 62" Movement, 72" Wide Jaws w/ (2) 70 Ton Overhead Rams, Max. Part 6' W x 18'L.

DoAll Mod. 1612-0, 16" Vert. Band Saw w/ Blade Welder.
    S/N 277-69614

Elephant Disc Sander.

1/2 Ton Hoist.

W.F. Wells Mod. W-9, 9" Horiz. Band Saw.
    S/N W8-94481

Greenerd No. 3 1/2, Arbor Press.

5' x 20' T-Slot Layout Table.

USATCO Mod. 6-A, Sheet Metal Shrinking & Stretching Machine.
    S/N 6087

2 1/2" x 48" x 120" Steel Layout Table.

2 1/2" x 40" x 108" Steel Layout Table.

Page 7

**Exhibit "4"**



DESCRIPTION

Aeronca No. 1-12, 1200 Ton Side Pull Stretchformer, 15'
Long Jaws, Man. 8' Wide Die w/ 300 Ton Overhead
Ram.

Aeronca No. 1-11, 800 Ton Stretchformer, 6' x 26'
Movement, 110" Wide Skin Jaws w/ (2) 100 Ton
Overhead Rams, Max. Part Size 16'W x 26'L.

Aeronca No. 1-9, 400 Ton Stretchformer, 69" x 21"
Movement, 120" Wide Skin Jaws w/ (2) 100 Ton
Overhead Rams, Max. Part Size 16'W x 26'L.

4' x 48" x 144" Steel Layout Table.

Moak 36" Vert. Band Saw.
    S/N 8132

Bridgeport 2 H.P. V.S. Vert. Mill.
    S/N 354560281V

Parlec Mod. 975, Tool Presetter.

Cincinnati Milacron Four-Gantry, 13-Spindle Profiler, 12'
x 174' Table:
Gantry #4: 3-Spindle, 5-Axis, 3600 RPM Spindles
Vickers Acromatic 2100 Controls S/N 4318-81-0034;
Gantry #5: 3-Spindle, 5-Axis, 3600 RPM Spindles
Vickers Acromatic 2100 Controls S/N 4318-81-0038;
Gantry #3: 4-Spindle, 3-Axis, 3600 RPM Spindles
Vickers Acramatic 2100 Controls S/N 4318-79-0005;
Gantry #2: 3-Spindle, 3-Axis, 3600 RPM Spindles
Vickers Acromatic 2100 Controls S/N 4318-79-0004.

Acco Mod. 5600-8-2-6-4-820-N30, 6400 Lb. Vacuum
Plate Hoist Clamp.
    S/N 86-5312

Exhibit "4"



DESCRIPTION

(2) (1983 & 1981) Cincinnati Milacron Mod. 20V80, 80"
Travel, 5-Axis CNC Hydrotels, 40" x 144" Tables,
Cincinnati Milacron Controls.
   S/N 83-4090433-1
   S/N 81-4090400-1

Cincinnati Milacron Mod. 10HC-2500-A, 4-Axis CNC
Horiz. Machine Center, 30" x 96" Table w/ (2) 30" Dia.
Rotary Index Tables.
   S/N 49954

(15) Nu-Era Tool Cabinets w/ Contents.

Indoco 12' x 30' x 10'H, 2.5 Million BTU Gas-Fired
Aging Oven.
   S/N 5572

MEC Mod. 2548HT, Scissors Lift.

Burr-King Mod. 482, 1 1/2" Belt Sander.

Arboga Mod. E830, G.H. Drill Press.
   S/N 171876

Acra-Turn Mod. LS-430, 17" x 30" Engine Lathe.
   S/N 80513

3-Ton Bridge Crane, 30' Span.

AcTek Bridge Crane, 3 Ton, 30' x 320' Span.

Misc. Maintenance Shop Tools & Equipment.

Hufford Mod. A-10, Stretchformer.  (Rebuilt 2005)

Rockwell Hardness Tester.

(10) Monorail Hoist Systems.

Page 9

**Exhibit "4"**



DESCRIPTION

Gardner Denver Mod. FAO, 150 H.P. Rotary Screw Air
Compressor.
  S/N M64709

Tennant Mod. 6400, Floor Sweeper.

(2004) Sullair Mod. SR-800, Refrig. Air Dryer.
  S/N 2612320002

(2) I.R. Mod. SSR-EP60, 60 H.P. Rotary Screw Air
Compressors.
  S/N CA4161U11018  (2011)
  S/N CA4111U10293  (2010)

(2010) I.R. Mod. IRN60H-CC, 60 H.P. Rotary Screw Air
Compressor.
  S/N NU3820U10295

(3) Vert. Air Receivers.

Motion Industries Port. Hyd. Oil Filters Pump Unit.

Delco Mark 2000, Steam Cleaner.


### YARD & ROLLINGSTOCK

(77) Sects. Dbl. Sided Cantilever Racks.

(10) Sects. Cantilever Racks.

(2) Cooling Towers.
  S/N GA2754
  S/N N/A

12' x 20' Port. Office.

12' x 40' Port. Office.

Page 10

**Exhibit "4"**



DESCRIPTION

(2) 40' Storage Containers.

(8) Port. Dump Bins.

Mark Industries Mod. 80C4X4, Telescoping Boom Manlift.
   S/N A90-M4688

(2004) Ford F250, Ext. Cab. Pick-Up Truck.
   Vin. #EA34572
   Lic. #7M34896

*(2003) International.
   Vin. #11080

*(2002) International.
   Vin. #52189

(2) EZ-Go Electric Golf Carts w/ Chargers.

EZ-Go Truck Type Electric Utility Cart w/ Charger.

Taylor-Dunn 3-Wheel Elec. Utility Cart.

Hyster Mod. H80E, 8000 Lb. L.P.G. Forklift.
#20    S/N D00SD01693D

Hyster Mod. H40XL, 4000 Lb. L.P.G. Forklift.
#25    S/N A177B143356

Hyster Mod. S150A, 13,500 Lb. L.P.G. Forklift.
#30    S/N A024D0S164D

*Hyster Mod. H60JS, 7500 Lb. L.P.G. Forklift.
#35    S/N F003D02538D

Cat Mod. 6C60K, 14000 Lb. L.P.G. Forklift.
   S/N AT8900766

Page 1)

**Exhibit "4"**

**DESCRIPTION**

Hyster Mod. H110E, 11000 Lb. L.P.G. Forklift.
#75    S/N D004D11057Y

Hyster Mod. S30MX, 2600 Lb. L.P.G. Forklift.
#45    S/N C010H02348

Hyster Mod. H25XL, 3000 Lb. L.P.G. Forklift.
#65    S/N C001B02044E

Taylor Mod. TY4SW0S, 45000 Lb. L.P.G. Forklift.
#50    S/N 11-383-101-21

Hyster 8000 Lb. L.P.G. Forklift.

Yale 3000 Lb. L.P.G. Forklift.
#70    S/N A809N11326Y

### BUILDING #B

DoAll Mod. 36-2, 36" Vert. Band Saw w/ Blade Welder.

   S/N 52-57404

Apex 16" Disc Grinder.

Craftsman Ped. Drill Press.

Bridgeport 1 1/2 H.P. V.S. Vert. Mill.
   S/N 170756

Wolverine Bronze Co. 1" x 94" x 144" Steel Layout Table.
   S/N W/S-02268

Jet Mod. 1024PY, 10" x 24" Toolroom Lathe.
   S/N H81-10-195

Page 12

**Exhibit "4"**



DESCRIPTION

2" x 36" x 240" Steel Layout Table.

(2) 14" x 72" x 96" Granite Surface Plates.

10" x 48" x 46" Granite Surface Plate.

(8) Cad Cam Stations.

HP Designjet Mod. 1055CM, Printer.

Lincoln Mod. CN655, 650 Amp. Arc Welder w/ Wire
Feed.

1 Ton Jib Hoist.

### BUILDING #C

Cincinnati Mod. 3FL, 20' x 3/4" Hyd. Sheet Metal Shear,
F.O.P.B.G..
    S/N N/A

Vacu-Lift 3200 Lb. Vacuum Plate Hoist Clamp.

Delta 10" Unisaw Table Saw.

DeWalt Radial Arm Saw.

(12) Sects. Cantilever Rack.

(4) 1 Ton Bridge Cranes, 35' Span.

### BUILDING #E

Heco Dual Girder Bridge Crane, 50 Ton & 20 Ton
Hoists, 90' Span.
    S/N 1899R

Page 13

**Exhibit "4"**



**DESCRIPTION**

Heco Dual Girder Bridge Crane, 35 Ton & 15 Ton Hoists, 90' Span.
    S/N 1899R

**Cyril Bath Mod. VTL-1000, 1250 Ton CNC Stretch Press, (28) Individual Prog. Axis & Feedback Servos, Tension/Strain Control & Tangency Sensors, 170" x 56" Sheet Cap., S Jaws, Curvature 55" Radius Min. x 70" Width, 14" Dia. Extrusion Jaws, 50' Max Part Length, Strong Back For Bullnose & Deep Drawforming, 15 Degree Jaw Oscillation, 15 Degree Yoke Oscillation, 30 Degree Jaw Rotation, 90 Degree Horiz. To Vert. Yoke Angulation, 24" Tension Cyl. Stroke, (3) Die Tables, 2250 Ton In Tandem Cap., 152" Stroke, 15 Degree Tilt, 2 Position Center Die Table, Transverse & Longitudinal 1000 Ton Thrust, (2) Poutboard Die Tables, 750 Ton Thrust Each, 400 Ton Bulldozer, 60" Stroke.
    S/N M-9200

### BUILDING #D

(1983) Hassleholms Mod. PS255, 22' x 12 Ga. Pyramid Rolls.
    S/N 833084

Chicago Mod. 131, 48" x 18 Ga. Power Press Brake.
    S/N 6W-10098

Niagara 84" Sheet Metal Rolls.
    S/N N/A

Webb 6' Primary Bending Rolls.

(1986) Roundo Mod. R-4-S, 4" x 4" x 1/2" Vert. Angle Rolls.
    S/N 863818

F.A. Nugier Mod. H150-MD, 150 Ton H-Frame Press.
    S/N 1250

Page 14

**Exhibit "4"**



DESCRIPTION

Pneu. Punch.

Marchant Mod. H-30, Sheet Metal Shrinking & Stretching Machine.
 S/N N/A

Marchant Mod. 4-8, Sheet Metal Shrinking & Stretching Machine.
 S/N 44

F.A. Nugier Mod. H40, 40 Ton H-Frame Press.
 S/N 1188090

Hot Press.

1 Ton Cap. Bridge Crane, 25' Span.

Pacific Mod. 400-24, 24' x 400 Ton Hyd. Press Brake.
 S/N 2701

Pacific Mod. 400-32, 32' x 400 Ton Hyd. Press Brake.
 S/N 9939

Bertsch Power Bending Rolls, 37' x 26 1/2" Dia. Rolls.
 S/N N/A

(4) Small Hyd. C-Fra,e Presses For Stretchers.

(2) Large Hyd. C-Frame Presses For Stertchers.

(8) 5' x 8' Contour Inspection Test Fixtures.

Misc. Stretchformer Parts. (Outside)

*Not Inspected & Not Installed Is The Cincinnati 5-Axis Gantry Milling Machine, 30' x 120" x 48" Travels, 24000 RPM.

Page 15

**Exhibit "4"**



DESCRIPTION

Misc. Office Equipment & Furniture Including: Office
Suites; PC Computers; Laser Printers; Fax Machines;
Copiers; Conference Room; HP DesignJet 1055CM Plus
Plotter; LAN System; Dell Poweredge 4200, 1400SC,
2400; (2) Racks.

Page 16

**Exhibit "4"**

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

3027341450

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

NATIONAL CORPORATE RESEARCH, LTD.

615 S DUPONT HWY

DOVER DE 19901

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 02:55 PM 01/03/2013
INITIAL FILING # 2012 3759836
AMENDMENT    # 2013 0033051
SRV: 130010061

---

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2012 3759836 | ☐ |

2. ☐ # TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| OR | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| OR | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|
| | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

PACIFIC STANDARD EQUIPMENT LEASING, LLC

10. OPTIONAL FILER REFERENCE DATA

DE - SOS; Debtor: PCA AEROSTRUCTURES COMPANY

**Exhibit "4"**

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
KIMBERLEY A LATHROP        213-680-6400

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

BINGHAM MCCUTCHEN LLP

355 South Grand Avenue

Los Angeles, CA  90071

kimberley.lathrop@bingham.com

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 06:49 PM 09/28/2012*
*INITIAL FILING # 2012 3759901*

*SRV: 121082461*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
PCA AEROSTRUCTURES COMPANY

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17800 Gothard Street | Huntington Beach | CA | 92647 | US |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | Delaware | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
PACIFIC STANDARD EQUIPMENT LEASING, LLC

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Vintage Fund Management, LLC, 11611 San Vicente Blvd., 10th Flr. | Los Angeles | CA | 90049 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See Annex I (attached)

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
Filed with: DE - Secretary of State                    2 pages attached

F#357902
A#518435

**Exhibit "4"**

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

<u>Annex I</u>

DEBTOR:                    PCA AEROSTRUCTURES COMPANY

SECURED PARTY:            PACIFIC STANDARD EQUIPMENT LEASING, LLC


The Financing Statement covers all of the following property and interests in property of Debtor, whether now owned or existing or hereafter created or acquired or arising and wheresoever located:

(a)      Accounts;

(b)      Certificated Securities;

(c)      Chattel Paper;

(d)      Commercial Tort Claims;

(e)      Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f)      Contract Rights;

(g)      Deposit Accounts;

(h)      Documents;

(i)      Electronic Chattel Paper;

(j)      Equipment;

(k)      Financial Assets;

(l)      Fixtures;

(m)      General Intangibles, including Payment Intangibles and Software;

(n)      Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(o)      Instruments;

(p)      Patents, patent applications, trademarks, trademark applications, copyrights, copyright applications, and all other intellectual property;

A/40296568.2

(q)     Inventory;

(r)     Investment Property;

(s)     Money (of every jurisdiction whatsoever);

(t)     Letter-of-Credit Rights;

(u)     Payment Intangibles;

(v)     Security Entitlements;

(w)     Software;

(x)     Supporting Obligations;

(y)     Uncertificated Securities; and

(z)     to the extent not included in the foregoing, all other personal property of any kind or description;

together with all books, records, writings, databases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing; and all Proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that the Collateral shall not include, and no security interest is hereby granted with respect to, that certain Kolb Varimat, 5 axis, single-spindle, high speed CNC Gantry type vertical mill machine owned by Aerostructures; and provided further that to the extent that the provisions of any license, permit, lease or contract expressly prohibit (which prohibition is enforceable under applicable law) any assignment thereof, and the grant of security interest therein, the Secured Party will not enforce the security interest in that Obligor's rights under such license, permit, lease or contract (other than in respect of the Proceeds thereof) for so long as such prohibition continues, it being understood that upon request of the Secured Party, such Obligor will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of the Secured Party (and to enforcement by the Secured Party of such security interest) in the Obligor's rights under such license, permit, lease or contract.

A/40296568.2

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

3027341450

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

NATIONAL CORPORATE RESEARCH, LTD.

615 S DUPONT HWY

DOVER DE 19901

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 05:33 PM 09/10/2014*
*INITIAL FILING # 2014 3624343*

*SRV: 141164949*

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PCA AEROSTRUCTURES COMPANY | | | | |

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17800 GOTHARD STREET | HUNTINGTON | CA | 92467 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION |
|---|---|---|
| | | |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| GEMCAP LENDING I, LLC | | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 24955 PACIFIC COAST HIGHWAY, SUITE A202 | MALIBU | CA | 90265 | US |

**4. This FINANCING STATEMENT covers the following collateral:**

(i) All "Equipment", (as such term is defined in the Uniform Commercial Code as adopted in the State of California), now owned or hereafter acquired by each Debtor, wherever located, and shall include, without limitation, the machinery and equipment set forth on Section 5.4(j) to the Borrower's Disclosure Schedule delivered to Secured Party, and all other equipment, machinery, furniture, Fixtures, computer equipment, telephone equipment, molds, tools, dies, partitions, tooling, transportation equipment, all other tangible assets used in connection with the manufacture, sale or lease of goods or rendition of services, and each Debtor's interests in any leased equipment, and all repairs, modifications, alterations, additions, controls and operating accessories, attachments and parts thereof or thereto, and all substitutions and replacements therefor; provided, that, equipment excludes molds that are owned by customers of each Debtor.

(ii) All "Fixtures" (as such term is defined in the Uniform Commercial Code as adopted in the State of California), now owned or hereafter acquired by each Debtor.

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum          [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]          [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|
| 8. OPTIONAL FILER REFERENCE DATA | | | | | |

Filed with: DE - Secretary of State

**Exhibit "4"**

# UCC FINANCING STATEMENT ADDENDUM – COLLATERAL

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| 9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT | | |
|---|---|---|
| | 9a. ORGANIZATION'S NAME | |
| OR | PCA  AEROSTRUCTURES COMPANY | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

This FINANCING STATEMENT covers the following collateral

(iii) All accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any of the property described in (i) and (ii) above, and all substitutions and replacements therefor.

(iv) All books and records relating to any of the above including, without limitation, all purchase and sale agreements, invoices, statements, correspondence, memoranda, and other data relating to the Collateral, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of each Debtor with respect to any of the foregoing maintained with or by any other person or entity).

(v) Any and all products and "Proceeds" (as such term is defined in the Uniform Commercial Code as adopted in the State of California) of the above described property in any form including, without limitation, all insurance claims, warranty claims and proceeds and claims against third parties for loss or destruction of or damage to any of the above described property.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

3027341450

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

NATIONAL CORPORATE RESEARCH, LTD.

615 S. DUPONT HWY

DOVER DE 19901

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 12:25 PM 06/02/2015
INITIAL FILING # 2014 3624343
AMENDMENT     # 2015 2331667
SRV: 150865016

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 2014 3624343 | ☐ |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION |
|---|---|

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

Collateral Description  - please see attachment

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT

GEMCAP LENDING I, LLC

10. OPTIONAL FILER REFERENCE DATA

Filed w/ DE-SOS; Debtor: PCA  AEROSTRUCTURES COMPA

**Exhibit "4"**

| Qty | Description |
|---|---|
| 1 EA | (1979) CINCINNATI ME..ACRON 4-SPINDLE, 3-AXIS GANTRY MACHINE CENTER, VICKER ACRAMATIC 2100 CONTROL. CONVERSION, 60' W. 120' BED. 30 J1.P., 3600 RPfYl.J.§;.WIDE  SIN 431879-Q005 |
| 1 EA | (1981) CINCINNATI MILACRON 3-SPINDLE. 5-JIXIS GANTRY MACHINE CENTER. 60' BED.(20" WIDTH, 30 H.P.. 3600 RPM SPINDLE, AC 950 CONTROLS SIN 4318-81-35 |
| 2 Ea | (2) TRADEMARK 2 TON STAND ALONE TRAVELLING BRIDGE CRANES, 90' X I 20' RAILS *WT* SUPPORTS L *SIN* 260408 |
| 1 EA | KOMATSU MOD. FG35ST-7.14000 LB.LPG FORKLWf *SIN* 102310A |
| 1 EA | CROWN MOD. RP3520-45, 4500 LB. F.LEC. FORKLIYfS SfN'S 1AI88249. 1A18823 |
| 1 EA | TORIT DUST COLLECTOR. |
| Half Of Total | CANTILEVER & PALLET SHELVING. |
| 1 EA | (2006) 1NK MOD PM-6B, 3-SPINDLE, 3-AXIS GANTRY PROFILER. FANUC 15IM CONTROLS, 70' X 12' TABLE, 84" V-TRAVEL, 865"X TRAVEL. 28" Z TRAVEL, (IOOOOR PM, VACUUM PUJvfP. SNN/A |
| 1 EA | (2005)J.R. MOD. SSREPIOO, 100 H.P.ROTARY SCREW AIR _.C...O. MPRE·SSOR WIDRYER SIN GK6929U05333 |

Exhibit "4"

1   Riddell Williams P.S.
    Robert N. Amkraut, Bar No. 27412
2   1001 Fourth Avenue
    Suite 4500
3   Seattle, WA 98154-1192
    Telephone:    206.624.3600
4   Facsimile:    (206) 389-1708

5   Attorneys for Fuji Heavy Industries USA, Inc. (*pro
    hac vice* application to be filed)
6

7

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  PCA Aerostructures Company,                Case No.  16-10738-SC

12              Debtor,                         Chapter Number:  7

13                                              **DECLARATION OF SATOSHI
                                                KAWAZOE**
14

15

16

17      I, Satoshi Kawazoe, declare as follows:

18  1.  I make this Declaration based on personal knowledge and on records kept in the ordinary

19      course of business.  I am competent to testify about the following matters.

20  2.  I am employed by Fuji Heavy Industries USA, Inc. ("FUSA") as its Procurement

21      Manager.  FUSA is a subsidiary of Fuji Heavy Industries Ltd. ("FHI"), a Japanese

22      company.

23  3.  FHI manufactures center wings for Boeing 777 aircraft.  FHI must provide the center

24      wings to Boeing on an agreed schedule.  A late delivery of the center wings could cause a

25      delay in the entire 777 production line.

26  4.  FHI has been doing business with PCA Aerostructures Company ("PCA") for about 20

27      years.  Among other things, PCA fabricates and finishes parts that are shipped to FHI and

28      ultimately become component parts of the center wings.

RIDDELL WILLIAMS
P.S.
ATTORNEYS AT LAW
SEATTLE

4812-8732-1134.03
65972.00001                                    DECLARATION OF SATOSHI KAWAZOE

5. As of February 25, 2016, the date PCA filed its Chapter 7 bankruptcy petition, PCA was working on eight (8) FHI purchase orders (the "Purchase Orders"). A list of the Purchase Orders is attached to this Declaration as Exhibit A. The Purchase Orders are included in Kintetsu World Express Sales, Inc.'s ("KSI") purchase order PCA-20150213REV0 to PCA attached to this Declaration as Exhibit B. KSI is FHI's agent. This work in process ("WIP") was in various states of production, but all of it will require additional work. The WIP requires further machining, painting, and other work.

6. Some of the WIP is currently in the possession of a third party subcontractor for PCA, Metal Improvement Co., Inc. (also known as Curtiss-Wright). This WIP is referenced in PCA purchaser order numbers 108609 and 108650.

7. The due dates for the Purchase Orders range from December 4, 2015 through February 12, 2016. Because the parts ordered under the Purchase Orders have still not been completed, PCA has breached all of the Purchase Orders.

8. The total agreed price for the Purchase Orders listed above, if the work was completed on time, is $107,428.

9. FHI will incur significant additional and unexpected expense to complete the WIP and to ship it by air. FHI estimates that it will incur over $80,000 of these additional expenses. These additional expenses do not include the possible cost to obtain WIP held by Metal Improvement Co., who may assert a lien on WIP in its possession. This also does not include FHI's significant administrative expenses and attorney's fees incurred in trying to resolve issues relating to the WIP.

10. If FHI obtains control of the WIP, it will immediately seek to complete the WIP and ship it to Japan by air freight. Because the WIP is in various states of incompletion, FHI does not know precisely how long it will take to complete the WIP. Our best estimate is at least 5 working days. To meet FHI production schedules, it is important to ship the WIP by March 14, 2016.

11. FHI needs to complete the WIP, and ship it to Japan as soon as possible. A delay in obtaining the WIP will delay center wing manufacturing, and ultimately delay Boeing's

RIDDELL WILLIAMS
P.S.
ATTORNEYS AT LAW
SEATTLE

4812-8732-1134.03
65972.00001                    - 2 -        DECLARATION OF SATOSHI KAWAZOE

1    777 production line. If the Boeing production line is delayed due to FHI's failure to

2    timely supply center wings, Boeing will have a large damages claim against FHI.

3    I declare under penalty of perjury that the foregoing is true and correct.

4

5    Dated: March 4, 2016

6

7                                                    Satoshi Kawazoe

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RIDDELL WILLIAMS
P.S.
ATTORNEYS AT LAW
SEATTLE

4812-8732-1134.03
65972.00001                              - 3 -        DECLARATION OF SATOSHI KAWAZOE

# EXHIBIT A

# 777 PCA Status Check List

| FHI PO# | KSI Ref.#[1] | | P/N | FHI P.O. Due Date | Ex-Fact Due Date[2] | PO Qty |
|---|---|---|---|---|---|---|
| | Issue# | PO# | | | | |
| 15009055 | 20150213 R0 | 50005000 | 111W2321-3 | 2/4/16 | 12/4/15 | 9 |
| 15009056 | 20150213 R0 | 50005001 | 111W2322-5 | 2/4/16 | 12/4/15 | 2 |
| 15009058 | 20150213 R0 | 50005003 | 111W2321-3 | 3/8/16 | 1/8/16 | 9 |
| 15009059 | 20150213 R0 | 50005004 | 111W2322-5 | 3/8/16 | 1/8/16 | 9 |
| 15009060 | 20150213 R0 | 50005005 | 111W2322-6 | 3/8/16 | 1/8/16 | 9 |
| 15009061 | 20150213 R0 | 50005006 | 111W2321-3 | 4/12/16 | 2/12/16 | 9 |
| 15009062 | 20150213 R0 | 50005007 | 111W2322-5 | 4/12/16 | 2/12/16 | 9 |
| 15009063 | 20150213 R0 | 50005008 | 111W2322-6 | 4/12/16 | 2/12/16 | 9 |

[1]  KSI refers to FHI's agent, Kiutetsu World Express Sales, Inc.

[2]  This is the date the purchase order was due from PCA.

4820-5435-7806

# EXHIBIT B

**KWE** Kintetsu World Express Sales Inc.          **PURCHASE ORDER**

| CNEE / BILL TO : | ORDER DATE |
|---|---|

KINTETSU WORLD EXPRESS SALES,INC.
e-SUPPORT SALES DEPT.
5F, TDS MITA BLDG  2-7-13 MITA
MINATO-KU, TOKYO , JAPAN

ORDER DATE: 2015/2/13

Issue # : PCA-20150213REV0

**MESSRS:**
PCA Aerostructures Company
17800 Gothard Street, Huntington Beach, CA 92647

ATTN: Mr.  John Pruett

**DELIVER TO :**
KINTETSU WORLD EXPRESS(U.S.A.), INC. Long Beach  Branch
18450 So. Wilmington Ave. Rancho Dominguez, CA90220
TEL:310-667-4500
ATTN: Mr.Bo Nara

**TRADE TERMS:**
EXW YOUR FACILITY

**PAYMENT TERMS:**
NET 45 DAYS

**SHIP VIA:**
WILL CALL

| PO NO | ITEM NO | ITEM  DESCRIPTION | UOM | QTY | UNIT PRICE US$ | AMOUNT US$ | DELIVERY REQUIREMENT DATE |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  | **PLEASE REFER TO ATTACHED SHEET(S)** |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  | **SUB TTL** |  |  |  | 342,090.00 |  |
|  |  | **GRAND TOTAL IN US DOLLAR :** |  |  |  | 342,090.00 |  |

BASIC CONTRACT BETWEEN FHI AND YOUR COMPANY IS APPLIED.
MOU FOR 2015 IS IN PROCESS OF CONCLUSION.
DOCUMENT REQUIREMENT:
- COC(CERTIFICATION OF CONFORMANCE) WILL BE REQUIRED ON ALL SHIPSET.
QC REQUIREMENT:
SPECIFICATION;
- FASOP-Q-011
- OPCCP#  AMSI-1001
PRODUCTION SOURCE INSPECTION:
- WILL BE ANNOUNCED IF NECESSARY.
FIRST ARTICLE INSPECTION (FAI):
- REQUIRED.

PLEASE ACKNOWLEDGE RECEIPT OF THIS PURCHASE ORDER BY SIGNING BELOW  AND RETURNING IT TO US.

Kintetsu World Express Sales Inc.

(Company Name) 2/18/15

PCA AEROSTRUCTURES CO.

**KWE**

**Kintetsu World Express Sales Inc.**

Issue # : PCA-20150213REV0

### PURCHASE ORDER

| No. | PO NO | ITEM NO | ITEM DESCRIPTION | UOM | QTY | UNIT PRICE US$ | AMOUNT US$ | DELIVERY REQUIREMENT DATE | NOTE | FHI PO |
|-----|-------|---------|------------------|-----|-----|----------------|------------|---------------------------|------|--------|
| 1 | 50004994 | 111W2321-3 | LOWER WEB CHORD | EA | 9 | 2,787.00 | 25,083.00 | 2015/10/16 | OPCCP-AMSI-1001 | 15009049 |
| 2 | 50004995 | 111W2322-5 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2015/10/16 | OPCCP-AMSI-1001 | 15009050 |
| 3 | 50004996 | 111W2322-6 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2015/10/16 | OPCCP-AMSI-1001 | 15009051 |
| 4 | 50004997 | 111W2321-3 | LOWER WEB CHORD | EA | 9 | 2,787.00 | 25,083.00 | 2015/11/13 | OPCCP-AMSI-1001 | 15009062 |
| 5 | 50004998 | 111W2322-5 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2015/11/13 | OPCCP-AMSI-1001 | 15009053 |
| 6 | 50004999 | 111W2322-6 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2015/11/13 | OPCCP-AMSI-1001 | 15009054 |
| 7 | 50005000 | 111W2321-3 | LOWER WEB CHORD | EA | 9 | 2,787.00 | 25,083.00 | 2015/12/4 | OPCCP-AMSI-1001 | 15009055 |
| 8 | 50005001 | 111W2322-5 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2015/12/4 | OPCCP-AMSI-1001 | 15009056 |
| 9 | 50005002 | 111W2322-6 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2015/12/4 | OPCCP-AMSI-1001 | 15009057 |
| 10 | 50005003 | 111W2321-3 | LOWER WEB CHORD | EA | 9 | 2,787.00 | 25,083.00 | 2016/1/8 | OPCCP-AMSI-1001 | 15009058 |
| 11 | 50005004 | 111W2322-5 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2016/1/8 | OPCCP-AMSI-1001 | 15009059 |
| 12 | 50005005 | 111W2322-6 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2016/1/8 | OPCCP-AMSI-1001 | 15009060 |
| 13 | 50005006 | 111W2321-3 | LOWER WEB CHORD | EA | 9 | 2,787.00 | 25,083.00 | 2016/2/12 | OPCCP-AMSI-1001 | 15009061 |
| 14 | 50005007 | 111W2322-5 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2016/2/12 | OPCCP-AMSI-1001 | 15009062 |
| 15 | 50005008 | 111W2322-6 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2016/2/12 | OPCCP-AMSI-1001 | 15009063 |
| 16 | 50005009 | 111W2321-3 | LOWER WEB CHORD | EA | 9 | 2,787.00 | 25,083.00 | 2016/3/18 | OPCCP-AMSI-1001 | 15009064 |
| 17 | 50005010 | 111W2322-5 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2016/3/18 | OPCCP-AMSI-1001 | 15009065 |
| 18 | 50005011 | 111W2322-6 | LOWER WEB CHORD | EA | 9 | 1,774.00 | 15,966.00 | 2016/3/18 | OPCCP-AMSI-1001 | 15009066 |
| | | | TOTAL | | 162 | | 342,090.00 | | | |

*close*

*close*